# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

L.G.M.L., *et al*,

       *Plaintiffs*,

v.

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security, *et al*,

       *Defendants*.

Case No.  <u>25-cv-2942-TJK</u>

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
MOTION FOR
PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION……………………………………………………………………...1

LEGAL AND FACTUAL BACKGROUND …………………………………………….....3

    A.  Protections for Unaccompanied Children Under Permanent Injunctions, the Homeland Security Act, and the Trafficking Victims Protection Reauthorization Act of 2008...................................................................................................................... 9

        *1. Early judicial interventions to remedy abuses against unaccompanied children.*........ 10

        *2. Homeland Security Act of 2002*.................................................................. 11

        *3. William Wilberforce Trafficking Victims Protection Reauthorization Act* .................. 12

           i.  Full removal proceedings.......................................................... 13

           ii.  Safe repatriation .................................................................... 14

           iii.  Access to counsel .................................................................. 16

           iv.  Other procedural protections..................................................... 17

           v.  Care in custody...................................................................... 19

LEGAL STANDARD…………………………………………………………………21

ARGUMENT ……………………………………………………………………….21

    A.  Plaintiffs Are Likely to Succeed on the Merits. .................................................. 21

        *1. Defendants' actions violates the statutory protections afforded to unaccompanied children in the TVPRA and the INA.*................................................................. 21

        *2. Plaintiffs are likely to succeed on the merits because Defendants' actions violate Due Process.*............................................................................................... 27

        *3. Plaintiffs are likely to succeed on the merits of their claim that ORR's actions violate the Accardi principle.*...................................................................................... 31

    B.  Plaintiffs will suffer irreparable harm in the absence of an injunction. ......... 35

    C.  The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction. .......................................................................... 41

    D.  The Court Should Not Require Plaintiffs to Provide Security Prior to the Preliminary Injunction. .......................................................................... 42

CONCLUSION…………………………………………………………………........42

## TABLE OF AUTHORITIES

Page(s)

Cases

*A.A.R.P. v. Trump*,
   145 S. Ct. 1364 (2025)..................................................................................................2, 29
*Abrego Garcia v. Noem*,
   777 F. Supp. 3d 501 (D. Md. 2025)...........................................................................27, 29
*Abrego Garcia v. Noem*
   145 S. Ct. 1017 (2025)..................................................................................................... 27
*Al-Hela v. Biden*,
   66 F.4th 217 (D.C. Cir. 2023) ...................................................................................26, 27
*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2024) .................................................................................... 20
*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013)........................................................................................ 26
*Am. Council of Learned Societies v. McDonald*,
   --- F. Supp. 3d ---2025 WL 2097738 (S.D.N.Y. July 25, 2025) ...................................... 2
*Barabra v. Trump*,
   --- F. Supp. 3d. ---, 2025 WL 1904338 (D.N.H. July 10, 2025) ..................................... 2
*Battle v. FAA*,
   393 F.3d 1330 (D.C. Cir. 2005)...................................................................................... 31
*Bellotti v. Baird*,
   443 U.S. 622 (1979) ....................................................................................................... 30
*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) ....................................................................................................... 27
*Brock v. Cathedral Bluffs Shale Oil Co.*,
   796 F.2d 533 (D.C. Cir. 1986)....................................................................................... 31
*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
   513 F. Supp. 3d 154 (D.D.C. 2021)............................................................................... 35
*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018)............................................................................... 31
*Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)....................................................................................... 40
*Huisha-Huisha v. Mayorkas*,
   560 F. Supp. 3d 146 (D.D.C. 2021)............................................................................... 35
*Huisha-Huisha v. Mayorkas*,
   24 F.4th 718 (D.C. Cir. 2022) ........................................................................................ 36
*Immigrant Defs L. Ctr. v. DHS*,
   21-cv-395 (FMO),2025 WL 1191572 (C.D. Cal. Mar. 14, 2025)............................21, 23, 27
*J.L. v. Cissna*,
   374 F. Supp. 3d 855 (N.D. Cal. 2019)........................................................................... 28
*J.O.P. v. DHS*,
   338 F.R.D. 33 (D. Md. 2020) ........................................................................................ 24

i

*Johnson v. Guzman-Chavez,*
   594 U.S. 523 (2021) ................................................................................................. 22

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,*
   88 F.3d 1191 (D.C. Cir. 1996) .................................................................................. 31

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................. 35, 41

*Ludlow's Heirs v. Johnston,*
   3 Ohio 553 (1828) .................................................................................................... 25

*M.M.M. on behalf of J.M.A. v. Sessions,*
   347 F. Supp. 3d 526 (S.D. Cal. 2018) ...................................................................... 41

*Make the Road N.Y. v. Noem,*
   No. 25-cv-190 (JMC), 2025 WL 2494908 (D.D.C. Aug. 29, 2025) ......................... 13

*Mathews v. Eldrige,*
   424 U.S. 319 (1976) ..................................................................................... 26, 27, 30

*Minney v. United States Office of Personnel Mgmt.,*
   130 F. Supp. 3d 225 (D.D.C. 2015) .......................................................................... 30

*Mullane v. Cent. Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ................................................................................................. 29

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................. 41

*O.A. v. Trump,*
   404 F. Supp. 3d 109 (D.D.C. 2019) .......................................................................... 24

*Open Communities Alliance v. Carson,*
   286 F. Supp. 3d 148 (D.D.C. 2017) .......................................................................... 41

*Orantes-Hernandez v. Meese,*
   685 F. Supp. 1488 (C.D. Cal. 1988) ........................................................................ 39

*Osorio-Martinez v. Att'y Gen. of the U.S.A.,*
   893 F.3d 153 (3d Cir. 2018) ..................................................................................... 28

*P.J.E.S. ex rel. Escobar Francisco v. Wolf,*
   502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................. 36, 39, 42

*Perez-Funez v. Dist. Dir.,*
   619 F. Supp. 656 (C.D. Cal. 1985) .......................................................................... 10

*PLIVA, Inc. v. Mensing,*
   564 U.S. 604 (2011) ................................................................................................. 25

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
   831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 20, 40

*Reno v. Flores,*
   507 U.S. 292 (1993) ................................................................................................. 26

*Simms v. D.C,*
   872 F. Supp. 2d 90 (D.D.C. 2012) .................................................................... 41, 42

*Torres v. U.S. Dep't of Homeland Sec.,*
   18-cv-02604, 2020 WL 3124216 (C.D. Cal. Apr. 11, 2020)..................................... 41

*Trump v. J.G.G.,*
   145 S. Ct. 1003 (2025)....................................................................................... 26, 27

*United Space Alliance, LLC v. Solis,*
   824 F. Supp. 2d 68 (D.D.C. 2011).......................................................................... 31

*U.S. ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ....................................................................... 31, 35
*VanderMolen v. Stetson,*
    571 F.2d 617 (D.C. Cir. 1977) ............................................................ 31
*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 20

Statutes

5 U.S.C. § 706 ............................................................................................... 35
6 U.S.C. § 279 ...................................................................................... Passim
8 U.S.C. § 1101 ............................................................................................ 18
8 U.S.C. § 1155 ............................................................................................ 28
8 U.S.C. § 1158 ................................................................... 16, 17, 24, 27
8 U.S.C. § 1229 ................................................................................... Passim
8 U.S.C. § 1231 ........................................................................ 17,18, 23, 25
8 U.S.C. § 1232 ................................................................................... Passim
8 U.S.C. § 1225 ............................................................................ 13, 14, 22
8 U.S.C. § 1101 ....................................................................... 2, 11, 26
Pub. L. No. 105-277 ....................................................................... 18, 25
Pub. L. No. 107-296 ....................................................................... 11, 19
Pub. L. No. 110-457 ................................................................ 2, 11, 20

Rules & Regulations

8 C.F.R. § 205.2 ............................................................................................ 28
8 C.F.R. § 208.16 to 208.18 ....................................................................... 25
8 C.F.R. § 239.2 ............................................................................................ 23
8 C.F.R. § 1003.18 ......................................................................................... 3
8 C.F.R. § 236.3 ............................................................................... 10, 23
45 C.F.R. § 410 ................................................................................... Passim
45 C.F.R. §1308 ............................................................................................ 33
45 C.F.R. § 411 ............................................................................................ 19
45 C.F.R. § 412 ............................................................................................ 19
45 C.F.R. §1600 ............................................................................................ 34
45 C.F.R. § 1302 .......................................................................................... 33
89 Fed. Reg. 34,384 .............................................................................. 19, 31
89 Fed. Reg. 34,442 .................................................................................... 32
89 Fed. Reg. 34,443 .................................................................................... 32
Fed. R. Civ. P. 65 ........................................................................................ 42

Other Authorities

W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024) 2
U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 ................................ 25

154 Cong. Rec. H10905 .................................................................................................. 11

154 Cong. Rec. S10886 ................................................................................................... 12

154 Cong. Rec. S10887 ................................................................................................... 11

**INTRODUCTION**

In the wee hours of the morning on the Sunday morning of Labor Day weekend, the Trump administration put 76 Guatemalan children on planes bound for Guatemala. These children were taken from shelters operated by the Office of Refugee Resettlement ("ORR"), where staff had received notice to prepare the children just hours before, and were bused to airports. But for this Court's intervention while the plane sat on the tarmac in Texas, those children would have been expelled to Guatemala, despite many of them having ongoing proceedings before the immigration court and fearing return to their home country. Multiple public reports indicate these actions were part of an orchestrated plan to remove hundreds of Guatemalan children, including Plaintiff Children and putative class members.

The administration's position that it was merely cooperating with the Guatemalan government to return children to their parents is belied by the facts. Many of the Plaintiffs in this case have expressed fear of returning and do not in fact have safe caregivers to which they can return. They wish to pursue their immigration cases in the United States. Several Guatemalan parents have also indicated that they did not request their children's return. Even if the administration's contentions regarding its coordination with the Guatemalan government are true, any such coordination does not excuse the government's illegal action and does nothing to change its obligation to provide unaccompanied minors with the process unambiguously due to them under the law.

