# EXHIBIT B

**Declaration of Carrie Vander Hoek**

I, Carrie Vander Hoek, declare as follows:

1.  This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.  I currently work as a Deputy Program Director of the Child Advocate Program at the Young Center for Immigrant Children's Rights ("Young Center"). The Young Center is a national non-profit organization whose mission is to protect and advance the rights and best interests of immigrant children in accordance with state, federal, and international law. Since 2004, the Young Center has been appointed by the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services to serve as the independent Child Advocate, akin to a best interests guardian *ad litem*, for unaccompanied and separated immigrant children. The Young Center is appointed as Child Advocate pursuant to the Trafficking Victims Protection Reauthorization Act (TVPRA), which authorizes ORR to appoint Child Advocates to "child trafficking victims and other vulnerable unaccompanied [immigrant] children." 8 U.S.C. § 1232(c)(6)(A).

3.  The Young Center's Child Advocate Program currently operates in nine locations across the country including: Phoenix, Arizona; Los Angeles, California; Chicago, Illinois; Grand Rapids, Michigan; New York, New York; Harlingen, Texas; Houston, Texas; San Antonio, Texas; and Washington, D.C.

4.  Since its founding, the Young Center has served as the independent Child Advocate for more than 7,000 children in federal custody. We are the only organization authorized by ORR to serve in that capacity.

5.  The Young Center is serving as next friend for the plaintiffs, who are minors, in this case. Over the years, the Young Center has served as next friend for

1

Declaration of Carrie Vander Hoek, Young Center

unaccompanied children in other federal litigation seeking to protect their rights and best interests.

6. I am a Licensed Master Social Worker (LMSW). For the last 18 years I have worked with unaccompanied children in federal custody and children in the state foster care system. Prior to joining the Young Center, I spent over seven years working for General Dynamics IT pursuant to its work with ORR. In that capacity, I provided review, assessment, and third-party release recommendations for children in ORR custody seeking release to family and later supervised 11 bilingual Case Coordinator staff who submitted child welfare-based recommendations on family reunification, transfers, and placements of unaccompanied children in ORR custody.

7. I received my Master of Social Work Degree from the University of New England in 2014, during which time I completed an internship with the Hope Family Health Center, and I received my Bachelor of Social Work from Calvin College in 2007. I am bilingual in Spanish and English.

8. I have worked at the Young Center for more than six years. From 2019 to 2020, I served as a Staff Child Advocate in our Harlingen, Texas, office, providing Child Advocate services for unaccompanied children in ORR custody. In that role, I advocated for children's best interests and developed Best Interests Determinations (BIDs) regarding children's care, custody, release, legal representation, and repatriation. I also provided case consultations and case support for staff on issues involving child welfare, child development, and trauma. I also supervised volunteer Child Advocates who were assigned to meet regularly with children in federal custody. From 2020 to 2021, I served as a Managing Social Worker, supervising both staff and volunteer Child Advocates in the Young Center's Harlingen, Texas, office. My role was to ensure our team's best interests advocacy was grounded in

2

Declaration of Carrie Vander Hoek, Young Center

child welfare and trauma-informed best practices. I engaged with local stakeholders on all issues impacting children's time in custody, and reviewed BIDs that were submitted in children's cases.

9. Since 2021, I have served as a Deputy Program Director of the Young Center's Child Advocate Program, based out of our Harlingen, Texas, office and more recently out of our Houston, Texas, office. In that capacity, I have overseen Child Advocate staff in our Harlingen, Houston, San Antonio, Washington, D.C., and Grand Rapids offices. I serve as a primary point of contact for Young Center Child Advocate and supervisory staff, ORR staff, ORR grantees and ORR contractors. I support Child Advocate Program staff in their role of providing BIDs regarding a child's safe release from ORR care, including reunification with sponsors in the United States and safe repatriation.

The Role of Independent Child Advocates

10. Young Center attorneys and social workers are appointed as independent Child Advocates alongside trained, bilingual volunteers to particularly vulnerable unaccompanied and separated children. The role of the Child Advocate is to determine and advocate for the best interests of children on matters related to a child's custody, placement, transfer, reunification with family or release to another sponsor, access to services, immigration case, and repatriation, where appropriate. Child Advocates identify a child's best interests by considering the child's expressed wishes, safety, right to family integrity, liberty, developmental needs, and identity. These "best interests factors" are well-established in the child welfare laws of all 50 states and in international law, including the Convention on the Rights of the Child.

