UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

L.G.M.L., *et al.*,

    Plaintiffs,

v.

KRISTI NOEM, *et al.*,

    Defendants.

Case No. 1:25-cv-2942

**DECLARATION OF ANGIE SALAZAR**

I, **Angie Salazar**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Acting Director of the Office of Refugee Resettlement (ORR), an entity within the Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS). I have held my current role since March 5, 2025. As Acting Director, I am responsible for carrying out ORR's statutory mandates and mission and providing guidance and general supervision to the components of ORR.  My responsibilities encompass leading the agency, and directing and approving decisions related to care, custody, placement, and discharge of UAC in ORR's custody under the authorities provided by the Homeland Security Act of 2002 (HSA), 6 U.S.C. § 279; Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232; and ORR's regulations, including the Foundational Rule, 45 CFR part 410.[1] In February 2021, I became a member of the career Senior Executive Service. Prior to my current role I have led federal several offices covering, Illinois, Indiana, Wisconsin, Michigan, Ohio, South Texas, and abroad in Bogota, Colombia. I also served as the first director for the DHS Center for Countering Human Trafficking and as the Federal Coordinator over Operation Allies Welcome in Fort McCoy, Wisconsin. During my career, I investigated and/or led agents who investigated

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UAC Policy Guide"), which is publicly available on ORR's website at https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

violations of crime under the authority of the U.S. Department of Homeland Security (DHS), Homeland Security Investigations.

2. This declaration is based upon my personal knowledge, information acquired in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors. It describes actions taken by ORR as part of a coordinated effort by the United States government to respond to a request by the Guatemalan government to repatriate Guatemalan unaccompanied alien children in federal custody.

**ORR'S AUTHORITY TO REPATRIATE CHILDREN FOR REUNIFICATION WITH THEIR PARENTS IN GUATEMALA UNDER 6 U.S.C. § 279(b)(1)(H)**

3. In July 2025, the Government of Guatemala through its Ambassador requested the U.S. Government reunify unaccompanied alien children (UAC) in ORR custody with their parents or legal guardians in Guatemala. Based on the authorities delegated to me as the Acting ORR Director under the Homeland Security Act, 6 U.S.C. 279(b)(1)(H), my understanding is that ORR may legally support the reunification of certain Guatemalan children with a parent or legal guardian in appropriate cases in response to Guatemala's request. Under this authority, ORR would not act unilaterally but rather in coordination with other federal agencies. For example, ORR would coordinate with the U.S. Department of State (DOS) to ensure that Guatemala make certain assurances as to the children's safety once repatriated to Guatemala. ORR may also coordinate with U.S. Immigration and Customs Enforcement (ICE or DHS/ICE) and the Executive Office for Immigration Review (EOIR or DOJ/EOIR), a sub-agency of the U.S. Department of Justice (DOJ), following a negative fear screening for reunification in Guatemala consistent with 8 U.S.C. § 1231(b)(3) so that the child does not suffer adverse consequences such as having an order of removal entered against them in absentia.

4. In response to Guatemala's request, relevant federal agencies including ORR, ICE, DOJ/EOIR, and the U.S. Department of State/Bureau of Western Hemisphere Affairs (DOS/WHA) communicated amongst each other to discuss the request. ORR, for example, noted that it would need to ascertain through the appropriate Department or agency whether there were known trafficking, credible fear/asylum claims, or other issues (such as membership in a plaintiff class) that would make Guatemalan UACs in ORR custody ineligible for reunification under 279(b)(1)(H), given protections for certain unaccompanied alien children who are victims of

human trafficking or at risk of victimization, pursuant to the Trafficking Victims Protections and Reauthorization Act (see 8 U.S.C. 1232(b)(1); (c)(2)(A)). ORR also consulted with the DHS/ICE Office of the Principal Legal Advisor on the specific equities or issues involved with a child who has ongoing immigration proceedings (as well as those who do not).

5.  On July 24, 2025, ORR leadership, including me, Acting ORR Chief of Staff Matthew O'Neill-Levine, Assistant Deputy Director for Policy Toby Biswas, and officials from DHS and DOS, met with Guatemalan officials at the Guatemalan Embassy in Washington, D.C. At the meeting, ORR leadership explained that the office had been made aware through the Guatemalan Ambassador of the Guatemalan Government's request that their citizen nationals in ORR custody be returned to Guatemala, and that the decision had been made that the United States would honor the request. ORR explained that our authorities permitted us to reunite children with a parent abroad in appropriate cases. Our understanding based on that meeting is that Guatemalan officials believed their citizen nationals should be placed with their families rather than in prolonged U.S. government custody. Additionally, Guatemalan officials wanted to explore after demonstrating a concept of the reunification process (as a pilot) followed by a regular (routine) process. DHS would be responsible for organizing and facilitating transportation of children for purposes of repatriation, and transferring custody of the children to Guatemalan authorities, who in turn would return children to the custody of their parents.