Indeed, robust statutory protections prevent unaccompanied children from being whisked off under cover of darkness at the whim of any government. The product of decades of bipartisan advocacy on behalf of this uniquely vulnerable group, Congress enacted these protections to ensure children can seek immigration relief, have access to counsel, and are safely housed and cared for at ORR facilities until they can be reunified with family or other sponsors in the United

1

States. If, at any point, a child wishes to be repatriated, that child may ask an immigration judge to allow them to voluntarily depart from the United States and undergo a process to ensure safe repatriation. Contrary to the government's assertion before the Court on August 31, 2025, 6 U.S.C. § 279(b)(1)(H) does not provide standalone authority to summarily expel or repatriate an unaccompanied child. If a child is ordered removed or granted voluntary departure by an immigration judge, § 279(b)(1)(H) provides for their safe repatriation. *See infra* p.23. Had the government complied with the laws, it would not have attempted to remove dozens of children in the middle of the night on a holiday weekend, and this litigation would have been unnecessary.

Putative class members include all Guatemalan children in ORR custody without final orders of removal, as well as ten named Plaintiff Children.[1] They all are at risk of removal from the United States without due process. Defendants' plans to transfer the class from ORR custody in order to summarily remove them put each member at risk of abuse, neglect, persecution, or torture in Guatemala. Plaintiffs Children and putative class members move the Court to issue a preliminary injunction barring Defendants from transferring Guatemalan unaccompanied children from ORR custody and summarily expelling them in violation of Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008), 8 U.S.C. § 1232; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*.; 45 C.F.R. § 410.1000, *et seq*.; and the Fifth Amendment of the United States Constitution.[2]

---

[1] Plaintiffs intend to clarify in their papers relating to class certification that the class does not and should not include children with Voluntary Departure granted by an immigration judge.

[2] In its 12:37 p.m. Temporary Restraining Order, the Court issued temporary relief to members of the putative class shortly after Plaintiffs filed their motion for class certification. As the Court noted, the Supreme Court recently clarified that "courts may issue temporary relief to a putative

2

## LEGAL AND FACTUAL BACKGROUND

On August 29, 2025, reports surfaced that the administration was planning to remove

hundreds of Guatemalan children in government custody who arrived in the United States

unaccompanied.[3] These children were living in shelters and foster care in the custody of ORR, a

component of the Department of Health and Human Services ("HHS") that is charged with

caring for unaccompanied children. Many are waiting to be released to a relative or guardian in

the United States who can care for them while they make their case for protection before the

immigration courts.

The news reports confirmed what child advocates and immigration attorneys were seeing

on the ground, which signaled the government was about to transfer the children from ORR

___

class" and that it is therefore not necessary to "decide whether a class action should be certified . . . . in order to temporarily enjoin the Government from removing putative class members." *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025) (quoting W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024)).

"[T]he Court's holding [in *A.A.R.P.*] means that the filing of a class suit ('a putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief to the entire putative class. Nothing more, in terms of class certification, is necessary." 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and June 2025 Update).

At this juncture, the Court may *either* issue further interim relief (*i.e.*, a preliminary injunction) as to the putative class *or* provisionally certify the class concurrently with issuing a preliminary injunction. *See id.*; *see also, e.g.*, *Am. Council of Learned Societies v. McDonald*, --- F. Supp. 3d ---, 2025 WL 2097738, at *37-38 (S.D.N.Y. July 25, 2025) ("[M]ust the Authors Guild classes [] be formally certified before we can grant preliminary relief to the putative class members pending further proceedings? The answer is no. We are so informed by [*A.A.R.P.*].") (granting preliminary injunction), *appeal filed* (2d Cir. Aug. 6, 2025); *Barabra v. Trump*, --- F. Supp. 3d. ---, 2025 WL 1904338 (D.N.H. July 10, 2025) (concluding that it is appropriate for courts "to certify classes [] for the purposes of [preliminary] injunctive relief").

[3] Priscilla Alvarez, *Exclusive: Trump administration plans to send hundreds of Guatemalan children in government custody back to home country*, CNN (Aug. 29, 2025), https://www.cnn.com/2025/08/29/politics/migrant-kids-guatemala-immigration; Jody Garcia *et al.*, *U.S. is Working With Guatemala to Return Hundreds of Children*, N.Y. Times (Aug. 29, 2025), https://www.nytimes.com/2025/08/29/us/immigration-guatemala-children.html.

custody and expel them without an opportunity to complete their removal proceedings [4] and seek long-term immigration status. For example, in some instances Defendants had simply removed minors' pending cases from the immigration court docket in preparation for their summary removal. *See* ECF No. 2-2 at 31, Declaration of Lauren Fisher Flores, Legal Director, South Texas Asylum Representation Project ("ProBAR") ("Flores Decl.") ¶ 8. Some Plaintiff Children reported Homeland Security Investigations ("HSI"), a component of Defendant ICE, recently interviewed them and asked about their family members in Guatemala. *See, e.g.*, ECF No. 2-2 at 31, Flores Decl.,¶¶ 6, 7; ECF No. 2-2 at 26, Declaration of A.R.M.D. ("A.R.M.D. Decl."), ¶ 2; ECF No. 2-2 at 7, Declaration of H.L.E.C. ("H.L.E.C. Decl."), ¶ 5; ECF No. 2-2 at 5, Declaration of M.O.C.G. ("M.O.C.G. Decl."), ¶ 5; Ex. N, Declaration of W.M.R.P. ("W.M.R.P. Decl."), ¶ 5. Another learned from that her parents had been notified by the Guatemalan government that she would be deported. ECF No. 2-2 at 29, Declaration of M.Y.A.T.C. ("M.Y.A.T.C. Decl."), ¶ 6.

Late on the night of August 30, 2025, ORR shelters received an email from "ORR Guatemala Reunification (ACF)" stating that unaccompanied Guatemalan children needed to be

---

[4] Immigration judges have administratively closed, terminated, or dismissed the immigration proceedings of some Plaintiff Children. Retired Immigration Judge Ashley Tabaddor explains the significance of these docket management tools during her 15 years on the bench:

> "When an unaccompanied minor applied for asylum or petitioned for SIJS, immigration judges sometimes administratively closed, terminated, or dismissed their removal proceedings as a docket management tool where the respondents appeared likely to win immigration relief before USCIS. Doing so did not mean they could be removed from the United States. In my experience, an immigration court would never close a case for purposes of removal, and in fact when a TVPRA or SIJS case was closed it was for the sole purpose of pursuing relief before USCIS."

Ex. E, Declaration of Retired Immigration Judge Tabaddor ("Tabaddor Decl.") ¶ 13; *see also* 8 C.F.R. § 1003.18(d)(1)(ii)(A) (permitting termination when an unaccompanied minor has filed an asylum application); *id.* § 1003.18(d)(1)(ii)(B) (permitting termination when a noncitizen is prima facie eligible for relief from removal and the application for relief is pending with USCIS).

ready to be transferred to DHS custody within two hours (or four hours in they were in foster care). ECF No. 3-2, Ex. 2. After learning of this notification, Plaintiff Children filed a class action complaint immediately on August 31, 2025, at 1:02 a.m. and an emergency motion for temporary restraining order ("TRO") at 1:30 a.m. ECF No. 1, Compl.; ECF No. 2, Mot. for TRO. The court granted the TRO at 4:22 a.m. as to the individual Plaintiffs. Min. Order entered at 4:22 a.m. Later that morning, there were reports that Guatemalan children were being loaded onto buses and transported to the airport in Harlingen, Texas – a hub for deportation flights – despite the Court's TRO.[5] The Court moved the emergency hearing from 3:00 p.m. to 12:30 p.m. Before the hearing, Plaintiffs filed a motion for class certification. ECF No. 6, Mot. to Certify Class. At 12:37 p.m., the Court ordered that the Defendants "cease any ongoing efforts to transfer, repatriate, remove, or otherwise facilitate the transport of any Plaintiff or member of the putative class from the United States." Min. Order entered at 12:37 p.m. Later that evening, Defendants confirmed in a status report that 76 minors had been on planes to Guatemala and had been returned to ORR custody. ECF No. 9, Second Status Report.

Plaintiff Children are ten unaccompanied children from Guatemala between the ages of 10 and 17. *See* ECF No. 2-2, Plaintiff Children Decl. *All* Plaintiff Children wish to remain in the United States to pursue lawful pathways to permanent legal status while in ORR custody; *none* have accepted voluntary departure through the legally mandated process for unaccompanied

---

[5] Valerie Gonzalez et al., *As Guatemalan kids sit in planes in Texas, judge orders they stay in the U.S., for now*, Tex. Tribune (Aug. 31, 2025), (stating that "authorities had walked dozens of passengers — perhaps 50 — toward the plane in an area restricted to government planes. Passengers wore colored clothing typically used in government-run shelters for migrant children."), https://www.texastribune.org/2025/08/31/texas-harlingen-guatemala-immigration-asylum/.

children. *Id.* At least one of Plaintiff Children, A.R.M.D., was taken to the airport on August 31, 2025:

> On Sunday, August 31, 2025, around two in the morning, a supervisor at the Compass Connections Harlingen Shelter woke me up from my sleep. I woke up very scared, and I felt like I lost my breath for a second because they had never woken us up in the middle of the night before. The supervisor told me we were going to leave and to get our things. I asked for an explanation, but they didn't say why we were going to leave or where we were going. I started to pray to God because I was scared and wanted to stay in the shelter. I asked God to protect me and told him I would follow his will. I stayed seated in the room for a couple of minutes, praying and thinking about what would happen to me. They had not called my family, and I didn't know what to expect if they would take me back to Guatemala. I was pensative and worried. I didn't have time to wash my face or brush my teeth before they placed me on a bus headed for the airport.
>
> I asked the bus driver if he could tell us what was happening. He said he couldn't tell us anything and that we would see where they would take us. They took us to the airport, and we made it there around 5:30 am. They fed us breakfast while we were on the bus, but I wasn't able to eat because of my nerves. I had no appetite for food. Around 10 am, they began to take us off the bus. I got off the bus and I started to say goodbye to all the friends I had made in the shelter in case we would not see each other again. I thought they were going to make me board the plane like they did for the other kids from the shelter, but they asked me for my name and then told me I was not on the list. I saw the other kids get on the plane around 10:30 am, and I saw the plane go up in the air around 11 or 12 pm, but eventually the same plane came back to the airport. When I saw the plane land back at the airport, I thought it was another plane, and I thought the kids were already back in Guatemala, but it was the same group of kids in the plane. The kids got off the plane, and then they were all placed back on the bus. We left the airport around 6:30 pm, and they took me to a new shelter. I made it to Compass Connections Cameron around 8 pm.