11.     Child Advocates meet regularly with the children to whom they are appointed, to learn their story, understand their wishes, and to develop recommendations about what course of action by government officials will be in that child's best interests.

12.     To inform the Child Advocate's recommendations regarding the child's best interests, Child Advocates also gather information about the child's history from any adult who has relevant information about the child. This includes from parents and other adult family members, whether in the United States or in the child's country of origin.

The Role of Parents in the ORR Reunification Process

13.     When a child arrives in ORR care, the role of the ORR care provider's case manager is to support the child in locating a sponsor to ensure the child's prompt and safe release to a community setting while the child continues their immigration proceedings.

14.     The case manager speaks with the child and their parent(s) or legal guardian to identify a potential sponsor. A sponsor is an adult in the United States who can care for the child while the child's immigration case proceeds through immigration court or before U.S. Citizenship and Immigration Services (USCIS)—a process that can take months or even years.

15.     The case manager is required to interview the child and contact the child's parent or legal guardian, regardless of that adult's location, within 24 hours of the child's placement in ORR care. *See* Admin. for Child. & Fams. Off. of Refugee Resettlement, *Unaccompanied Child Manual of Procedures*, § 2.2.1. If an individual other than the child's parent was the child's caregiver in the child's country of origin, the care provider also speaks with that individual as part of a

safety assessment. *See* Admin. for Child. & Fams. Off. of Refugee Resettlement, *Unaccompanied Child Manual of Procedures*, § 2.2.

16. Federal law requires ORR to place children in the least restrictive setting in their best interest, which means prompt release to a safe adult whenever possible. *See* 8 U.S.C. § 1232(c)(2). In accordance with federal law, ORR gives first preference to a parent, if a parent is available in the United States. If a parent is not available, then ORR engages the child's parent(s) to identify whether there is an adult in the United States who would be an appropriate sponsor (caregiver) for the child.

17. Once a potential sponsor is identified, the case manager contacts the potential sponsor to submit a sponsor application, referred to as a family reunification packet, and completes an interview with the potential sponsor called the "sponsor assessment" that assesses the potential sponsor's willingness and ability to care for the child.

18. Before a child can be released to a non-parental sponsor, ORR typically obtains a written authorization from the child's parent for their child to be released to the sponsor through a form known as a "Letter of Designation for Care of a Minor." It is my understanding that ORR staff retain a copy of the letter in the child's ORR case files. In my experience, parents who can be located and contacted rarely decline to provide authorization for release to a sponsor.

19. In some cases, ORR is unable to secure a parent's authorization for a child's release to a sponsor because the parent(s) is/are deceased, a parent is unknown, the parent's location is unknown, or because the parent has otherwise abandoned care of the child. In these cases, ORR may gather information from a prior caregiver and conduct additional assessments to ensure a child's safe release to a sponsor, and if

5

Declaration of Carrie Vander Hoek, Young Center

ORR deems that the child can be safely released to the sponsor, ORR will release the child to the sponsor without a signed authorization from the child's parent.

Reunification in the Child's Country of Origin

20. I have worked with unaccompanied children in ORR care for over 15 years. What happened this past weekend is highly irregular. I have never experienced a purported reunification of a child in ORR care that occurred in the middle of the night, with minimal notice to the ORR care provider and with no notice to the child or to their family.

21. Typically, if children wish to return to their country of origin, ORR is not involved in this decision-making because the legal mechanism for return generally requires the involvement of an immigration judge. ORR is not a party to the child's immigration proceedings and does not provide recommendations related to repatriation to the immigration judge. If the immigration court grants voluntary departure, ORR plays a limited role in the process of return.

22. If a child wishes to return to their country of origin, the child's legal service provider or attorney supports the child in requesting voluntary departure before an immigration court. If there are concerns about the child repatriating due to their young age, safety reasons, or other concerns, the Young Center is often appointed as Child Advocate to the child to help conduct a safety assessment related to the child's repatriation and then provide a BID to the immigration judge, DHS, and the child's attorney. In many cases where there are concerns about the child's safety in the child's country of origin, the Young Center will conduct a safe repatriation assessment, contracting with experts in the child's country of origin to visit the child's community, meet with family members, and determine whether the child will be safe upon return.