6.  On August 26, 2025, the Government of Guatemala sent the U.S. Embassy a formal diplomatic note stating that the return of Guatemalan unaccompanied alien children who, by judicial action or voluntarily, return to Guatemala will be received by officials from various Guatemalan government entities,[2] consistent with the framework of the "best interests of the child" ("interés superior del niño") for "reunification with suitable family members" ("reunificación con familiares idóneos"). Notwithstanding the verbiage of the diplomatic note mentioning suitable family members, as noted, ORR had previously discussed with Guatemalan officials that its authority under 6 U.S.C. § 279(b)(1)(H) was limited to parents or legal guardians in appropriate cases, and ORR thus proceeded to consider eligibility for reunification on that more limited basis.

7.  According to the diplomatic note, following the children's arrival in Guatemala, the children would be received safely and in an orderly manner by the Guatemalan Migration Institute,

---

[2] *"[E]l lnstituto Guatemalteco de Migración (IGM), la Procuraduría General de la Nación (PGN) y la Secretaría de Bienestar Social (SBS);"* translated to English as: "the Guatemalan Migration Institute (IGM), the Attorney General's Office (PGN), and the Social Welfare Secretariat (SBS)."

3

the Solicitor General's Office, and the Social Welfare Secretariat in accordance with their protocols for reunification with suitable family members. Additionally, ORR would only be sending to Guatemala for reunification ying those children with an identified parent (or legal guardian) in Guatemala.

8. As noted, the Homeland Security Act delegates to the ORR Director the authority to reunite an unaccompanied alien child with his or her "parent abroad in appropriate cases." 6 U.S.C. § 279(b)(1)(H). Although the statute explicitly mentions parents, ORR has historically and consistently interpreted parent to include legal guardians because parents and legal guardians serve similar functions in the child welfare context, and thus ORR interprets the statute to permit reunification with a legal guardian abroad as well when appropriate. Applying this authority, in select cases in the past, ORR has released UAC to the custody of foreign governments or their consulates in the past. For example, in 2015, ORR released a set of siblings to the Mexican consulate so that they can be reunited with their grandmother in Mexico. In 2023, ORR discharged a child from the United Kingdom to the British Embassy so that he can reunite with his grandmother in the UK. On other occasions, ORR has also released children to Canadian government child welfare immigration authorities for purposes of third country reunifications with parents or legal guardians located in Canada.

9. Following the Government of Guatemala's request, ORR for its part sought to identify authorities under which it could respond, consistent with its other responsibilities for the care and custody of UACs and in coordination with other Federal agency partners.

10. Therefore, in accordance with ORR's statutory authority under 6 U.S.C. 279(b(1)(H), ORR Federal staff reviewed individual cases of unaccompanied alien children who are nationals or citizens of Guatemala to determine which cases were appropriate for reunification with their parents and legal guardians. Specifically, ORR employed the following criteria using a best interests framework in determining what constitutes an "appropriate case" for repatriation within the meaning of 6 U.S.C. § 279(b)(1)(H),

- Child is a national of Guatemala;
- Child does not have a parent or legal guardian in the United States who is sponsoring the child;
- Child has a parent or legal guardian in Guatemala;
- Child does not have credible fear claim or a pending asylum case;
- ORR is assured the child will not be trafficked upon their return;

4

- Child is medically cleared for travel;
- Child does not have indications of being a victim of trafficking;
- The child's attorney of record has not affirmatively protested the child's reunification with their parent (or legal guardian) in Guatemala; and,
- Child does not have indications of child abuse/neglect perpetrated by a parent/legal guardian.

11. ORR is statutorily responsible for the care and placement of unaccompanied alien children. With respect to Guatemala's request for repatriation of UACs, ORR made individualized determinations based on a review of its records to identify children who met the above criteria. These children do not have a parent or legal guardian in the United States who can sponsor them, meaning they will either need to remain in ORR care and custody in a group care setting, or be released to non-parent sponsors. Further, ORR verified based on its records that each of the identified children do have a parent or legal guardian in their home country of Guatemala and their government is requesting that the children be returned to their parent or legal guardian in Guatemala. ORR's statutory authorities contemplate reunification with a parent abroad in appropriate cases, and in ORR's view, given these facts and the other criteria identified above, it is appropriate and in the best interests of these children to reunite these children with their parent or legal guardian in their home country.

12. Based on the aforementioned criteria, as of August 29, 2025, ORR initially identified a total of 457 Guatemalan UAC in ORR care and custody as potentially appropriate for reunification with a parent or legal guardian as requested by the Government of Guatemala. After individualized case review, 91 children were removed from eligibility for reunification. ORR reviewed the children's cases for claims of fear of persecution with DHS's verification, as well as whether there were any pending asylum applications. Moreover, any child with other pending forms of immigration relief or human trafficking indicators were also removed from consideration. DHS also performed its review of the same case files for fidelity with their records. Any child under 10 years of age was further removed from consideration. 327 children were determined to be ultimately eligible in the end. Based on available information and belief, five of the ten named plaintiffs were included among these 327 UACs. ORR has not received from Plaintiffs the identifying

5

information (e.g., Alien numbers) of the named plaintiffs, which would enable it to know with certainty how many of the named plaintiffs were included among the 327.