Ex. O, Supplemental Declaration of A.R.M.D. ("A.R.M.D. Supp. Decl.") ¶¶ 8-9. This harrowing

experience illustrates the imminent harm that requires injunctive relief.[6] [7] Putative class

members who did board the flight waited hours on the tarmac before returning to buses and later

to shelters. Ex. A, Supplemental Declaration of Lauren Fisher Flores ("Suppl. Flores Decl.") ¶¶

14-16. *See also* Ex. P, ("A.J.D.E. Decl.") ¶ 12 ("The impact is real. I feel totally traumatized. I

don't even know how to explain it")

        Many Plaintiff Children have currently pending asylum claims based on fear of returning

to Guatemala. *See e.g.* ECF No. 2-2 at 29, M.Y.A.T.C. Decl, ¶ 4 ("I am afraid to return to

Guatemala. I have a pending petition for asylum . . . I am currently awaiting an Asylum Office

interview"); Ex. M, Declaration of E.Y.T.T. ("E.Y.T.T. Decl.") ¶ 5 ("I fear returning to

Guatemala because random men have threatened if I do not do what they want. . . If I am sent

back, I believe I will be in danger."). Others have experienced abuse and neglect in Guatemala

and some are requesting Special Immigrant Juvenile Status ("SIJS") on that basis. *See e.g.* ECF

No. 2-2 at 1, Declaration of L.G.M.L. ("L.G.M.L. Decl.") ¶ 6, ("I came to the United States after

experiencing abuse, neglect, and family violence"); *id.* at 3, Declaration of L.M.R.S. ("L.M.R.S.

---

[6] A putative class member was similarly awoken in the middle of the night to be taken to the airport: "A putative class member was similarly awoken late at night:

>  Late Saturday night, we went to bed as normal. But then somebody woke me up and told me to come down to the main floor with other Guatemalan children. They sat us down and the director told me that they received a letter that all Guatemalans had to be returned to our home country. I wondered why, because I knew that I had a right not to be deported and speak with a judge.

Ex. P, Declaration of A.J.D.E. ("A.J.D.E. Decl.) ¶ 7.

[7] Plaintiff Next Friend Young Center for Immigrant Children's Right ("Young Center") had four children it was appointed to represent awoken in the night to board flights as well. Ex. B, Declaration of Carrie Vander Hoek ("Vander Hoek Decl.") ¶ 31.

Decl.") ¶ 6 ("We came to the United States after experiencing neglect from my parents…If we are sent back, we will not be able to live safely"); *id.* at 24, Declaration of G.A.B.B. ("G.A.B.B. Decl."), ¶ 6 ("My parents were not able to care for me in Guatemala. I am going to pursue Special Immigrant Juvenile Status in the United States"); *id.* at 19, Declaration of L.F.M.M. ("L.F.M.M. Decl.") ¶ 8 ("I want to remain in the United States and continue to fight my case. I want the chance to present my claim for asylum and Special Immigrant Juvenile Status and to have a fair opportunity to be heard"); *see also* Tabaddor Decl. ¶ 11 ("In my experience, I do not recall any instance in which a child with an SIJ order pursued voluntary departure.").

The majority of Plaintiff Children have pending § 1229a removal proceedings mandated by the TVPRA. Many have hearings scheduled in the next few weeks. *See, e.g.*, ECF No. 2-2 at 26, A.R.M.D. Decl., ¶ 4 (next hearing scheduled for October 1, 2025); ECF No. 2-2 at 7, H.L.E.C. Decl., ¶ 3; ECF No. 2-2 at 5, M.O.C.G. Decl., ¶ 7; ECF No. 2-2 at 10, Declaration of T.A.C.P. ("T.A.C.P. Decl.") ¶ 4 (next hearing scheduled for November 26, 2025); ECF No. 2-2 at 24, G.A.B.B. Decl., ¶ 5. Several are also pursuing asylum through the non-adversarial procedure that the TVPRA uniquely affords them by filing affirmative asylum applications with the United States Citizenship and Immigration Service ("USCIS"). Plaintiff L.F.M.M., for example, is a sixteen-year-old who states, "I am now just waiting for an asylum interview to be scheduled. I still have the right to continue fighting for protection." ECF No. 2-2 at 19, L.F.M.M. Decl., ¶ 3; *see also* ECF No. 2-2 at 29, M.Y.A.T.C. Decl., ¶ 4.

Plaintiff Children's parents were similarly blindsided by the government's actions to suddenly remove their children from the United States. As M.Y.A.T.C.'s father explained:

> On or around August 15, 2025, my wife and I received a strange phone call. The person told us in Spanish that the U.S. government is going to soon deport [M.Y.A.T.C.]. as part a large group of Guatemalan children from the United States. The person asked us in Spanish whether we would be able to

> receive [M.Y.A.T.C.] back. We told the person that [M.Y.A.T.C.] was
> going to school in the United States and that she has an attorney there. We
> were very surprised to receive this call. I was alarmed and extremely
> worried about my daughter after receiving this call. My wife and I told our
> daughter [M.Y.A.T.C.] about this call, and she became very worried and
> scared. We do not know why we received this call. We never asked for
> [M.Y.A.T.C.] to be sent back to Guatemala.

Ex. D, Declaration of Rudy Anibal Tiul Cucul ("Tiul Cucul Decl.") ¶¶ 5-6; *see also* Ex. C,

Declaration of Magaly Yaneth Vicente Sontay ("Vicente Sontay Decl.") (Mother of M.F.A.P.V.)

¶¶ 3-5 ("About two weeks ago, I was visited by two women at my house to talk about my

daughter, [M.F.A.P.V.]. These women seemed angry and were reprimanding me. They told me

that I should not have sent my daughter to the United States."). Meanwhile other parents of

putative class members were never notified of their children's imminent removal: "I was afraid

that I was going to be returned. At around 2:30 a.m., I called my mother to tell her I might be

deported to Guatemala. My mom started crying. She said that we could only trust in God. She

had no idea that the government had a plan to return me." Ex. P, A.J.D.E. Decl., ¶ 9.

**A.**    **Protections for Unaccompanied Children Under Permanent Injunctions, the
Homeland Security Act, and the Trafficking Victims Protection Reauthorization Act
of 2008.**

Under U.S. law, an unaccompanied child is defined as a child who "(A) has no lawful

immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect

to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal

guardian in the United States is available to provide care and physical custody." 6 U.S.C. §

279(g)(2). Congress has created an exclusive statutory scheme for determining how

unaccompanied children in government custody must be treated and whether they may remain in

the United States. These procedures also govern when and under what conditions

unaccompanied children may depart the United States—either voluntarily or as the result of a

removal order. The procedures are purposefully tailored to the unique needs and vulnerabilities of unaccompanied children and reflect decades of litigation and advocacy on behalf of their rights and dignity.

### 1. *Early judicial interventions to remedy abuses against unaccompanied children.*

As the phenomenon of unaccompanied child migration increased in the 1980s and 1990s, along with general concern for child welfare,[8] concerns grew about the conditions of confinement for unaccompanied children in United States custody. These concerns resulted in litigation seeking to protect unaccompanied children from mistreatment and abuse while they are in government custody. In 1985, the Central District of California issued a permanent injunction granting special protections to unaccompanied children before they can accept voluntary departure, a form of immigration relief that allows noncitizens in removal proceedings to leave the United States without the issuance of a removal order. *Perez-Funez v. Dist. Dir.*, 619 F. Supp. 656 (C.D. Cal. 1985). This lawsuit arose out of the Immigration and Nationality Service's ("INS") coercive practices, and its protections are now implemented by regulation. 8 C.F.R. § 236.3(g)-(h), 1236.3(g)-(h). INS's requirements include: (1) a written notice of rights; (2) a list of free legal service providers; and (3) access to telephones and notice that they may call a parent, close relative, friend, or attorney. Additionally, for unaccompanied children from noncontiguous countries (*i.e.* children not from Canada or Mexico), the government must ensure that the child in fact communicates with a parent, adult relative, friend, or attorney before accepting voluntary departure. *Id*. §§ 236.3(g), 1236.3(g).

---

[8] *See, e.g.*, History of Child Rights, United Nations International Children's Emergency Fund ("UNICEF") (noting the adoption of the United Nations Convention of the Rights of the Child in 1989, which "guarantees and sets minimum standards for protecting the rights of children in all capacities," and the establishment of the Child Rights International Network ("CRIN") in 1995), https://www.unicef.org/child-rights-convention/history-child-rights.

In 1997, the Central District of California approved a consent decree covering "[a]ll minors who are detained in the legal custody of the INS [Immigration and Naturalization Service]." Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK(Px), ¶ 10 (C.D. Cal. Jan. 17, 1997).[9] Among other requirements, the Flores Settlement Agreement directs the INS to "treat all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors" and to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs." *Id.*

### 2.  Homeland Security Act of 2002

With the enactment of the Homeland Security Act ("HSA"), Pub. L. No. 107-296, § 462, 116 Stat. 2135 (2002) and its overhaul of immigration authority, INS' "functions under the immigration laws of the United states with the respect to the care of unaccompanied alien children" were "transferred to the Director of the Office of Refugee Resettlement of the Department of Health and Human Services." 6 U.S.C. § 279(a). In doing so, Congress intentionally chose to transfer responsibility for these vulnerable children away from ICE, the then-nascent arm of immigration enforcement, to ORR. The HSA provided a list of 11 functions related to the care of unaccompanied minors for which ORR "shall be responsible." *Id.* § 279(b)(A)-(K). Congress specifically stated that "[n]othing in this section may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) from the authority of any official of the Department of Justice, the Department of Homeland Security, or the Department of State." *Id.* § 279(c). Section 462 of the HSA extended to all the key protections of the *Flores* Settlement Agreement,

---

[9] *Available at* http://www.aila.org/File/Related/14111359b.pdf [hereinafter the "Flores Settlement Agreement"]. After *Flores*, the INS was dissolved and subsumed into DHS, whereupon DHS inherited the INS' obligations under the *Flores* Settlement Agreement.

including its "least restrictive setting" requirement. Pub. L. No. 107-296, § 462, 116 Stat. 2143 (2002).