23.     If the immigration court grants a child's request for voluntary departure, federal law requires the federal government to provide safeguards to ensure safe repatriation. *See* 8 U.S.C. § 1232(a)(1),(5). When a child is being repatriated, the U.S. Department of Homeland Security (DHS) typically notifies consulate and government officials for the child's country of origin and communicates with these officials to obtain necessary travel documents and make travel arrangements for the child. For children to whom the Young Center is appointed, Young Center Child Advocates collaborate with the Young Center's Safe Repatriation Team to identify case-specific safeguards and coordinate with local partner organizations in the child's country of origin to ensure the child's safe return. These safeguards typically including ensuring that the child's parents or caregiver is timely and adequately notified of (1) the child's travel itinerary, including when the child will leave ORR care and when the child will arrive in their country of origin; (2) the location where the child will arrive; and (3) the documentation the caregiver needs to bring with them (typically proof of relationship such as the child's birth certificate and proof of the caregiver's identification) so that the caregiver can retrieve the child and resume care of the child once the child arrives. If the child has any medical needs or other special circumstances, the Young Center informs DHS so that they can ensure that the adults traveling with the child can implement appropriate care for the child during their travel back to their country of origin. In nearly every case where a Child Advocate recommends specific safeguards regarding safe repatriation, the Young Center recommends that travel (departure and arrival) occur during daylight hours, to ensure that the child gets a developmentally appropriate night of sleep and arrives at a reasonable time of the day so that they can connect with their caregivers safely.

Guatemalan Children at Risk of Unsafe Return

24. On Friday, August 29, 2025, my team and I learned that immigration officials might attempt to return to Guatemala children in ORR custody who did not have a parent in the U.S. seeking their release. We were immediately concerned, as many of the Guatemalan children to whom we are appointed as Child Advocate and who do not have a parent in the U.S. available to sponsor the child's release from custody have informed their Child Advocate that they do not want to repatriate to Guatemala because they fear conditions in Guatemala or because they do not have a safe, permanent caregiver able or willing to care for them. Some children may have parents in Guatemala, but have experienced abuse, abandonment, or neglect at their hands.

25. On August 29, 2025, my colleagues and I quickly compiled a list of 114 Guatemalan children in ORR custody to whom we are appointed as Child Advocate and who do not have a parent in the U.S. available to sponsor the child's release from custody. The Young Center also has pending referrals for many other children who meet those criteria; but we have not yet been appointed due to limited capacity. The Young Center receives far more referrals for the appointment of Child Advocates each year than it is funded to serve.

26. Of the 114 Guatemalan children to whom the Young Center is appointed and who do not have a parent in the U.S. available to sponsor them, only two (2) had requested and received permission from an immigration judge to return to their country of origin through voluntary departure. Two other children had indicated an interest in seeking voluntary departure but had not yet appeared in immigration court.

27. Under normal circumstances, the two children granted voluntary departure by a judge would prepare to return with safeguards, including advance notice of their travel, advance notice to their family, and support for family who need assistance

8

Declaration of Carrie Vander Hoek, Young Center

traveling to the location of the child's return—usually Guatemala City, which may be a full-day trip for families living in other parts of the country.

28. In contrast, 14 children had already filed claims for asylum or Special Immigrant Juvenile Status (SIJS), meaning that they feared return to Guatemala. These cases are pending before USCIS.

29. An additional 32 children have been identified as eligible for asylum or Special Immigrant Juvenile status but were still searching for counsel to assist them in developing those complex legal claims.

30. For the remaining children, our information about their desire to seek protection was incomplete to due to our recent appointment to the case, limited information from the child or other stakeholders, or our rush to compile information about more than 100 active cases on such short notice.

31. In total, four (4) children to whom the Young Center was appointed were woken up and abruptly removed from ORR facilities in the dead of night between Saturday, August 30, 2025, and Sunday, August 31, 2025. All of those children were returned to ORR custody by the evening of August 31st.

32. However, two children who had previously been placed in ORR Long-Term Foster Care (LTFC) programs were *not* returned to their foster families and were instead placed in ORR shelter (congregate care) settings. In addition to the trauma that they experienced this weekend, these two children are now having to adapt to wholly new facilities with new staff and new children. One child had been in her LTFC placement for nearly 3 months, after having been in an ORR congregate care setting for almost 4 months. The other child had been in his LTFC placement for over 4 months, after having been in an ORR shelter setting for 5 months. Children in LTFC often live with a foster family that is trained to receive and care for unaccompanied children. Children in LTFC attend school in the community. In

these two cases, both children were integrating well into their foster homes and were excited because they had started public high school in August. Both children had expressed that do not wish to return to Guatemala. Now both children are living in a more restrictive, congregate care setting, hours away from their foster families, their attorneys, and without access to their schools, further exacerbating the harm of the events of August 30-31, 2025.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of September, 2025, at Houston, Texas.

Carrie Vander Hoek