13. ORR is neither a party to nor responsible for implementing removal proceedings, and so we deferred to DHS as to what if actions were needed with respect to terminating removal proceedings for UACS subject to Guatemala's request.

**NOTIFICATION TO CARE PROVIDERS AND LEGAL SERVICES PROVIDERS**

14. On August 30, 2025 at 11:45 PM EST, after I determined to authorize reunification, ORR sent notices to care providers to notify them of the fact that they have children in their program who have been identified for reunification in Guatemala. The notice called for care providers to take "proactive measures" to ensure that children are prepared for discharge within 2 hours (4 hours if in a foster care program).

15. The notice to care providers was accompanied by an attachment containing a corresponding Notice to Attorney of Record, and required care providers to utilize the attached notice for immediate dissemination to attorneys of record and child advocates of those children who were identified for reunification.

16. The notice to care providers also required care providers to ensure that the identified child have:
    - Identification and Documentation: The UAC possesses all necessary personal identification and travel documentation.
    - Personal Belongings: The UAC's personal belongings must be organized and ready for travel, adhering to one suitcase (40 lb. maximum) limit per child.
    - Medication: The UAC must have access to prescriptions and a 30-day supply of any required medications.
    - Food: The UAC must have two prepared sack lunches (nut free) ready for discharge.

17. The notice to care providers stated that care providers must contact ORR immediately if a child identified for reunification is not medically cleared for travel due to a documented medical condition.

18. The notice to care providers further instructed care providers to follow normal discharge procedures pursuant to ORR Policy Section 2.8 and make the appropriate documentation when completing the Discharge Notification Form.

19. Upon receipt of the notice, some care providers initially refused to comply with the stated instructions contained within the notice.
20. On August 31, 2025 at 1:12 AM, ORR sent notices to ORR-funded legal service provider, Acacia, to provide notification that the Government of Guatemala has requested the return of certain unaccompanied alien children who met the abovementioned criteria for reunification with a parent or legal guardian in Guatemala.
21. The notice to Acacia stated the criteria that ORR had considered as well as provided an attached list of children in ORR custody who were identified as meeting such criteria. The notice also stated that repatriation travel was to begin on August 31, 2025 and that legal service providers should immediately notify ORR and ICE/OPLA if they believe that a child on the list does not in fact meet the criteria.
22. On August 31, 2025, at 9:17 AM, ORR sent another memorandum to ORR care provider facilities stating that "ORR requires that all care facilities comply with the lawful directives of ORR as consistent with applicable laws and court orders."
23. Contrary to various media reports, my understanding is that no planes were ever in the air on August 31, 2025 in furtherance of repatriation.
24. The repatriation planes had been scheduled to depart on August 31, 2025 at 10:45 AM EST. The repatriation scheduled for the morning of August 31, 2025 encompasses 76 children and constituted phase one of the repatriation plan. The 76 children were all ages 14 or older who had self-reported that they had a parent or legal guardian in Guatemala but none in the United States.
25. To our knowledge, only one of the individual Plaintiffs was actually scheduled to depart on August 31, 2025. The sole scheduled Plaintiff was never actually boarded onto the plane scheduled to depart for reunification and repatriation.
26. Spanish language media reported and photographed family members of the children slated for reunification waiting to receive the repatriated children at Guatemalan Migration Institute's Centro de Recepción de Retornados, the agency within the Government of Guatemala for receiving returned individuals.[3]

---

[3] Noticias Telemundo, *Una jueza federal bloquea temporalmente la deportación de unos 600 niños guatemaltecos a su país de origen*, Aug. 31, 2025, https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/una-jueza-bloquea-temporalmente-la-deportacion-de-10-ninos-de-guatemal-rcna228278

7

**STATUS UPDATE**

27. On August 31, 2025 at 4:32 PM, ORR provided an updated notice to care providers stating that a temporary restraining order has been issued which enjoins Defendants from transferring, repatriating, removing, or otherwise facilitating the transportation of putative class members from the United States for the next 14 days absent further order from the Court. The putative class consists of all Guatemalan unaccompanied alien children identified as eligible for reunification in Guatemala as of August 31, 2025.

28. ORR has, to the best of my knowledge, fully complied with all court orders, including the initial temporary restraining order and the subsequent temporary restraining order issued on August 31, 2025 and all requests for pertinent status updates.

**Dated:**
**Washington, D.C.**
**September 6, 2025**

_____
**Angie Salazar**