### 3. *William Wilberforce Trafficking Victims Protection Reauthorization Act*

Six years later, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA), Pub. L. No. 110-457, 122 Stat. 5044 (2008). The bipartisan statute, passed by unanimous consent on the same day by both the House of Representatives and the Senate,[10] embodied Congress' unequivocal intent to provide unique substantive and procedural protections to unaccompanied children in United States custody. The TVPRA responded to concerns that, despite the transfer of authority to ORR, unaccompanied children were not sufficiently protected in their legal proceedings and were routinely enduring punitive conditions in juvenile jails.[11] The bill incorporated provisions regarding unaccompanied children previously included in the unpassed Unaccompanied Alien Protection Act, a bill introduced in 2000 and 2007 by Senator Diane Feinstein.[12] Senator Feinstein also introduced the TVPRA and explained that the statute provided a much-needed "procedure to make sure" that the United States respects its "special obligation to ensure that [unaccompanied children] are treated humanely and fairly" and that it treats them "as children and not as criminals" in federal

---

[10] *See* 154 Cong. Rec. H10905 (daily ed. Dec. 10, 2008); 154 Cong. Rec. S10887 (daily ed. Dec. 10, 2008).

[11] *See, e.g*, Jenny Rodriguez, Protections for Unaccompanied Children in the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) in Where We Stand: A 20-Year Retrospective of the Unaccompanied Children's Program in the United States, U.S. Committee for Refugees and Immigrants (Apr. 24, 2023) (quoting Sen. Feinstein), https://refugees.org/where-we-stand-a-20-year-retrospective-of-the-unaccompanied-childrens-program-in-the-united-states/

[12] *See* Rodriguez at 2.

custody.[13] She also noted that "[the TVPRA] ensured that appropriate steps would be taken before returning children to their home countries or placing them with sponsors."[14]

The core requirements of the TVPRA with respect to removal proceedings are that any unaccompanied child sought to be removed from the United States, except certain unaccompanied children from a contiguous country, shall (1) be placed in removal proceedings under 8 U.S.C. § 1229a; (2) be eligible for [voluntary departure] under 8 U.S.C. § 1229c at no cost to the child; *and* (3) be provided access to counsel in accordance with subsection (c)(5). 8 U.S.C. § 1232 (a)(5)(D). Shortly after its passage, advocates and legal scholars celebrated that "section 235 of the TVPRA [8 U.S.C. § 1232] increased many protections for unaccompanied alien children seeking relief from removal" and "provides more child-sensitive procedures for those in immigration custody and at imminent risk of removal."[15]

### i.    *Full removal proceedings*

The first core requirement of the TVPRA mandates that DHS place unaccompanied children in full removal proceedings pursuant to 8 U.S.C. § 1229a. The Immigration and Nationality Act (INA) provides the exclusive procedure by which the government may determine whether to remove an individual, including children. 8 U.S.C. § 1229a(a)(3). The INA contains "two main processes for removing noncitizens deemed ineligible to enter or remain in the United States." *Make the Road N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *2 (D.D.C. Aug. 29, 2025). Section 240 proceedings are the "standard mechanism:" an adversarial

---

[13] 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein).

[14] *See* Rodriguez, *supra* n. 10 at 2 (quoting Sen. Feinstein).

[15] Deborah Lee, Manoj Govindaiah, Angela Morrison, & David Thornson, *Update on Legal Relief Options for Unaccompanied Alien Children Following the Enactment of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* (Feb. 19, 2009), https://scholarship.law.tamu.edu/facscholar/820/.

proceeding before an immigration judge that "allows time for individuals to gather and present evidence in support of petitions for relief" and comes with the right to appeal to the Board of Immigration Appeals ("BIA") and to judicial review before a federal court of appeal. *Id.* (citing 8 U.S.C. §§ 1229a(a)(1), (b)(4)(B); 1252). Once immigration proceedings have been initiated, ICE cannot unilaterally cancel them as jurisdiction has vested with the immigration judge and the decision to dismiss proceedings rests only with the immigration court.  The second mechanism, expedited removals, allows DHS to remove certain noncitizens with limited ties to the United States with little process, "typically after a single conversation with an immigration officer." *Make the Road*, 2025 WL 2494908, at *1; 8 U.S.C. §§ 1225(b), 1232(a)(2)(B), (a)(3), (a)(5)(D).

By requiring that unaccompanied children for a noncontiguous country be placed in § 1229a proceedings, the TVPRA constitutes a bar on placing them in expedited removal proceedings. Thus, Congress required that unaccompanied children from noncontiguous countries—regardless of the circumstances of their arrival to the United States—receive the benefit of full immigration proceedings, including a hearing on claims for relief before an immigration judge.

### ii.  *Safe repatriation*

In its second core requirement, the TVPRA provided special procedural protection to unaccompanied children who ask an immigration judge for voluntary departure. 8 U.S.C. § 1232(a)(5)(D)(ii). Voluntary departure is a form of immigration relief that allows eligible noncitizens in removal proceedings to request to depart the United States without the issuance of a removal order. 8 U.S.C. §§ 1229c(a)(1), (b)(1). Once a noncitizen is placed in § 1229a proceedings, only an immigration judge may grant them voluntary departure. In general, a noncitizen granted voluntary departure must pay for their own travel expenses and post a bond

14

"in an amount necessary to ensure that the alien will depart." *Id.* § 1229c(b)(1), (3). The TVPRA, however, uniquely provides that unaccompanied children will not bear the cost of voluntary departure. "For legal practitioners, Voluntary Departure at no cost to the child is significant because many unaccompanied alien children are indigent and have no other means to assume the financial cost of returning to their home country."[16]

To further protect children from traffickers and other persons seeking to victimize children, DHS, in conjunction with the Department of State, DOJ, and HHS, bears an affirmative responsibility to ensure the safety of any unaccompanied seeking repatriation through a voluntary departure order or ordered removed from the United States. 8 U.S.C. § 1232(a)(1). The TVPRA similarly requires DHS and HHS to work together to ensure "safe and sustainable repatriation and reintegration" of unaccompanied children into their countries of nationality or last habitual residence, "including placement with their families, legal guardians, or other sponsoring agencies." 8 U.S.C. § 1232(a)(5).

The process for seeking voluntary departure before an immigration is "carefully and deliberately coordinated" among "[c]ounsel for the child, government counsel, and the parent." Ex. E, Tabaddor Decl. ¶ 17. ORR typically appoints a child advocate to provide the immigration judge with a "safety assessment related to the child's repatriation," which includes "contracting with experts in the child's home country to visit the child's community, meet with family members, and determine whether the child will be safe upon return." Ex. B, Vander Hoek Decl. ¶ 22. Child advocates are "third parties who make independent recommendations regarding the best interests of an unaccompanied child." 45 C.F.R. § 410.1308(b). They "formally submit their recommendations to ORR and/or the immigration court, where appropriate, in the form of best

---

[16] Lee, et. al, at 2.

interest determinations (BIDs)." *Id*. ORR appoints child advocates after referral by an "interested party" (*e.g.*, shelter staff, immigration judges, and attorneys) on behalf of minors "determined to be [victims] of trafficking or especially vulnerable." *Id*. § 410.1308(d)(1). Retired Immigration Judge Tabaddor notes that "[c]ounsel, often working with child advocates, would investigate the circumstances of the proposed return, including whether the child would face danger, coercion, or undue pressure to abandon claims for relief in the United States." Ex. E, Tabaddor Decl. ¶ 15.

### iii. *Access to counsel*

In its third core requirement, the TVPRA requires HHS to ensure, to the greatest extent practicable, that all unaccompanied alien children who are or have been in DHS custody (other than those children from contiguous countries as described in (a)(2)), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking. 8 U.S.C. § 1232(c)(5). Alongside this requirement, the TVPRA requires that HHS ensure that unaccompanied children in custody receive legal orientation presentations that, at a minimum, "address the custodian's responsibility to attempt to ensure the child's appearance at all immigration proceedings and to protect the child from mistreatment, exploitation, and trafficking." *Id*. § 1232(c)(4).

Regulations further govern the content of the legal orientation presentation, including that it feature "[a] confidential legal consultation with a qualified attorney . . . to determine possible forms of relief from removal in relation to the unaccompanied child's immigration case, as well as other case disposition options such as, but not limited to, voluntary departure." 45 C.F.R. § 410.1309(a)(2)(v). ORR is also authorized to contract with legal service providers to ensure "that all unaccompanied children who are or have been in ORR care have access to counsel to represent them in immigration legal proceedings or matters and to protect them from

mistreatment, exploitation and trafficking, to the greatest extent practicable, in accordance with the TVPRA [at 8 U.S.C. 1232(c)(5)]." *Id.* § 410.1309(d)(1). ORR facilitates the TVPRA's guarantee of legal services, but it is not a party to the proceedings and "does not provide recommendations related to repatriation, or otherwise, to the immigration judge." Ex. B, Vander Hoek Decl. ¶ 21.

### iv. *Other procedural protections*

### - *Asylum*

The TVPRA also amended the asylum statute, 8 U.S.C. § 1158, to create special procedures for adjudicating asylum applications filed by unaccompanied children in removal proceedings. First, Congress mandated that unaccompanied minor's claims for asylum be heard in the first instance in a non-adversarial setting before an asylum officer trained by USCIS rather than in the adversarial courtroom setting in which other people in removal proceeding must request asylum. 8 U.S.C. § 1158(b)(3)(C). Congress also exempted unaccompanied children from (1) the general filing deadline for asylum, which bars applications submitted more than one year after an applicant entered the United States, *id*. §§ 1158(a)(B), (E), and (2) from the standard safe third country limitation, which bars applications where an applicant may be removed pursuant to a bilateral or multilateral agreement to a third country where their life or freedom would not be threatened based on a protected ground and where they would have access to a full and fair procedure for determining eligibility for asylum. *Id*. §§ 1158(a)(2)(A), (E). Congress enacted these "additional protections" for unaccompanied children "[r]ecognizing [their] unique and vulnerable situation."[17]

---

[17] *Id.* at 7.

The specific protections for unaccompanied children in asylum complement the general procedural protections afforded to all people seeking refuge in the United States. *First*, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum. 8 U.S.C. § 1158(a)(1). *Second*, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds. 8 U.S.C. § 1231(b)(3). This form of relief is mandatory upon certain findings and implements the United States' obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. *Third*, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See* 8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding of removal, CAT relief is mandatory if that standard is met. There is no exception to CAT relief.

-    ***Special Immigrant Juvenile Status***

The TVPRA also expanded eligibility for Special Immigration Juvenile Status ("SIJS"), an immigration classification that provides a pathway to permanent residency for certain young people who were abused, neglected, or abandoned by one or both parents. *See* 8 U.S.C. § 1101(a)(27)(J). To receive SIJS, a noncitizen must obtain a state court order containing several findings, including "that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence." *Id*. § 1101(a)(27)(J)(ii). The TVPRA removed the requirement that the state court deem a noncitizen seeking SIJS eligible for long-term foster care and replaced it with a requirement that the court

determine that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law" and "that it would not be in the alien's best interest." TVPRA § 235(d)(1)(A). This section also allowed the state court to consider family reunion with one *or* both parents. *See id.* "[T]he expansion in the definition of Special Immigrant Juvenile allows for more vulnerable and mistreated children to qualify for this form of relief."[18]

### v. *Care in custody*

Finally, the TVPRA greatly expanded on the HSA's delegation of authority to ORR by creating robust requirements for housing and caring for unaccompanied children in government custody and for ensuring their safety upon release. The statute reinforced the separation between the immigration enforcement system and ORR's child welfare mandate, requiring any federal agency with custody of an unaccompanied child to transfer the child to HHS within 72 hours and mandating that ORR promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). It contemplates that children will usually be placed with "a suitable family member" and provides for ORR to conduct suitability assessments of potential sponsors focused on the safety and well-being of the child. 8 U.S.C. §§ 1232(c)(2)(A), (c)(3).

ORR has promulgated detailed regulations for making placement determinations as to unaccompanied children (*i.e.*, determining where to house them while in custody), 45 C.F.R. §§ 410.1100-1109, and for determining when and to whom to release an unaccompanied child in ORR custody. *Id.* §§ 410.1200-1210. Following notice comment, the Foundational Rule was published as a final rule with an effective date of July 1, 2024. Unaccompanied Children

---

[18] *Id.* at 4.

Program Foundational Rule, 89 Fed. Reg. 34,384 (Apr. 30, 2024). The Foundational Rule requires, for example, that "unaccompanied children shall be treated with dignity, respect, and special concern for their particular vulnerability," *id*. § 419.1003(a), and that "ORR shall place each unaccompanied child in the least restrictive setting that is in the best interests of the child, giving consideration to the child's danger to self, danger to others, and runaway risk." *Id*. § 419.1003(f).[19]

The TVPRA, along with prior injunctions and the HSA, amount to an exclusive system regulating the treatment of unaccompanied children in United States custody and structuring the disposition of their removal proceedings. The TVPRA contains no exceptions to its protections, confirming Congress's clear directive regarding the removal protections afforded to unaccompanied children. It does not distinguish between unaccompanied children who have or do not have prior immigration histories, and it does not exclude those who have prior removal orders. The TVPRA does not allow DHS to bypass § 1229a proceedings and remove children without observance of the procedures it prescribes and without their day in court.

---

[19] ORR is mandated to follow certain procedures for the care and custody of unaccompanied children and is tasked with their safe reunification with family members OR ensure their safe repatriation should the immigration court determine that that is the best interest of the child while in their care. The ORR Policy Guide provides guidance to care providers and other service providers regarding the placement, care, and services provided to unaccompanied alien children in ORR custody consistent with ORR's legal authorities (e.g., section 462 of the Homeland Security Act of 2002, Pub. L. No. 107-296, 6 U.S.C. § 279; section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, 8 U.S.C. § 1232; the Unaccompanied Alien Children Program Foundational Rule, codified at 45 C.F.R. § 410; the Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children Interim Final Rule, codified at 45 C.F.R. § 411; and the Investigations of Child Abuse and Neglect Interim Final Rule, codified at 45 C.F.R. § 412).

## LEGAL STANDARD

To obtain a preliminary injunction, the party must show that "(1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer [] harm in the absence of preliminary relief'; (3) 'the balance of equities tips in its favor'; and (4) the issuance of a preliminary injunction is 'in the public interest.'" *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (citation omitted); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

## ARGUMENT

Plaintiff Children and putative class members are entitled to preliminary injunctive relief to prevent grave and irreparable harms resulting from Defendants' plans to unlawfully transfer them from ORR custody and summarily expel them to Guatemala. Plaintiffs satisfy the factors for a preliminary injunction. First, Plaintiff Children and putative class members are likely to show that Defendants' actions violate the TVPRA, INA, and due process. Second, Plaintiff Children and putative class members will suffer irreparable harm related to their safety, care, and ability to pursue their immigration cases if they are unlawfully transferred from ORR custody and expelled to Guatemala. Finally, the balance of equities and the public interest strongly favor an injunction to protect children in government custody. Accordingly, Plaintiff Children and putative class members request that the Court enjoin Defendants' actions.

**A.    Plaintiffs Are Likely to Succeed on the Merits.**

**1.    *Defendants' actions violates the statutory protections afforded to unaccompanied children in the TVPRA and the INA.***

Plaintiffs are likely to succeed on the merits of their claim that Defendants' actions violate the TVPRA and the INA. These statutes unambiguously mandate a specific procedure for determining whether unaccompanied children may be removed from the United States and

specific protections that the government has no discretion to ignore. Defendants' actions violate these statutory mandates.

The TVPRA "guarantees certain protections for unaccompanied children—irrespective of the specific circumstances that led an unaccompanied child to arrive at the border." *Immigrant Defs L. Ctr. v. DHS*, No. 21-cv-395 (FMO), 2025 WL 1191572, at *12 (C.D. Cal. Mar. 14, 2025). The TVPRA requires that any unaccompanied child sought to be removed by DHS— except for certain unaccompanied children from a contiguous country—shall (i) be placed in removal proceedings under section 8 U.S.C. § 1229a; (ii) be eligible for relief under 8 U.S.C. § 1229c [voluntary departure] at no cost to the child; *and* (iii) be provided access to counsel in accordance with subsection (c)(5). 8 U.S.C. § 1232 (a)(5)(D) (emphasis added); *see also Immigrant Defs L. Ctr*, 2025 WL 1191572, at *12 ("§ 1232(a)(5)(D)(i) entitles '[a]ny unaccompanied alien child' to placement in § [1229a] proceedings as an unaccompanied child with the full range of protections to which unaccompanied children are entitled.").

Guatemala is not a country that is contiguous to the United States, as they share no border. As such, the mandate provided in 8 U.S.C. § 1232(a)(5)(D) and any other statutory language regarding unaccompanied children unambiguously apply to Guatemalan unaccompanied children like Plaintiffs and the putative class. Section 1232(a)(5)(D) contains no exceptions other than those for minors from contiguous countries. By summarily removing Plaintiffs, Defendants seek to violate the statutory mandate of § 1232(a)(5)(D).

*First*, Defendants' actions violate the TVPRA's mandate that unaccompanied children be placed in § 1229a and, with it, the statutory requirements that the INA provides in those proceedings. Defendants violate the INA by simply pretermitting ongoing removal proceedings. Once an unaccompanied child is placed in § 1229a proceedings, the government cannot simply

choose to cancel those proceedings by some extralegal mechanism that thwarts the disposition of the cases. The INA provides that, "[u]nless otherwise specified in this chapter, a proceeding under [§ 1229a] shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). The INA also provides all noncitizens in § 1229a proceedings the right to appeal an unfavorable decision to the BIA and to petition a Court of Appeals for judicial review. *See* 8 U.S.C. §§ 1229a(c)(5); 1252(b). A removal order can only be effectuated upon the commencement of a 90-day removal period, which "begins on the latest of three dates: (1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." *Johnson v. Guzman-Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(1)(B)). Regulations provide specific mechanisms and conditions under which DHS may seek to cancel a Notice to Appear after jurisdiction has vested with the immigration court and before the issuance of a removal order. *See* 8 C.F.R. § 239.2. Defendants' actions in summarily expelling Plaintiffs violate the INA's requirements as to § 1229a removal proceedings.

*Second*, Defendants' actions also violate TVPRA's statutory mandate that the government provide unaccompanied children with the opportunity to seek voluntary departure under 8 U.S.C. § 1229c. *See, e.g.*, *Immigrant Defs. L. Ctr.*, 2025 WL 1191572, at *14 ("The language of § 1232(a)(5)(D)(ii) is clear that '[a]ny unaccompanied alien child' – meaning all unaccompanied children – must be eligible for voluntary departure.") (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012)). 8 U.S.C. § 1229c in turn authorizes the Attorney General "[to] permit an alien voluntarily to depart the United States"

23

subject to certain restrictions. Voluntary departure is a form of immigration that only an immigration judge can grant. The TVPRA contains numerous provisions that ensure that unaccompanied children do not bear the cost of their voluntary repatriation, 8 U.S.C. § 1232 (a)(5)(D)(ii), and that the government ensure their safety and sustainable repatriation. *Id*. §§ 1232(a)(1), (5); *see also Perez-Funez*, 619 F. Supp. at 670 (granting unaccompanied children special protection before they can accept voluntary departure); 8 C.F.R. § 236.3(g)-(h), 1236.3(g)-(h) (providing procedural rights for voluntary departure). Although Plaintiffs seek to remain in the United States, Defendants' summary removals nonetheless deprive them of their statutory right to request voluntary departure under special conditions.

*Third*, Defendants are also violating the asylum provision of the TVPRA, which provides a unique mandatory procedure for evaluating asylum claims when unaccompanied children are in removal proceedings. *See* 8 U.S.C. § 1158(b)(3)(C); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 121-22 (D.D.C. 2019) (noting that the TVPRA entitles unaccompanied minors to present their asylum claims "in the first instance in a non-adversarial setting."). Many Plaintiff Children and putative class members have pending asylum applications. *See, e.g.*, ECF No. 2-2 at 19, L.F.M.M. Decl. ¶ 3; ECF No. 2-2 at 26, A.R.M.D. Decl., ¶ 4. It is impossible for Plaintiffs summarily removed to file or to proceed with their asylum applications. Thus, Defendants violate the asylum provision of the TVPRA by seeking to summarily remove unaccompanied children awaiting a decision on their asylum applications. *See, e.g.*, *J.O.P. v. DHS*, 338 F.R.D. 33, 65 (D. Md. 2020) (enjoining DHS from applying eligibility criteria that would deprive certain unaccompanied minors of initial non-adversarial review).

*Fourth*, Defendants' actions are also unlawful because they also unlawful because they run afoul of the INA's statutory protections for noncitizens fleeing persecution and torture by

subjecting them to removal without meaningful consideration of their claims. As noted above, none of the 76 children on board the August 31 flight, as well as potentially hundreds more putative class members have been granted voluntary departure. *See* Ex. E, Tabaddor Decl. ¶ 12 ("Voluntary departure, while available under statute, is rare for unaccompanied minors and requires careful scrutiny. Immigration Judges generally ensured that any such request was made with the advice of independent counsel and, where possible, with input from a child advocate."). In fact, many have expressed fear of return to Guatemala. *See. e.g.,* ECF No. 2-2 at 5, M.O.C.G. Decl., ¶ 7; *id.* at 19, L.F.M.M. Decl., ¶ 3; *id.* at 29, M.Y.A.T.C. Decl., ¶ 4; Ex. R, Declaration of R.M.S.C.C. ("R.M.S.C.C. Decl."), ¶ 5; Ex. F., Declaration of D.I.R. ("D.I.R. Decl."), ¶¶ 6,7,8; Ex. Q, Declaration of G.Y.V.S. ("G.Y.V.S. Decl.") ¶ 5. These children have a right to request asylum and protection under the CAT.[20]

Beyond Defendants' clear statutory violations, it is important to stress that no statute authorizes Defendants' actions. 6 U.S.C. § 279(b)(1)(H), codified in 2002 as part of the HSA, states that ORR "shall be responsible for . . . reuniting unaccompanied alien children with a parent abroad in appropriate cases." This statute can and therefore should be read harmoniously with the specific procedures mandated in the TVPRA, which were enacted six

---

[20] Congress enacted the Foreign Affairs Reform and Restructuring Act (FARRA) to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT) and to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); 8 C.F.R. § 208.16 to 208.18 (FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

years later. *See, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) ("[I]f by any fair

course of reasoning the two [statutes] can be reconciled, both shall stand.") (quoting *Ludlow's*

*Heirs v. Johnston*, 3 Ohio 553, 564 (1828)) (alterations in original). An "appropriate case" for

reunification under 6 U.S.C. § 279(b)(1)(H) is one in which a child has been ordered removed

at the conclusion of § 1229a proceedings or has requested and been granted voluntary

departure by an immigration judge, as required by the TVPRA. At that point, the government

bears a responsibility to ensure the child's safety in departing the United States. *See, e.g.*, 8

U.S.C. § 1232(a)(1), (5). The HSA offers no substantive grant of authority to do anything

beyond what is authorized by statute. It contains a general list of eleven functions transferred to

ORR, including "ensuring that the interests of the child are considered in decisions and actions

relating to the care and custody of an unaccompanied alien child." *Id*. § 279(b)(1)(B). If there

were any doubt that this reading is proper, Congress stated clearly that § 279 "may [not] may

be construed to transfer the responsibility for adjudicating benefit determinations under

the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) from the authority of any official

of the Department of Justice, the Department of Homeland Security, or the Department of

State." 6 U.S.C. § 279(c); *see* ECF No. 2-2 at 1, L.G.M.L. Decl., ¶ 3; *id.* at 3 L.M.R.S. Decl., ¶

3; *id.* at 5, M.O.C.G. Decl., ¶ 3; *id.* at 7, H.L.E.C. Decl., ¶ 3.

Defendants' transfers from ORR custody and summary expulsions of unaccompanied

minors are an obvious violation of the TVPRA and the INA are an obvious violation of the

TVPRA and the INA. "[T]he President and federal agencies may not ignore statutory mandates

or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty.*, 725

F.3d 255, 261 (D.C. Cir. 2013). Plaintiffs are likely to succeed on the merits of their claim that

Defendants are violating the TVPRA and INA.

26

**2.** *Plaintiffs are likely to succeed on the merits because Defendants' actions violate Due Process.*

Plaintiffs are likely to succeed on their claim that Defendants' actions the Due Process Clause of the Fifth Amendment. "'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). The three-part balancing test in *Mathews v. Eldrige*, 424 U.S. 319 (1976), "is the leading authority for deciding what procedural protections are required to comport with the Due Process Clause." *Al-Hela v. Biden*, 66 F.4th 217, 228 (D.C. Cir. 2023). The *Mathews* test balances (1) the private interest that will be affected; (2) the risk of an erroneous deprivation through the procedures used and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest, including any administrative or fiscal burdens of the additional or substitute procedures. *See, e.g.*, *id*. at 229 (quoting *Mathews*, 424 U.S. at 335). Each factor weighs in Plaintiffs' favor.

As to the first prong, Plaintiffs have several protected interests upon which Defendants are infringing. *First*, Plaintiffs have an indisputable interest in avoiding summary expulsion. *See, e.g.*, *J.G.G*, 145 S. Ct. at 1006 ("The detainees' rights against summary removal . . . are not currently in dispute.").

*Second*, the TVPRA creates protected interests in the three core procedures it mandates on behalf of unaccompanied children. *See, e.g.*, *Immigrant Defs. L. Ctr.*, 2025 WL 1191572, at *15-16 (concluding that unaccompanied children' rights to apply for affirmative asylum before an asylum officer in the first instance and to seek voluntary departure "are constitutionally protected property interests."). A statute creates a protected interest where it includes "rules or understandings that secure certain benefits and that support claims of entitlements to those benefits.", *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Abrego Garcia v. Noem*,

27

777 F. Supp. 3d 501 (D. Md. 2025) (finding that INA's withholding of removal provision created a protected interest "in avoiding forcible removal to El Salvador" by limiting DHS's discretion to remove noncitizen absent process), *aff'd in relevant part sub. nom*, 145 S. Ct. 1017 (2025). Congress enacted the TVPRA to create mandatory procedures for unaccompanied children in removal proceedings and offer them special protection when they seek immigration relief. Congress exempted unaccompanied children from expedited removal, guaranteed them eligibility for voluntary departure at no cost, provided them enhanced access to counsel. 8 U.S.C. § 1232(a)(5)(D). It created a special procedure for non-adversarial review of their asylum applications. 8 U.S.C. § 1158(b)(3)(C). And it further provided a special form of custody in the care of ORR that takes account of their particular vulnerability. 8 U.S.C. § 1232(b)(1); *see also* 45 C.F.R. § 410.1003 (implementing the TVPRA by providing general principles for caring and placing unaccompanied children). Each of these rules mandatorily structures removal proceedings in such a way as to protect and benefit unaccompanied children in light of their unique vulnerabilities. Thus, unaccompanied children have a protected interest in the immigration procedures and specially tailored custody system guaranteed to them by statute.

*Third*, putative class members who have petitioned for or been granted SIJS, *see, e.g.*, Ex. L, Declaration of S.M.G.T. ("S.M.G.T. Decl.") ¶ 4; Ex. S, Declaration of M.F.I.T. ("M.F.I.T. Decl."), ¶ 3, also have a protected interest in that status. *See, e.g.*, *Osorio-Martinez v. Att'y Gen. of the U.S.A.*, 893 F.3d 153, 171 (3d Cir. 2018) ("Congress . . . afforded these aliens [granted SIJS] a host of procedural rights designed to sustain their relationship to the United States and to ensure they would not be stripped of SIJ protections without due process."); *Joshua M. v. Barr*, , 679 (E.D. Va. 2020) ("SIJ status may constitute a protected liberty or property interest, and it may be revoked only for what the Secretary of Homeland Security deems 'good and

sufficient cause,' 8 U.S.C. § 1155; 8 C.F.R. § 205.2."); *J.L. v. Cissna*, 374 F. Supp. 3d 855, 869 (N.D. Cal. 2019) ("Plaintiffs [with *unapproved* SIJS petitions] have plausibly alleged that they have a protected property interest in SIJ status.").

As to the second prong, the risk of erroneous deprivation is extremely high. Defendants are discarding mandatory procedural protections in favor of no procedure at all. Defendants have offered Plaintiffs *no* procedure by which to challenge their transfer from ORR custody and their summary expulsion. *See generally* Ex. A, Suppl. Flores Decl. (describing haphazard and abrupt process by which children were roused from their sleep without notice and put on planes in the middle of the night); *cf.* Ex. B, Vander Hoek Decl., ¶ 27 (describing the procedures "[u]nder normal circumstances" for children granted voluntary departure); Ex. E, Tabaddor Decl. ¶¶ 15, 17 (describing "carefully and deliberately coordinated" process for "very rare instances where voluntary departure was ultimately requested and granted").

The risk of erroneous deprivation is also uniquely elevated because Defendants have failed to provide unaccompanied children notice that they will be imminently transferred from ORR custody imminently subject to summary expulsion. *See generally* Ex. A, Suppl. Flores Decl.; *see also, e.g.*, *Abrego Garcia*, 777 F. Supp. 3d at 517 ("Defendants deprived Abrego Garcia of this right without *any procedural protections* due to him. Indeed, nothing in the record suggests that Abrego Garcia received any process at all."); *cf. A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367-68 (2025) ("Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties' and that 'afford[s] a reasonable time ... to make [an] appearance.'") (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Deprived of lawful procedures, Plaintiffs or putative class members erroneously transferred from ORR custody or expelled have no recourse to challenge these deprivations. Moreover, those with

viable asylum claims and pending or granted SIJS petitions have no mechanism to challenge the erroneous deprivation of their protected interest.

As to the third prong, the government does not have an interest in violating the TVPRA and its implementing regulations or in unlawfully expelling unaccompanied children. Any interest that it may posit in this practice, however significant, must be measured against "the necessity that [the government interest] be pursued in a manner consistent with the Constitution." *A.A.R.P.*, 145 S. Ct. at 1368; *cf.* Ex. E, Tabaddor Decl. ¶ 16 ("Immigration courts recognized the need to safeguard the child's independent rights and ensure compliance with statutory protections.").[21] Moreover, any fiscal or administrative burdens imposed by compliance with the mandatory scheme created by the TVPRA and its implementing regulations[22] and with the INA are outweighed by the profound deprivation of Plaintiffs' protected interests and by the manifest risk of erroneous deprivation. *See, e.g.*, *Minney v. United States Office of Personnel Mgmt.*, 130 F. Supp. 3d 225, 233 (D.D.C. 2015) (additional administrative burden on the government was "far outweighed by the considerable private interests at stake.").

The procedures used to determine whether unaccompanied children should remain in the United States and how they should be treated in custody can be—and have been— "tailored . . . to the capacities of those who are heard . . . to ensure that they are given a

---

[21] *See also* Ex. E, Tabaddor Decl. ¶ 19 ("In my professional judgment, any decision to repatriate a child based solely on a parent's request, without ensuring independent counsel, full procedural safeguards, and consideration of the child's best interests, would be inconsistent with the standard practices and protections afforded to unaccompanied minors in immigration proceedings.").

[22] Immigration courts are well-versed in complying with statutory and constitutional requirements within limited administrative resources. *See, e.g.*, *id.* ¶ 18 ("While immigration judges are constrained by the INA, over time practices developed to provide additional safeguards, including specialized dockets, enhanced access to counsel, and attention to child welfare considerations.").

meaningful opportunity to present their case" without burdening the government. *Mathews*, 424 U.S. at 349; *see also Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (noting that "the State is entitled to adjust its legal system to account for children's vulnerability and their needs for concern, sympathy, and paternal attention.") (quotation marks, alterations, and citation omitted). Indeed, Defendants seek to deprive Plaintiffs of protected interests by eschewing procedures and systems tailored by Congress to their unique capacities. Plaintiffs show a likelihood of success on the merits of their claim that Defendants' actions violate the Due Process Clause of the Fifth Amendment.

### 3. Plaintiffs are likely to succeed on the merits of their claim that ORR's actions violate the Accardi principle.

ORR's actions to remove children from its custody and repatriate them to Guatemala without any of the protections provided to unaccompanied children violate the agency's own regulations. The *Accardi* doctrine, a bedrock administrative law precept, establishes that "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) (citing *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954)). This principle upholds "a fundamental tenet of our legal system" that "[a]ctions by an agency of the executive branch in violation of its own regulations are illegal and void." *VanderMolen v. Stetson*, 571 F.2d 617, 624 (D.C. Cir. 1977). Conduct in derogation of a regulation is thus "not in accordance with law" (namely the law established by the agency's own rule). *Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018).

The Foundational Rule falls within *Accardi*'s ambit. ORR promulgated the Rule as a formal regulation pursuant to notice-and-comment procedures. By definition, it "has the legal effect of binding the agency or other parties," *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1207 (D.C. Cir. 1996) (cleaned up), and "must be adhered to" under

*Accardi. United Space Alliance, LLC v. Solis*, 824 F. Supp. 2d 68, 82 (D.D.C. 2011); *accord Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.) ("It is axiomatic that an agency must adhere to its own regulations . . . .") (citing *Accardi*, 347 U.S. at 265-67)). This conclusion applies with "particular force" here because the Foundational Rule affects "the rights of individuals." *Damus*, 313 F. Supp. 3d at 335. Indeed, safeguarding the individual rights of unaccompanied children is the Foundational Rule's explicit purpose. *See* 89 Fed. Reg. 34384, 34385 ("Pursuant to these statutory requirements, the UC program provides safe and appropriate environment for unaccompanied children in ORR custody"); *id.* at 34389 ("The purpose of this rule is to finalize a regulatory framework that (1) codifies policies and practices related to the care and custody of unaccompanied children, consistent with ORR's statutory priorities; and (2) implements relevant provisions in the [*Flores* Settlement Agreement].").

Despite the Foundational Rule's binding nature, Defendants have defied it in favor of carrying out a scheme the agency itself previously rejected. When promulgating the Foundational Rule, ORR considered and rejected a proposal to prioritize repatriation rather than release unaccompanied children to sponsors. During notice and comment, one commenter recommended ORR amend its proposed rule to "prioritize uniting unaccompanied children with their families in home countries." 89 Fed. Reg. 34,442-43 (Apr. 30, 2024). ORR responded to explain that ORR "is not authorized to make decisions regarding repatriating individuals in their country of origin" and that "where appropriate, ORR may unite children with a parent abroad" but "placement with a vetted and approved family member or other vetted and approved sponsor is generally in the best interest of the child." *Id.*

32

The Foundational Rule requires ORR to treat children in their custody "with dignity, respect, and special concern for their particular vulnerability." 45 C.F.R. § 410.1003(a). The Rule states that ORR "shall place each unaccompanied minor in the least restrictive setting that is in the best interest of the child and appropriate to the child's age and individualized needs, provided that such setting is consistent with the interest in ensuring the unaccompanied child's timely appearance before DHS and the immigration courts and in protecting the unaccompanied child's well-being…" 45 C.F.R. § 410.1103(a).

To accomplish these ends, the Rule lays out a detailed structure for carrying out ORR's statutory obligations. If an unaccompanied child wishes to be repatriated, there is a clear process by which they may do so. In fact, all of the children in ORR custody should be aware of their right to pursue voluntary departure because the Foundational Rule requires ORR to "provide or arrange for" "legal services information regarding … the ability to apply for asylum with U.S. Citizenship and Immigration Services (USCIS) in the first instance, and the ability to request voluntary departure in lieu of removal." 45 C.F.R. § 410.1302(c)(12); *see also* 45 C.F.R. § 410.1309(a)(2)(B)(iv)-(v). Those regulations likewise protect children's best interest, even when it is in the best interests of an individual child to return to their country of origin.

The Foundational Rule also executes the TVPRA's requirements by providing services to the children in ORR's care; identifying, vetting, and releasing children to the care of suitable family members in the United States; providing legal services information and accurate legal advisal regarding their right to various immigration processes; and screening children for various vulnerabilities to facilitate the appropriate protection and referrals. 45 C.F.R. § 1302(c). The Foundational Rule also outlines detailed processes for evaluating and denying release to a sponsor in the United States, including notifying a child's counsel of such denial. 45 C.F.R. §

410.1205(e). Under the Foundational Rule, child advocates must also be able to meaningfully explain "the consequences and potential outcomes of decisions that may affect their unaccompanied child client" and advocate for the child client's "best interest with respect to care, placement, services, release, and within proceedings to which the child is a party." 45 C.F.R. § 1308(c)(2)-(3). Children's legal representatives and child advocates play an integral role in their protection and therefore must be kept informed of developments in their cases and be able to advocate on their behalf in a timely and meaningful way. *See* 45 C.F.R. §§ 410.1308(b); 410.1309 *et seq*.

Finally, the Foundational Rule outlines logistical processes and protections for children while in ORR custody including while being transferred to different locations. 45 C.F.R. § 410.1600. These protections include providing sufficient notice to interested parties (like a child's attorney of record or child advocate) well in advance of such transfer and ensuring children are medically cleared for travel. *Id.* These regulations apply whether children are transferred individually or in large groups. *Id.* at § 410.1600(c).

Summarily expelling children without any individualized assessment of their safety or needs, and without any "concern for their particular vulnerability" clearly contradicts the Foundational Rule's requirements. Instead of following the careful regulations designed to ensure that children would be safe and protected, Defendants failed to meaningfully notify children's attorneys and child advocates that they would be summarily removed. *See* Ex. A, Suppl. Flores Decl. ¶¶ 13-17. Moreover, rather than ensuring children knew what was happening and why, ORR woke children in the night and subjected them to the trauma of imminent removal contrary to best practices and the children's welfare. *See id*. ¶ 7. Summary removal interferes with ORR's obligations to release children to suitable caregivers in the United States. ECF No.

34

2-2 at 10, T.A.C.P. Decl. ¶ 2. ORR functionally prevented children from exercising the rights that it is required to advise children of by preventing them from appearing in immigration court, even to request voluntary departure. *See, e.g.*, ECF No. 2-2 at 26, A.R.M.D. Decl. ¶ 4; ECF No. 2-2 at 7, H.L.E.C. Decl. ¶ 3; ECF No. 2-2 at 5, M.O.C.G. Decl. ¶ 3; ECF No. 2-2 at 10, T.A.C.P. Decl. ¶ 4; ECF No. 2-2 at 24, G.A.B.B. Decl. ¶ 5. ORR did not follow many of its regulated procedures for transferring children, like ensuring children were medically cleared for travel or notifying interested parties 48 hours prior to physical transfer. 45 C.F.R. §1600(a)(2)-(3). In flouting its own regulations designed to protect children, ORR placed children in serious peril.

To the extent Defendants argue that children *want* to be repatriated, there is a clear process by which they may do so as discussed above. *See, e.g.*, Ex. E, Tabaddor Decl. ¶¶ 14-17. In fact, all of the children in ORR custody should be aware of their right to pursue voluntary departure because the Foundational Rule requires ORR to "provide or arrange for" "legal services information regarding … the ability to apply for asylum with U.S. Citizenship and Immigration Services (USCIS) in the first instance, and the ability to request voluntary departure in lieu of removal." 45 C.F.R. § 410.1302(c)(12); *see also* 45 C.F.R. § 410.1309(a)(2)(B)(iv)-(v). Those regulations likewise protect children's best interest, even when it is in the best interests of an individual child to return to their country of origin.

Defendants have thus done "precisely what the regulations forbid" them from doing. *Accardi*, 347 U.S. at 267. This conduct "not in accordance with law" must be "h[e]ld unlawful" as a result. *See* 5 U.S.C. § 706(2)(A).

**B.    Plaintiffs will suffer irreparable harm in the absence of an injunction.**

To establish irreparable harm, plaintiffs must show "(1) that the harm is 'certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm' and (2) that the harm is 'beyond remediation.'"

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 175

(D.D.C. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir.

2016) (cleaned up).

Here, Plaintiff Children and putative class members have demonstrated clear and

irreparable harms if removed to Guatemala. To begin, the threat of expulsion without the

opportunity to apply for humanitarian protection or other immigration relief constitutes

irreparable injury. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (finding

irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the

protections the immigration laws provide"), *aff'd in part, rev'd in part on other grounds*, 24

F.4th 718 (D.C. Cir. 2022); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517

(D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation

prior to receiving any of the protections the immigration laws provide").

The events of August 31, 2025 show the imminence and severity of the harm Plaintiffs

face. Putative class members were on the verge of unlawful expulsion but for Judge Sooknanan's

intervention. *See, e.g.*, Ex. A, Suppl. Flores Decl. ¶¶ 13-17 (describing abrupt and disruptive

government efforts, witnessed by declarant, to expel putative class members in the early morning

hours of August 31, 2025); *id*. ¶ 7 ("[O]ne young girl [at the ORR shelter declarant visited] was

extremely distraught, crying, and repeatedly saying she could not back to Guatemala . . . . [O]ne

young girl was so scared that she vomited and asked to speak with a clinician . . . . [O]ne young

teenager was so scared that he might end up murdered like one of his family member.").

Plaintiffs and putative class members risk imminently experiencing or reexperiencing this

trauma, which cannot be remediated; Ex. A, Suppl. Flores Decl. ¶ 9 ("My 10-year-old client, the

lead Plaintiff LGML, was asleep at the Urban Strategies San Benito shelter. She told me she was

taken out of bed around 4:30 in the morning for transport. Her Child Advocate from the Young Center was present at the facility and was able to get her removed from transport. LGML was tired and worried."). *See, e.g.*, Ex. P, A.J.D.E. Decl. ¶¶ 11-12 ("The director of the shelter told us that we were not going to be deported because a judge had issued an order pausing the deportations . . . . The impact is real. I feel totally traumatized. I don't even know how to explain it.").

If the Court does not issue a preliminary injunction, there is little doubt that Defendants will again put Plaintiffs back on airplanes and unlawfully expel them to Guatemala, where many have suffered abuse or neglect by parents and where they will not be able to live safely upon return. Statements in the record from Guatemalan unaccompanied children demonstrate the irreparable harm they imminently face:

- "I came to the United States after experiencing abuse and neglect from my father and abuse from the father of my child. If I am sent back, I will not be able to live safely." ECF No, 2-2 at 7, H.L.E.C. Decl., ¶ 6.

- "Since I was little in Guatemala I have suffered from physical and emotional abuse from both of my parents. I am receiving mental health care here in the shelter. My parents would say ugly things to me like, 'why was I born, that I have ruined their lives and why I was always in their way.' They hit me with a belt, with their hands and with sticks, and sometimes I would bleed. I fear that if I were to return to Guatemala my life would end. This is the reason why I do not want to return to Guatemala, and I wish to continue my legal process here in the United States." Ex. J, Declaration of J.A.I.T. ("J.A.I.T. Decl."), ¶¶ 7,8,9,10.

- "I have a deportation case before the Immigration Court in New York, NY. I still have hearings before the Immigration Court for my case, so I am fighting for protection against being deported to Guatemala. I learned recently that the government might try to deport me before I have gotten a chance to defend myself in my deportation case with Immigration Court. I do not want to be deported. I am afraid to return to Guatemala. My parents did not take care of me like they should have when I was in Guatemala; I do not believe my parents would be able to take care of me if I have to return. My attorney is helping me seek protection from the harm I suffered at the hands of my parents in Family Court. I ask that this Court allow me

to stay safely in the United States while I work with my attorneys to continue with my cases before the Family Court and Immigration Court. Ex. H, Declaration of E.M.V.M. ("E.M.V.M. Decl."), ¶¶ 3-8.

☐ "Before coming to the United States, I lived in [], Guatemala. My mother died when I was around 12 years old. Before my mother died, I stopped attending school to care for her fulltime. After she died, I lived with my father and stepmother and did not return to school. Instead, I had to work in the fields and do housework even though I wanted to go to school. My stepmother treated me differently than her kids, and I did not feel comfortable at home.

I fled to the U.S. on my own without a parent, and I am afraid to go back to Guatemala because there is a problem of gangs kidnapping girls my age and forcing them to be their girlfriends. I am afraid that will happen to me. There is no one who can care for me or protect me if am forced to return to Guatemala. Because I am Chuj, I don't think the government will help me if I need it. I feel safe and cared for here in the United States.

Around a week and a half ago, some immigration agents came to ask me questions at the foster care program. The agents asked me if I have any family in my home country, and if I talk to my parents. The agents did not ask me if I was afraid to go back to Guatemala, if I have ever been forced to work, if I can go back to live with my father, or what would happen to me if I had to go back to Guatemala. I felt ve1y anxious during the interview. I had never met the officers before and did not understand why they were asking me the questions they did or what they would do with the information." Ex. I, Declaration of S.C. ("S.C. Decl."), ¶¶ 3-5.

☐ "I am afraid of return to Guatemala by [sic] is in danger there. My father is dead and my mother does not want me to return." Ex. K., Declaration of E.A.M. ("E.A.M. Decl.").

The conditions under which Defendants will transfer Plaintiffs from ORR custody in order to summarily expel them absent a preliminary injunction constitute further irreparable harm. Plaintiffs are at imminent risk of being denied care and access to basic needs such as shelter, food, and education that Defendants are legally required to provide either in ORR custody or through safe repatriation *after* unaccompanied children have completed their removals proceedings or chosen to voluntarily depart with legally mandated safeguards. Ex. B, Vander Hoek Decl. ¶ 23. Plaintiffs would be removed from the United States without—or in

some cases in defiance of—a child advocate's regulatorily-mandated Best Interest Determination and denied the informed consideration of an immigration judge adjudicating a voluntary departure application. ECF No. 2-2 at 33, TVPRA Child Advocate Garcia Decl. ¶ 11 ("It is our determination that it is in H.M.O.C.'s best interests for this Court to ensure H.M.O.C. remains in the United States while her immigration case is pending and to protect her from being removed before she is able to have her case fully adjudicated by immigration officials . . . . If H.M.O.C. is ever ordered to leave the United States by an immigration judge, she should do so only after provisions are made under the TVPRA for her safe repatriation, including confirmation by her Child Advocate and attorney that she will have a safe, appropriate and permanent place to which she can return. Once they are removed to Guatemala, harms will be irreparable."). Both constitute indispensable procedural protections to prevent harm to repatriated UACs. Ex. B, Vander Hoek Decl. ¶ 22 ("In many cases where there are concerns about the child's safety in home country, the Young Center will conduct a safe repatriation assessment, contracting with experts int he child's home country to visit the child's community, meet with family members, and determine whether the child will be safe upon return.").

Further, Guatemalan unaccompanied children with pending asylum applications risk imminent removal from ORR custody and expulsion without the opportunity for their applications to be adjudicated. They risk imminent persecution or torture upon return to Guatemala. Once they are expelled, there will be no remedy for this violation. *P.J.E.S.*, 502 F. Supp at 517 ("[P]utative class members are being returned without any opportunity to apply for asylum or withholding of removal. Once expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can be provided."); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (plaintiffs would suffer irreparable harm if

they were summarily removed without being afforded opportunity to exercise their right to apply

for asylum). Many fear persecution or torture upon return and wish to continue pursuing their

asylum claims before the immigration court:

> ☐ "I identify as part of the LGBTQIA+ community and fear returning to Guatemala where I will be raped by men in my community and my family will force me to marry a man. If I had to return to Guatemala, I would kill myself." Ex. Q, G.Y.V.S. Decl. ¶ 5.

> ☐ "I am terrified of having to return to Guatemala because of the many terrible things that happened to me there…Also, I am certain that people there who hurt me and threatened to kill me before will once again hurt me and will carry out their threats to kill me. The Guatemalan police and government will not protect me. I am afraid of the Guatemalan government. Before I left Guatemala, a judge put me in a shelter for boys whose families severely mistreated them. This was supposed to protect me. However, living in that government shelter was horrific. For close to one year, staff members subjected me to many kinds of physical abuse on an almost daily basis, and also sexually abused me. I want the chance to have my claim for asylum, withholding of removal, and protection under the Convention Against Torture fully and fairly decided." Ex. F., D.I.R. Decl., ¶¶ 6,7,8.

> ☐ "I came to the United States after receiving threats from gang members. One day on my way from picking my brother up from school gang members approached us and told us to tell our mom to pay an extortion that she could not afford or they would kill us. If I am sent back, I will not be able to live safely. My mother did not request my return to Guatemala, she fears for my safety there. I want to remain in the United States and continue to fight my case in Immigration Court and have a fair opportunity to be heard." Ex. G, Declaration of D.E.C.E. ("D.E.C.E. Decl."), ¶¶ 5-6, 8.

> ☐ "I fear returning to Guatemala. I was a victim of human trafficking in the United States and my country does not have resources for victims of human trafficking." Ex. R, R.M.S.C.C. Decl., ¶ 5.

But for a preliminary injunction, Plaintiffs face imminent removal from ORR custody

and summary expulsion from the United States, including harms "beyond remediation" like the

loss of their substantial rights in their pending removal proceedings, in their applications for

relief, and in the safe repatriation guaranteed to them should they ever seek to or be ordered to

return to Guatemala. *See Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs'

imminent summary removals clearly constitute irreparable harm.

**C.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction.**

The balance of equities and the public interest factors merge in cases against the

government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)

(citations omitted). Where, as here, the challenged governmental conduct deprives Plaintiffs of

their rights and is contrary to the rule of law, both factors weigh in Plaintiffs' favor. Defendants,

to begin, "cannot suffer from harm from an injunction that merely ends an unlawful practice."

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). That is exactly

the relief Plaintiffs seek. The public—and therefore the government—has an interest in

protecting people in government custody, particularly children. *See Nken v. Holder*, 556 U.S.

418, 436 (2009) (describing the "public interest in preventing aliens from being wrongfully

removed, particularly to countries where they are likely to face substantial harm"). Moreover,

"[i]t is always in the public interest to prevent the violation of a party's constitutional rights."

*Simms v. D.C*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quotation marks and citations omitted);

*see also Torres v. U.S. Dep't of Homeland Sec*., 18-cv-02604, 2020 WL 3124216, at *9 (C.D.

Cal. Apr. 11, 2020) ("[T]he public has an interest in the orderly administration of justice[.]");

*League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (describing the "substantial

public interest in having governmental agencies abide by the federal laws that govern their

existence and operations") (citation omitted).

An injunction would particularly serve the public interest here given the public's special

concern for child welfare, which the TVPRA clearly articulates. The public has a particular

interest in ensuring children are not unlawfully removed to unsafe conditions. *See, e.g.*, *M.M.M.*

*on behalf of J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 537 (S.D. Cal. 2018) ("[T]he public has an interest in ensuring that these children [seeking asylum] receive the process that Congress has provided."). An injunction would particularly serve the public interest here given the public's special concern for the treatment and the unprecedented actions the government is taking planning to remove them without following clear legal mandates. That interest is best served by an injunction that ensures that ORR remain responsible for Plaintiffs' and putative class members' welfare, as Congress requires, during the pendency of this litigation.

**D.    The Court Should Not Require Plaintiffs to Provide Security Prior to the Preliminary Injunction.**

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." However, "courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. D.C.*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). District courts exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g.*, *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). This Court should do so here as well. Alternatively, the Court should order Plaintiffs to post security in the amount of $1.00.

**CONCLUSION**

The motion for a preliminary injunction should be granted.


Dated: September 3, 2025                              Respectfully submitted,

/s/ Efrén Olivares
Efrén C. Olivares*
Hilda Bonilla (D.C. Bar No. 90023968)
Lynn Damiano Pearson**
Kevin Siegel**
**NATIONAL IMMIGRATION LAW CENTER**
1121 14th Street, Suite 200
Washington, D.C. 20005
Tel: (213) 639-3900
Fax: (213) 639-3911
bonilla@nilc.org
olivares@nilc.org
damianopearson@nilc.org
siegel@nilc.org


*Counsel for Plaintiffs*
*Admitted pro hac vice*
**Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

　　*/s/ Efrén Olivares*
Efrén C. Olivares
Attorney for Plaintiffs