# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

L.G.M.L., et al.,

          *Plaintiffs*,

v.

KRISTI NOEM, et al.,

          *Defendants*.

Case No. <u>25-cv-2942-TJK</u>

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 2

   I.   DEFENDANTS' ACTIONS VIOLATE THE TVPRA, THE INA, AND THE HSA. ........................ 2

      A.   Title 6 does not provide Defendants authority to summarily expel unaccompanied minors from noncontiguous countries. ............................................................ 2

      B.   Defendants' opposition reveals further statutory violations ............................ 7

      C.   In addition to their statutory violations, Defendants attempted to expel children whose parents had not requested, or were aware of, the purported "reunification." ................. 9

   II.   DEFENDANTS' ACTIONS VIOLATED DUE PROCESS. ........................................... 11

   III.   DEFENDANTS ACTIONS VIOLATED THE ACCARDI DOCTRINE. ............................... 15

   IV.   PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM. ................................. 17

   V.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR. .... 19

   VI.   THIS COURT IS NOT BARRED FROM GRANTING CLASS-WIDE INJUNCTIVE RELIEF. .......... 20

   VII.   THE YOUNG CENTER IS A PROPER NEXT FRIEND. ........................................... 21

   VIII.   DEFENDANTS' UNLAWFUL ACTIONS APPLY TO ALL CHILDREN IN ORR CUSTODY FROM NON-CONTIGUOUS COUNTRIES. ................................................................. 22

CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.A.R.P. v. Trump*,
   145 S. Ct. 1364 (2025)...............................................................................................12, 13

*Bridges v. Wixon*,
   326 U.S. 135 (1945) ..........................................................................................................12

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985) ..........................................................................................................12

*Coal. for Humane Immigrant Rts. v. Noem*,
   No. 25-cv-872 (JMC), 2025 WL 2192986 (D.D.C. Aug. 1, 2025) .........................................18

*D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*,
   391 F.2d 478 (D.C. Cir. 1968)........................................................................................6, 7

*Dep't of Homeland Sec. v. Thuraissigiam*,
   591 U.S. 103 (2020) ..........................................................................................................11

*Dep't of State v. Muñoz*,
   602 U.S. 899 (2024) ..........................................................................................................12

*Devitri v. Cronen*,
   289 F. Supp. 3d 287 (D. Mass. 2018).................................................................................18

*Doe v. Mattis*,
   928 F.3d 1 (D.C. Cir. 2019)..............................................................................................17

*English v. D.C.*,
   717 F.3d 968 (D.C. Cir. 2013)...........................................................................................15

*Enriquez-Perdomo v. Newman*,
   No. 24-5714, 2025 WL 2408658 (6th Cir. Aug. 20, 2025) ...................................................13

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022)...............................................................................................20

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ..........................................................................................................21

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022)............................................................................................18

*Immigrant Defs L. Ctr. v. Dep't of Homeland Sec*,
   No. 21-cv-395 (FMO), 2025 WL 1191572 (C.D. Cal. Mar. 14, 2025)..................................13

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019)..........................................................................................19

*J.G.G. v Trump*,
   145 S. Ct. 1003 (2025)...................................................................................................12, 13

*Jam v. Int'l Fin. Corp.*,
   586 U.S. 199 (2019) ..........................................................................................................20

*Japanese Immigrant Case*,
   189 U.S. 86 (1903) .......................................................................................................13, 14

*Jennings v. Rodriguez*
   583 U.S. 281 (2018) ..........................................................................................................14

i

*Khushnood v. U.S. Citizenship & Immigr. Servs.*,
No. 21-cv- 2022, WL 407152 (D.D.C. 2022).................................................. 11

*Kingdomware Techs., Inc. v. U.S.*,
579 U.S. 162 (2016) ............................................................................................ 3

*Landon v. Plasencia*,
459 U.S. 21 (1982) ............................................................................................ 12

*Lightfoot v. D.C.*,
246 F.R.D. 326 (D.D.C. 2007) .......................................................................... 14

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......................................................................................... 12

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .................................................................................... 12, 14

*Muthana v. Pompeo*,
985 F.3d 893 (D.C. Cir. 2021)........................................................................... 22

*Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*,
199 F.3d 507 (D.C. Cir. 2000)............................................................................. 6

*Nelson's Cabinetry, Inc. v. Blinken*,
No. 24-cv-1335, 2025 WL 83027 (D.D.C. Jan. 13, 2025) ................................ 12

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................... 17, 20

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) .................................................................. 17

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025)........................ 21

*Reno v. Flores*,
507 U.S. 292 (1993) ............................................................................ 11, 14, 15

*Suri v. Trump*,
No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) .................................. 13

*U.S. ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) .......................................................................................... 15

*U.S. ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) .......................................................................................... 11

*U.S. v. Guzman-Hernandez*,
487 F. Supp. 3d 985 (E.D. Wash. 2020)............................................................ 11

*W.M.M. v. Trump*,
--- F.4th ----, 2025 WL 2508869 (5th Cir. Sept. 2, 2025) ........................ 17, 20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......................................................................................... 14

Statutes

2 U.S.C. § 644........................................................................................................ 7

6 U.S.C. § 279...................................................................................................Passim

8 U.S.C. § 1225....................................................................................................... 6

8 U.S.C. § 101....................................................................................................... 13

8 U.S.C. § 1158..................................................................................................... 21

8 U.S.C. § 1225 ......................................................................................................... 11

8 U.S.C. § 1229 ....................................................................................................... 5, 9

8 U.S.C. § 1231 ......................................................................................................... 18

8 U.S.C. § 1232 ................................................................................................... Passim

8 U.S.C. § 1252 ............................................................................................... 2, 20, 21

8 U.S.C. § 1101 ........................................................................................................... 5

8 U.S.C. §§ 1221-1232 ............................................................................................. 21

Pub. L. No. 119-21, 139 Stat. 72, 385-87 (2025) ...................................................... 6

Rules

Fed. R. Civ. P. 17 ................................................................................................. 21, 22

Regulations

8 C.F.R. § 208.30 ........................................................................................................ 8

8 C.F.R. § 236.3 .......................................................................................................... 3

8 C.F.R. § 208.16 ...................................................................................................... 18

45 C.F.R. § 410 ........................................................................................................... 3

45 C.F.R. § 410.1302 ................................................................................................ 16

45 C.F.R. § 410.1309 ................................................................................................ 16

45 C.F.R. § 410.1601 ................................................................................................ 16

45 C.F.R. § 410.1308 ................................................................................................ 16

Unaccompanied Children Program Foundational Rule,

   89 Fed. Reg. 34,384 ............................................................................................... 3

**INTRODUCTION**

Plaintiffs are unaccompanied Guatemalan children whom Defendants have sought to summarily expel from the United States in violation of the Trafficking Victims Protection and Reauthorization Act of 2008 ("TVPRA"), the Immigration and Nationality Act ("INA"), and the Due Process Clause of the Fifth Amendment. Defendants' argument that they can expel hundreds of children in the middle of the night with two hours' warning[1] relies on the fallacy that they were acting pursuant to authority to "reunify" them with their parents. That argument is illogical and illegal. Title 6 does not authorize Defendants' actions, and Title 8 prohibits them. Defendants misconstrue 6 U.S.C. § 279 in an effort to dissolve their statutory and constitutional obligations to unaccompanied children. As a result, Defendants are putting hundreds of children at risk of imminent, irreparable harm if they are expelled with no remedy.

The Court should reject Defendants' invocation of nonexistent statutory authority. The Court should moreover reject Defendants' unsupported allegations that expelling class members was "appropriate" and in their best interest. The TVPRA and the INA comprehensively establish procedures intended to protect vulnerable children and ensure that their best interests are taken into account by the officials charged with making determinations about their eligibility to remain in the United States, *i.e.*, immigration judges acting in consultation with child advocates. Defendants' clandestine actions, waking children up in the middle of the night, without advance warning, without notifying their attorneys, and clearly with the intent of expelling them from the country before a court could intervene, belies any effort by Defendants to claim the mantle of protecting these children's interests. Moreover, by the time of the late-night transfers of children

---

[1] *See* ECF No. 35-1, Declaration of Angie Salazar ¶ 14 ("Salazar Decl.") ("The notice called for care providers to take "proactive measures" to ensure that children are prepared for discharge within 2 hours (4 hours if in a foster care program.").

1

from Office of Refugee Resettlement (ORR) custody to DHS over Labor Day Weekend, it was

clear that Plaintiffs and putative class members (1) did not wish to return to Guatemala and (2)

feared persecution and/or had no parental caregiver. While Defendants initially contended that

these purported reunifications were at the behest of Guatemalan parents, when those claims were

refuted, they pivoted to invoking an alleged request by the Guatemalan government. Finally, the

Court should also reject Defendants' erroneous references to the jurisdictional bar at 8 U.S.C. §

1252(f)(1) and to a provision in the One Big Beautiful Bill Act ("BBB"), as well as their claim

that the Young Center is not a proper next friend. Plaintiffs merit a preliminary injunction.

## ARGUMENT

### I.    Defendants' actions violate the TVPRA, the INA, and the HSA.

#### A.    Title 6 does not provide Defendants authority to summarily expel unaccompanied minors from noncontiguous countries.

Plaintiffs continue to show a likelihood of success on the merits of their claim that

Defendants' actions violate the TVPRA, INA, and the Homeland Security Act (HSA).

Defendants' remarkable position is that fewer than a dozen words in 6 U.S.C. § 279(b)(1)(H)

give them broad unreviewable authority to summarily expel unaccompanied children against the

wishes of the child. They seek to do so regardless of the status of the child's removal

proceedings or requests for immigration relief, and absent any statutes, regulations, or

procedures that set out standards for their actions. That is not what the statute says. Defendants

can only arrive at that result by a series of misrepresentations and illogical inferences.

The TVPRA provides mandatory procedures that apply to unaccompanied children from

noncontiguous countries. The HSA does not authorize Defendants to ignore the TVPRA. Indeed,

Congress disclaimed any such effect by enacting 6 U.S.C. § 279(c)'s rule of construction. The

only logical reading of the statutes is that they authorize repatriation after removal proceedings

2

have been disposed of through a removal order or a grant of voluntary departure. This reading gives effect to the plain meanings of the TVPRA, INA, and the HSA. ECF No. 20-1 at 12-19 ("Pls. Mot.").

The TVPRA, at 8 U.S.C. § 1232(a)(5)(D), provides that unaccompanied children from noncontiguous countries shall (i) be placed in § 1229a removal proceedings, (ii) be eligible for voluntary departure under § 1229c at no cost; and (iii) be provided counsel to the greatest extent possible, an obligation the statute imposes on the Department of Health and Human Services (HHS). *See id*. § 1232(c)(5); *see also Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 171 (2016) ("Unlike the word "may," which implies discretion, the word "shall" usually connote a requirement."). The provision of the HSA Defendants rely on, 6 U.S.C. § 279(b)(1)(H), does not authorize Defendants to ignore these requirements. In responding to comments on the Foundational Rule just last year, ORR itself "note[d] that [ORR] is not an immigration enforcement agency and is not authorized to make decisions regarding repatriating individuals in their country of origin; such decisions are in the purview of DHS and DOJ." Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34,384-01, 34,443 (Apr. 30, 2024) (codified at 45 C.F.R. pt. 10). ORR moreover has no authority to transfer unaccompanied children to ICE custody until they turn 18. *See* 8 U.S.C. § 1232(b)(2)(B). Where Congress has proscribed specific procedures for ensuring that unaccompanied children are removed from DHS custody and placed in ORR custody, 6 U.S.C. § 279, and both ORR and DHS have promulgated extensive regulations governing the process for doing so, *see* 45 C.F.R. § 410; 8 C.F.R. § 236.3, it is remarkable that Defendants identify no authority at all for ORR to transfer custody of these children to DHS in the manner they attempted over Labor Day weekend.

3

Seeking to evade the plain text of the statute, Defendants cite other sections of the TVPRA, but those sections show that Defendants do not have the "reunification" authority they assert. *First*, 8 U.S.C. § 1232(b) does not "expressly recognize[] HHS's reunification authority under 'section 279 of title 6.'" Def. Opp. at 8. The statute states that, "[c]onsistent with section 279 of Title 6 . . ., the care and custody of all unaccompanied alien children, including the responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). If Congress had wanted to expressly recognize the reunification authority that Defendants assert under 6 U.S.C. § 279(b)(1)(H), Congress would have done so. Yet the words "reunify" and "reunification" do not appear anywhere in § 1232. That is far from an express recognition. *Cf. Express*, Black's Law Dictionary (8th ed. 2004) ("Clearly and unmistakably communicated; directly stated.").

*Second*, 8 U.S.C. § 1232(a)(1) does not "provide[] the general rule permitting repatriation to a UAC's 'country of nationality or last habitual residence.'" Def. Opp. at 8. Instead, it charges agencies with "develop[ing] policies and procedures to ensure that unaccompanied alien children are safely repatriated to their country of nationality or last habitual residence." 8 U.S.C. § 1232(a)(1). It does not negate other mandatory provisions of the statute, including § 1232(a)(5)(D), and Defendants identify no such policies or procedures that would be relevant here. Section 1232(a)(2) provides "'[s]pecial rules specifically for repatriation of UACs from 'contiguous' countries[,]'" and § 1232(a)(5)(D) provides procedural requirements before safely repatriating unaccompanied children from noncontiguous countries pursuant to a removal order or grant of voluntary departure.[2]

---

[2] Moreover, § 1232(a)(3) further makes clear that § 1232(a)(2)'s provisions do not apply to children from noncontiguous countries.

8 U.S.C. § 1232(a)(5), which applies to Plaintiff Children and putative class members, mandates "safe and sustainable repatriation and reintegration" of unaccompanied minors into their countries of nationality or last habitual residence, "including placement with their families, legal guardians, or other sponsoring agencies[,]" in accordance with its provisions. These provisions authorize repatriation *after* unaccompanied children have had the opportunity to pursue immigration relief or after they are granted voluntary departure by an immigration judge under 8 U.S.C. § 1232(a)(5)(D). *See* ECF No. 20-7, Tabaddor Decl. ¶17 ("Even in the very rare instances where voluntary departure was ultimately requested and granted, only after investigations into the home environment and parental circumstances had been completed, the process was carefully and deliberately coordinated [with] [c]ounsel for the child, government counsel, and the parent.").

If there were any doubt about whether 6 U.S.C. § 279 authorizes Defendants to violate the TVPRA, subsection (c) of the statute, its rule of construction, definitively denies HHS the authority to dispose of immigration proceedings outside of Title 8. There, Congress stated unambiguously that "[n]othing in this section may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. §§ 1101 *et seq.*) from the authority of any official of the Department of Justice, the Department of Homeland Security, or the Department of State." 6 U.S.C. § 279(c). Plaintiffs are noncitizen children whom DHS is seeking to remove under the INA. If HHS were permitted to summarily expel unaccompanied children without awaiting the conclusion of their removal proceedings, DOJ and DHS would lose their statutory authority to adjudicate unaccompanied minors' benefits requests (including for voluntary departure, *see* 8 U.S.C. § 1229(c)

in violation of § 279(c). That cannot be the meaning of § 279(b)(1)(H). The TVPRA is clear as to the procedures guaranteed to Plaintiffs and putative class members. Section 279(b)(1)(H) does not provide Defendants the authority they assert, and the Court should reject Defendants' claim that it does. *See* Reply Ex. B, Smyers Decl. ¶5 ("ORR has rarely used 6 U.S.C. 279(b)(l)(h), never on a mass scale, and always in compliance with processes and practices [] in the [] (TVPRA)").

Defendants nonetheless raise the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, 385-87 (2025) ("BBB"), as "confirming" their reading of ORR's purported "reunification" authority notwithstanding the TVPRA's mandates. Def. Opp. at 12-13 (quoting BBB § 100051(8)). But that section is merely an appropriations law. It limits the use of "funding amounts available under this paragraph" only "for permitting a specified unaccompanied alien child to withdraw the application for admission of the child pursuant to section 235(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1225(a)(4))," and proceeds to define the term "Specified unaccompanied alien child" for purpose of the section. Even Defendants do not represent that any child identified in last weekend's activity is purporting to "withdraw the[ir] application for admission." 8 U.S.C. § 1225(a)(4).[3]

In any event, § 100051 is not authorizing legislation, but an appropriation. *See Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 510 (D.C. Cir. 2000) ("[A]uthorization acts generally precede appropriations acts[.]"). As such, it does not purport to change immigration law by extending contiguous-country rules to all unaccompanied children. Rather, it funds activities that other law already authorizes, such as the TVPRA's contiguous-country returns. *See*

---

[3] Nor does 8 U.S.C. § 1225(a)(4) say anything about "reunification." That provision provides that "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." It does not say that Defendants' have any power to make that decision for the immigrant.

*D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*, 391 F.2d 478, 482 (D.C. Cir. 1968) ("[B]ecause appropriation acts generally apply to a limited period of time courts have been reluctant to hold that appropriation acts affect any substantive legislation whatsoever.").

The Court should read BBB's language in harmony, not conflict, with the TVPRA, which treats differently the two categories of contiguous and noncontiguous unaccompanied children. Reconciliation provisions like the BBB's are subject to the "Byrd Rule," a set of six prohibitions found in section 313(b)(1) of the Congressional Budget Act, 2 U.S.C. § 644(b)(1), that declare several kinds of provisions "extraneous" and hence subject to a point of order. Subparagraph (C) disallows any provision that "produces changes in outlays or revenues which are merely incidental to the non-budgetary components of the provision."  The Senate Parliamentarian in 2021 applied this provision to disallow provisions "rescinding any immigration status from anyone" and rejected the argument that "the policy of stripping status from any immigrant does not vastly outweigh whatever budgetary impact there might be."[4] Here, too, Congress could not under reconciliation rules have made such a major policy change as to include noncontiguous countries' unaccompanied children in the regime that the TVPRA limits to contiguous countries.

## B. Defendants' opposition reveals further statutory violations.

Beyond the fallacy of asserting independent Title 6 "reunification" authority, the procedures Defendants purport to be following are themselves additional violations of the TVPRA and the INA. *First*, as part of Defendants' plan, agents from Homeland Security Investigations ("HSI")—a component of ICE—interviewed children and determined they did not

---

[4] Lisa Desjardins, PBS News, *Read the Senate rules decision that blocks Democrats from putting immigration reform in budget*, (Sept. 20, 2021), https://www.pbs.org/newshour/politics/read-the-senate-rules-decision-that-blocks-democrats-from-putting-immigration-reform-in-budget.

have a credible fear of return.[5] But a "credible fear determination" occurs only in the context of expedited removal, a proceeding from which Congress exempted Plaintiffs and putative class members.[6] Only asylum officers and immigration judges are authorized to determine credible fear in any event. *See* 8 C.F.R. § 208.30(b); *id*. § 1208.30(a). These interviews violate the TVPRA and are not a substitute for its robust procedures.[7]

*Second*, Defendants' lack of meaningful notice to attorneys before summary removal violates the TVPRA's access to counsel provision. *See* 8 U.S.C. § 1232(c)(5).[8] In the night and early morning of August 30-31, 2025, Plaintiff Children and putative class members were taken to the airport without *any* notice from the government. ECF No. 20-3, Flores Decl. ¶ 8.[9] One attorney was informed by the shelter that the only way to "protest" these planned removals was to email a generic inbox, orrguatemalareunification@acf.hhs.gov, which her staff frantically emailed at 2:57 a.m. CT on August 31, 2025, and received no response. This lack of notice of

---

[5] Indeed, multiple Plaintiffs and putative class members who underwent interviews in the weeks leading up to August 31, 2025, were never asked about their fear of return at all. ECF No. 2-2 at 5, M.O.C.G. Decl. ¶ 5; ECF No. 2-2 at 7, H.L.E.C. Decl. ¶ 5; ECF No. 2-2 at 19. L.F.M.M. Decl. ¶ 5; ECF No. 2-2 at 26, A.R.M.D. Decl. ¶ 2; ECF No. 20-16, W.M.R.P. Decl. ¶ 5; ECF No. 20-19, G.Y.V.S. Decl. ¶ 7; Reply Ex. K, I.B. Decl. ¶ 8; Reply Ex. L, Z.I.M.T.T. Decl. ¶ 7.

[6] Since 8 U.S.C. § 1232(a)(5)(D) exempts unaccompanied children from non-contiguous expedited removal, they never undergo a credible fear interview before filing an asylum application with USCIS.

[7] The use of HSI officers to conduct interviews of unaccompanied children also runs contrary to the TVPRA provisions that authorize the appointment of specialized Child Advocates to perform Best Interest Determinations. *See* 8 U.S.C. § 1232(c)(6); ECF No. 20-4, Vander Hoek Decl. ¶ 10.

[8] *See* Reply Ex. B, Smyers Decl. ¶ 10 ("Before any effort to return a child to their country of origin, ORR has historically always given ample notice directly to the attorney of record. This is so that the attorney of record, as well as the child advocate, have time to properly raise any concerns and provide a [Best Interest Determination]").

[9] *See also* Reply Ex. E, Avila-Cimpeanu Decl. ¶¶ 14-15 (describing the lack of notice to attorneys representing putative class members at the Florence Project in Arizona).

> [O]ver the course of night, the U.S. Government actively sought to physically remove at least 33 children, and one shelter even woke up all the children in care in the facility in the middle of the night even though they were not supposed to be removed that night   Despite having entered appearances as the attorney of record in the vast majority of these children's cases, Florence Project staff received no direct communication, notice, or response to inquiries from the federal government about its plans to effectuate these removals. Rather, in every case Florence Project attorneys learned that their clients were at risk of imminent physical removal only after shelter staff notified the Florence Project that their clients were being transported, and as a result of FIRRP's constant, proactive communication with shelter staff over the course of Friday and Saturday.

their client's imminent removal cannot be reconciled with the TVPRA's access to counsel requirements. 8 U.S.C. § 1232(c)(5); *see also* ECF No. 20-1 at 16-17.[10]

*Third*, Defendants' actions in apparently suspending Plaintiffs' and putative class members' immigration cases in the middle of proceedings also violate the TVPRA and the INA, as well as the HSA. Recently, for example, ORR sent immigration judges a list of six putative class members allegedly "amenable" to voluntary departure even though they have not requested it. *See* Ex. P, Donovan-Kaloust Decl. ¶ 5. Two putative class members attended immigration court hearings on August 29, 2025, where a judge stated they were on a list to take voluntary departure. Reply Ex. M, M.A.L.R. Decl. ¶ 4; Ex. L, C.M.L. Decl. ¶ 4; Although both declined and stated that they wanted to pursue relief from removal, Defendants nonetheless awoke them at night on August 31, 2025, preparing to expel them to Guatemala. *See id.* Congress has made clear that ORR does not have authority to determine whether an unaccompanied child receives an immigration benefit, including voluntary departure, 6 U.S.C. § 279(c),[11] and that unaccompanied minors have a right to seek voluntary departure in accordance with the INA, 8 U.S.C. § 1229c; 8 U.S.C. § 1232(a)(5)(D)(ii).

These procedures purportedly implemented by Defendants violate the TVPRA, the INA, and HSA. They would—and very nearly did—result in erroneous expulsions of Plaintiffs and putative class members.

**C. In addition to their statutory violations, Defendants attempted to expel children whose parents had not requested, or were aware of, the purported "reunification."**

---

[10] After some shelter staff objected to the children being taken in this manner, ORR circulated a memorandum to all ORR Care Provider Facilities threatening "civil and criminal penalties and charges." Ex. D, ORR "Demand for Compliance," August 31, 2025, 9:17 am.

[11] *See also* Ex. L, Z.I.M.T.T. Decl. ¶ 7:

Last Friday, I met with my immigration judge. And I told the judge I was scared of going back to Guatemala. My attorney told the judge that too. And my attorney told the judge she was going help me apply for asylum. So, the judge gave me more time on my case so I could do that. But it did not matter…The very next day, immigration officials tried to deport me without a chance to present my case.

Defendants do not have statutory authority pursuant to 6 U.S.C. § 279 to summarily expel unaccompanied children. But, even if they did, the record shows there was never a factual basis to support "reunification" with parents in Guatemala. At the August 31, 2025, hearing, Defendants asserted that they were summarily expelling unaccompanied Guatemalan children pursuant to requests for reunification from their parents. Transcript of Record at 9:2. But, as described in a report from the Guatemalan government, *see* Reply Ex. A, Report of the National Attorney General's Office of Guatemala ("Guatemala Report"),[12] *no* Guatemalan parents affirmatively requested the return of their children. In response to a notification from ORR that 609 unaccompanied minors would be returned to Guatemala, Guatemalan authorities attempted to contact the families concerned to notify *them* of the planned repatriations. *See* Guatemala Report at 2-3 (describing outcomes of 115 home visits and noting that "*none* were requesting [children's] return") (emphasis added). Guatemalan officials only learned of the summary expulsions on August 31, 2025, the day the first flights would have departed absent intervention by the Court. *Id.*

Even if the Guatemalan Report supported the government's factual assertions, it could not override the statutory mandates Congress has imposed on Defendants, which prohibit their actions in this case. Nonetheless, the Report makes clear that the summary expulsions could not

---

[12] On September 4, 2025, the United States Senate Committee on Finance held an oversight hearing. Committee Ranking Member Senator Ron Wyden entered into the Committee record an internal memo issued by the Guatemalan government that "exposes the Administration's bogus family reunification' claims as false." *See* Press Release, *Wyden Blasts RFK Jr. on Trump Administration's Scheme to Disappear Vulnerable Unaccompanied Migrant Children*, (Sept. 5, 2025), https://www.finance.senate.gov/ranking-members-news/wyden-blasts-rfk-jr-on-trump-administrations-scheme-to-disappear-vulnerable-unaccompanied-migrant-children; The President's 2026 Health Care Agenda: Hearing Before the Sen. Comm. on Finance, 119th Cong. (2025) (Statement of Ranking Member Ron Wyden), https://www.finance.senate.gov/hearings/the-presidents-2026-health-care-agenda. This document was also published by Reuters, which included a link to the document in a September 3, 2025, article describing the document as having been produced by a Guatemalan attorney general's office. Emily Green, Ted Hesson, and Kristina Cooke, *Exclusive: Guatemalan document undercuts US claims on child deportations*, Reuters (Sept. 3, 2025, 7:17 PM), https://www.reuters.com/legal/government/guatemalan-document-undercuts-us-claims-child-deportations-2025-09-03/.

under any reading be "appropriate cases" of reuniting unaccompanied children with a parent

abroad. Defendants actions violate the TVPRA, the INA, and the HSA.

## II. Defendants' Actions Violated Due Process.

Plaintiffs and putative class members are entitled to due process of law, and Defendants'

actions unconstitutionally deprive them of protected interests. The Fifth Amendment provides

that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law,"

U.S. Const., amend. V, and noncitizens, regardless of how they entered the United States, are

entitled to due process of law. *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established

that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

Defendants nonetheless make the startling assertion that Plaintiffs have *no* constitutional

due process rights, relying erroneously on *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S.

103 (2020). Def. Opp. 14. *Thuraissigiam* merely stated that an adult noncitizen apprehended

within "25 yards into U.S. territory" was entitled only to the process Congress provided[13]

because he had not "effected an entry." *Id*. at 139-40. That was the *only* situation *Thuraissigiam*

addressed. Had Congress "intended to overturn more than a century of precedent, it would have

said so. It did not." *U.S. v. Guzman-Hernandez*, 487 F. Supp. 3d 985, 991 (E.D. Wash. 2020). No

Plaintiff or putative class member is in Thuraissigiam's position. Each has clearly "effected an

entry" and is currently living in the United States. Defendants must recognize the constitutional

rights of the noncitizen children in their care.[14]

---

[13] Notably, the petitioner in *Thuraissigiam* was asking for process beyond what Congress has provided in expedited removal proceedings under 8 U.S.C. § 1225(b). Here, Congress also recognizes Plaintiffs' special status by exempting them from expedited removal and demanding additional robust protections in custody and removal. 8 U.S.C. § 1232(a)(D)(5).

[14] Likewise, *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) and *Khushnood v. U.S. Citizenship & Immigr. Servs.*, No. 21-cv- 2022, 2022 WL 407152 (D.D.C. 2022), are inapposite to Plaintiffs and the putative class. *Knauff* is concerned with a noncitizen seeking admission at a port or entry and the language is not applicable on the due process rights of noncitizens already in the United States. 338 U.S. at 539-40. Khushnood, similarly, was a

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Defendants' attempted summary expulsions cannot satisfy due process under any framework. According to Defendants' own account, they first provided notice to caregivers at 11:45 PM, with the plan to remove children from the country in less than 12 hours. Salazar Decl. ¶¶ 14-24. If, for adults, providing a "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster," *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1368 (2025), it is hard to see how a mere two hours is sufficient for children.

The balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), underscores the impropriety of the procedures used here.[15] *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (applying *Mathews* to evaluate constitutionality of deportation procedure). Plaintiffs have articulated clear protected interests. Defendants cannot undermine Plaintiffs' protected interest in avoiding summary expulsion. *See* Def. Opp. at 17 (distinguishing *J.G.G. v Trump*, 145 S. Ct. 1003 (2025)). This interest is well-supported by decades of precedent. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) ("Here the liberty of an individual is at stake . . . . Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual

_____

noncitizen who did not reside in the United States and "merely [sought admission] to work in this country." 2022 WL 407152 at *6 (D.D.C. 2022). Plaintiffs and putative class members—all of whom are unaccompanied minors in ORR custody— have effected an entry to the United States and are entitled to due process.

[15] The cases Defendants cite to argue against the *Mathews* balancing test, Def. Opp. at 15, appear to be unrelated to the point Defendants seek to make. Defendants are correct that the cases "do not engag[e] in any balancing analysis," but that is because the courts found there was no protected interest and never discussed the test they would apply if there a protected interest. *See Nelson's Cabinetry, Inc. v. Blinken*, No. 24-cv-1335, 2025 WL 83027, at *11 (D.D.C. Jan. 13, 2025); In Munoz, the Supreme Court considered whether a plaintiff – an American citizen – could state a due process claim after her noncitizen spouse' visa application was denied. The Court held that citizens do not 'have procedural due process rights in the visa proceedings of others.'") (quoting *Dep't of State v. Muñoz*, 602 U.S. 899, 902-03, 917 (2024)).

and deprives him of the right to stay and live and work in this land of freedom."); *Japanese Immigrant Case*, 189 U.S. 86, 101 (1903); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *5 (4th Cir. July 1, 2025) ("Without that order [enjoining Title 8 removal], Suri may well have been deported without the reasonable notice and opportunity for judicial review that 'all nine Justices agree[ ]' is due.") (citing *J.G.G.*, 145 S. Ct. at 1006, and *A.A.R.P.*, 145 S. Ct. at 1368 *v. Trump*, 145 S. Ct. 1364, 1368 (2025)).[16]

Defendants also fail to undermine the other protected interests Plaintiffs assert. Plaintiffs have a protected interest in the procedures guaranteed to them by the TVPRA, including its asylum provision. *See* Pls.' Mot. at 27-28; *see also Immigrant Defs L. Ctr. v. Dep't of Homeland Sec*, No. 21-cv-395 (FMO), 2025WL1191572, at *15-16 (C.D. Cal. Mar. 14, 2025) (finding protected interest in TVPRA procedures). Plaintiffs with Special Immigrant Juvenile Status, 8 U.S.C. § 101(a)(27)(J), also have a protected interest in that status. Contrary to Defendants' suggestion, Def. Opp. at 15, a statute can give rise to a protected interest, and the INA does so by providing SIJS classification to young people who meet specific statutory criteria. *See* Pls.' Mot. at 28-29.

Moreover, Defendants' representations only confirm that their plan for summary expulsions features an elevated risk of erroneous deprivation. *See* Def. Opp. at 14, 17. For example, Defendants claim to rely on informal HSI interviews to determine whether unaccompanied children fear persecution. These law enforcement officers are not trained in asylum law, and the TVPRA explicitly tasks trained asylum officers with evaluating

---

[16] Defendants are wrong to suggest that "*J.G.G.* did not—and could not—address due process in the Title 8 context." Def. Opp. at 17. Numerous courts have cited Alien Enemies Act decisions to support propositions related generally to immigration law, including in Title 8 cases. *See, e.g., Enriquez-Perdomo v. Newman*, No. 24-5714, 2025 WL 2408658, at *7, n.2 (6th Cir. Aug. 20, 2025) (citing *J.G.G.* for the proposition that "[b]ecause immigration law is civil, the Fifth Amendment would apply to violations of due process in the immigration context.").

unaccompanied children's fear of persecution or torture. To the extent Defendants' messages to care providers in the middle of the night were "notice" for due process purposes, they were clearly insufficient. *See, e.g.*, *Mullane*, 339 U.S. at 306. With such procedures, there is an elevated risk of expelling children who fear persecution, who lack caregivers abroad, or whose return would otherwise be unlawful and erroneous. [17]

Class-wide relief is appropriate. *See* Class Cert. Reply at 10. Even if there are variations in their individual immigration cases, putative class members face the same deprivation and are entitled to the same processes required by the TVPRA and the Constitution. *See, e.g.*, *Lightfoot v. D.C.*, 246 F.R.D. 326, 334-35 (D.D.C. 2007) (denying decertification of a class asserting due process claims). [18]

Seeking to avoid the conclusion that they have violated due process, Defendants deeply misconstrue *Reno v. Flores*. The *Flores* Court stated that "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings" and noted that, "[t]o determine whether these [unaccompanied children] have received it here, we must first review in some detail the procedures the INS has employed." 507 U.S. at 306-07 (citing *Japanese Immigration Case*, 189 U.S. at 100-01). In *Flores*, unaccompanied children argued that an INS regulation "violate[d] 'procedural due process,' because it [did] not require the Service to determine, with regard to *each individual* detained juvenile who lacks an approved custodian,

---

[17] Notably, the only government interest that Defendants invoke indirectly is "in promptly [reunifying children] without the full Title 8 removal process, which currently takes on average more than three years." Def. Opp. at 16 (citation omitted). If the government wanted to expeditiously conclude removal proceedings for unaccompanied minors with a view toward safe repatriation, it could simply and lawfully prioritize those cases.

[18] The concerns about class-wide relief in *Jennings v. Rodriguez* are inapposite here. *See* 583 U.S. 281, 314 (2018). The *Jennings* Court was discussing whether it would be appropriate to grant the same relief—an individualized bond hearing—to a class of noncitizens subject to more than 6 months of mandatory detention. However, here, it is clear "that the complained-of 'conduct [violation of the TVPRA's provisions] is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Cf. id*. at 313 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)).

whether his best interests lie in remaining in INS custody or in release to some other 'responsible adult.'" *Id*. at 300. The *Flores* Court determined that the regulation "satisfied [due process] by giving the detained alien juveniles the *right* to a hearing before an immigration judge," *id*. at 309 (emphasis in original), *i.e.*, the same right Defendants seek to deny to Plaintiffs here.

Defendants string together several phrases in *Flores* to give the impression that the Court was suggesting that a child's interest should receive less weight in due process analysis. *See* Def. Opp. at 18. Defendants are simply wrong. In the passage Defendants cite, the Court was *not* discussing "interests" for due process purposes, but rather outlining the "best interest of the child" standard used in family court proceedings. *See Flores*, 507 U.S. at 303-04. This discussion is unrelated to the due process inquiry.

Finally, Defendants erroneously argue that "any balancing inquiry must take account of the interests of other stakeholders, including parents and the government of Guatemala." Def. Opp. at 15. These interests are not relevant. Due process does not balance the interests of third parties. *See, e.g.*, *English v. D.C.*, 717 F.3d 968, 972 (D.C. Cir. 2013). Even if it were proper for the government to assert the private interests of third parties, there is no evidence that those third parties have experienced a deprivation. *Cf.* Opp. at 16-17 (implying, without support, that unidentified Guatemalan parents are attempting to assert their interest in care, custody, and control of their children).

### III. Defendants' Actions Violated the *Accardi* Doctrine.

In opposing Plaintiffs' arguments that ORR is failing to comply with its own regulations in violation of *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), Defendants largely rehash their incorrect statutory arguments. Def. Opp. at 18. Defendants violated the Foundation Rule in Title 45, *see* Pls.' Mot. at 33-34, which "lays out a detailed structure for carrying out

15

*ORR's* statutory obligations" as to Plaintiffs and putative class members. Pls.' Mot. at 33 (emphasis added). The Court should reject Defendants' attempt to sidestep the Foundational Rule by suggesting that purported "reunifications" are beyond its reach.

To be clear, the Foundation Rule applies to Defendants' actions. Provisions such as 45 C.F.R. § 410.1302(c) provide minimum standards for *all* unaccompanied children in ORR custody. 45 C.F.R. § 410.1308 requires, "access to information" for all child advocates: "After a child advocate is appointed for an unaccompanied child, the child advocate *shall* be provided access to materials to effectively advocate for the best interest of the unaccompanied child." (emphasis added). 45 C.F.R. § 410.1309 creates a framework for "[u]naccompanied children's access to immigration legal services" and addresses "legal services" for "all unaccompanied alien children who are or have been in the custody of the Secretary [of HHS] or the Secretary of Homeland Security, and who are not [from contiguous countries]."

Moreover, 45 C.F.R. § 410.1601 requires notice for moving unaccompanied children within the ORR network. Even if transfer to an airport is not explicitly mentioned, the regulation's benchmark of 48 hours' notice "prior to the unaccompanied child's physical transfer [to] notify all appropriate interested parties of the transfer, including the child's attorney of record or DOJ Accredited Representative, legal service provider, or child advocate, as applicable" should inform Defendants' notice obligations for more consequential transfers involving children's summary expulsion from the United States. Indeed, Defendants identify no provision of law *at all* that authorizes ORR's transfer of the custody of unaccompanied children to DHS outside of the statutory transfer that occurs when the child turns 18, 8 U.S.C. § 1232(c)(2)(B).

16

Defendants can only claim that Title 45 regulations are irrelevant by repeating their flawed premise that the "reunification" label makes generally applicable regulations fall to the wayside. It is clear, however, that Defendants have violated the *Accardi* principle by disregarding the Foundational Rule.

**IV. Plaintiffs Have Demonstrated Irreparable Harm**.

Plaintiffs have demonstrated irreparable harm. To begin, even with an individualized determination, *cf*. Def. Opp. at 20-21, summary expulsion without the potential for effective relief is irreparable harm. While removal itself does not typically constitute irreparable harm, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), the Fifth Circuit recently found irreparable harm where removal involved "the prospect of irremediable error.'" *W.M.M. v. Trump*, --- F.4th ----, No. 25-10535, 2025 WL 2508869, at *21 (5th Cir. Sept. 2, 2025); *see also id*. ("If Petitioners are removed based on the alleged improper invocation of AEA, there is little potential for effective relief . . . .[Q]uestions remain on whether their return could ever be effected. Thus, the *Nken* presumption . . . does not apply in these circumstances."); *see also Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019) (noting that, in some cases, transfer itself is a harm that cannot be remedied). As in *W.M.M.*, Defendants have not provided any assurances that they will return unaccompanied minors erroneously expelled pursuant to purported Title 6 authority. *Cf. W.M.M.*, 2025 WL 2508869, at *21-22. Their inadequate procedures and disregard for reasonable notice further heighten the risk of erroneous expulsion. *See also P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) ("[P]utative [UAC] class members are being returned without any opportunity to apply for asylum or withholding of removal. Once expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can

17

be provided").[19] Plaintiffs face irreparable harm because, absent an injunction, Defendants will

summarily expel them and cannot assure any remedy.

Defendants are wrong to suggest that the harms to Plaintiffs are speculative. On August

31, 2025, 76 Guatemalan children would have been expelled from the United States but for the

Court's intervention.[20] Each of those children would have had no remedy for an erroneous

expulsion. Putative class members without caregivers in Guatemala would be certain to

experience irreparable harm upon expulsion.[21] Putative class members who have presented

unrebutted evidence of a threat of persecution or torture, and who would be denied the

opportunity to seek asylum or CAT relief, would also experience certain irreparable harm.

Defendants unavailingly attempt to distinguish *Huisha-Huisha v. Mayorkas*, which found that

"Plaintiffs [would] suffer irreparable harm if they are expelled to places where they will be

persecuted or tortured." 27 F.4th 718, 733 (D.C. Cir. 2022); *see also Coal. for Humane*

*Immigrant Rts. v. Noem*, No. 25-cv-872 (JMC), 2025 WL 2192986, at *34-35 (D.D.C. Aug. 1,

2025) (finding that "risks of persecution and death if/when noncitizens subject to expedited

removal are removed" constituted irreparable harm); *Devitri v. Cronen*, 289 F. Supp. 3d 287,

296-97 (D. Mass. 2018) (rejecting government's assertion that unrebutted fear of persecution or

---

[19] Further, removal of the Plaintiffs and putative class members would contravene U.S. and international law barring the United States from sending individuals, including children, back to countries where they would face persecution or torture. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16(c); 208.18(a).

[20] *See* Reply Ex. L, Z.I.M.T.T. Decl. ¶¶ 9-15; Reply Ex. M, C.M.L. Decl. ¶ 8; Reply M.A.L.R. Decl. ¶¶ 5,7; Reply Ex. H, A.Y.S.T. Decl. ¶ 8; Reply Ex. O, D.A.G.R. Decl. ¶ 6; Reply Ex. G, F.O.Y.P. Decl. ¶ 7; ECF No. 20-18, Ex. P, A.J.P.D. Decl. ¶ 7; ECF No. 20-17, Ex. O, A.R.M.D. ¶ 8.

[21] *See* ECF No. 20-12, Ex. J, JAIT Decl. ¶ 7 ("Since I was little in Guatemala I have suffered from physical and emotional abuse from both of my parents. I am receiving mental health care here in the shelter"); Reply Ex. L, C.M.L. Decl. ¶ 6; ECF No. 20-14, Ex. L, S.M.G.T. Decl. ¶ 4 (SIJS approved); ECF No. 20-10, Ex. H, E.M.V.M. Decl. ¶ 6 ("My parents did not take care of me like they should have when I was in Guatemala; I do not believe my parents would be able to take care of my if I return"); ECF No. 2-2 at 24, G.A.B.B. Decl. ¶ 7 ("My parents were not able to care for me in Guatemala"); ECF No. 2-2 at 7, H.L.E.C. Decl. ¶ 6 ("I came to the United States after experiencing abuse and neglect from my father and abuse from the father of my child. If I am sent back, I will not be able to live safely"); ECF No. 2-2 at 5, M.O.G.C. Decl. ¶ 6; ECF No. 2-2 at 3, L.M.R.S. Decl. ¶ 6; Reply Ex. J, I.B. Decl. ¶ 3.

torture did not constitute irreparable harm and noting that petitioners "may not be able to return to the United States" even if they were successful on appeal). It is not relevant that ORR, rather than the President, is determining whom to expel. Def. Opp. at 21-22. Plaintiffs make clear that ORR's procedures are deficient and unlawful, and Defendants cannot provide assurances that they will remedy erroneous expulsions. Numerous Plaintiffs and putative class members fear persecution or torture in Guatemala, and Defendants have not rebutted this evidence.[22]

Finally, Defendants also wrongly suggest that Plaintiffs cannot show harm because, according to Defendants, only one named Plaintiff was on the first flight departing for Guatemala on August 31, 2025. Def. Opp. at 5. Plaintiffs do not have access to Defendants' list and cannot confirm which Plaintiff Children or putative class members Defendants have or will seek to summarily expel. Given the hundreds of children who were at risk of imminent expulsion, *see, e.g.*, Guatemala Report at 2-3, coupled with the dubious vetting of their purported eligibility through HSI interviews, Plaintiffs and putative class members have shown imminent irreparable harm and should not be forced to file individual TROs if they are erroneously boarded on an airplane bound for Guatemala. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1338 (D.C. Cir. 2019) (rejecting the contention that a class-wide preliminary injunction was inappropriate where class members could show irreparable harm in individual TROs "on a rolling, emergency basis as they arise in the course of the litigation").

**V. The balance of the equities and public interest weigh in Plaintiffs' favor.**

Plaintiffs continue to show that the balance of equities and public interest weigh in their favor. Neither the government nor the public has an interest in summarily expelling

---

[22] *See* ECF No. 20-19, Ex. Q, G.Y.V.S. Decl. ¶ 5 (expressing fear of rape and forced marriage on account of LGBT identity); ECF No. 20-8, Ex. F, D.I.R. Decl. ¶¶ 6-7; ECF No. 20-9, Ex. G, D.E.C.E. Decl. ¶ 5; ECF. No. 20-20, Ex. R, R.M.S.C.C. Decl. ¶ 5; Reply Ex. K, Z.I.M.T.T. Decl. ¶ 7; ECF No. 2-2 at 5, M.O.G.C. Decl. ¶ 7; ECF No. 2-2 at 15, M.F.A.P.V Decl. ¶ 3; ECF No. 2-2 at 19, L.F.M.M. Decl. ¶ 3; ECF No. 2-2 at 29, M.Y.A.T.C. Decl. ¶ 4.

unaccompanied minors, many of whom would face neglect and persecution, without statutory authority and in violation of their constitutional rights. *See, e.g.*, *W.M.M.*, 2025 WL 2508869, at *22 ("'Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'") (quoting *Nken*, 556 U.S. at 436). Even if the public has an interest "in prompt execution of removal orders," Plaintiffs *do not* have removal orders and are vulnerable children who ask only to be afforded the procedures Congress has provided them. *Cf. id.* ("'The interest in prompt removal may be heightened by the circumstances as well — if, for example, the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him.'") (quoting *Nken*, 556 U.S. at 436). Defendants will not be harmed by the relief Plaintiffs seek, including on a classwide basis. *Cf.* Def. Opp. at 23.

## VI. This Court is Not Barred from Granting Class-Wide Injunctive Relief.

In conclusory fashion, Defendants raise 8 U.S.C. § 1252(f)(1)[23] as a purported impediment to classwide relief. Def. Opp. at 13. This provision does not apply here. First, Plaintiffs' claims based on the TVPRA are not covered by section 1252(f)(1) because the TVPRA was enacted in 2008, 12 years after enactment of that jurisdictional bar. The provision's limitation to "part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996," freezes its reach to exclude subsequent enactments. *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022); *see also Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209-10 (2019) (where an Act of Congress specifically references a statute by name, the Act

---

[23] This provision states: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

applies only with respect to "the referenced statute as it existed when the referring statute was

enacted, without any subsequent amendments"). Moreover, Plaintiffs' protection claims include

relief under the Convention Against Torture (CAT), which similarly does not fall under the

ambit of section 1252(f)(1) because the Foreign Affairs Reform and Restructuring Act

(FARRA)'s provisions enacting CAT protections are not in "chapter 4 of title II [of the INA]."

*See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025

WL 1825431, at *52 (D.D.C. July 2, 2025) (hereinafter *RAICES*).

Second, section 1252(f)(1) applies only to relief that enjoins or restrains the operation of

a limited subset of the INA, namely 8 U.S.C. §§ 1221-1232. Plaintiffs' claims are based on

statutory provisions *outside* the INA as well as encompassing INA provisions such as 8 U.S.C. §

1158 that are beyond section 1252(f)(1)'s coverage. *See* Pls.' Mot. at 23-24, 30, 34; *see also* Def.

Opp. at 11 (describing "Plaintiffs' third and fourth arguments" as stemming from 8 U.S.C. §

1158). Importantly, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022), also

distinguished circumstances in which "a court may enjoin unlawful operation of a provision that

is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation

of a covered provision." Thus, the Court "can grant effective injunctive relief without ordering

any federal official 'to take or to refrain from taking actions to enforce, implement, or otherwise

carry out' any provision" covered by section 1252(f)(1). *RAICES*, 2025 WL 1825431, at *52.[24]

**The Young Center is a Proper Next Friend.**

Defendants' argument that Plaintiffs are not properly before the court is without merit

and ignores the record before the court. Fed. R. Civ. P. 17(c)(2) allows a minor who "does not

---

[24] *See also RAICES*, 2025 WL 1825431, at *52 ("The relevant question for purposes of § 1252(f)(1) . . . is whether [the] plaintiff seeks to 'enjoin or restrain' a 'provision' located in part IV, not whether the plaintiff cites to authority found in part IV to support his request to enjoin or restrain a federal official's enforcement or implementation of a distinct statutory or constitutional provision.").

have a duly appointed representative" to "sue by a next friend." The very case Defendants cite to challenge the Young Center as next friend undercuts their argument: although ordinarily a significant relationship between a minor and their next friend is required, "that requirement may not rigidly apply when a minor has no significant relationships." *Muthana v. Pompeo*, 985 F.3d 893, 902 (D.C. Cir. 2021). And the Young Center *does* have significant relationships with Plaintiffs: it has now been appointed by ORR to serve as the Independent Child Advocate *for all ten Plaintiff children*, as well as other putative class members. Reply Ex. C, Nagda Decl. ¶12. The Young Center's unique role in unaccompanied minor cases was modeled in part on the concept of guardians *ad litem* or best interests advocates appointed to children in other situations where their parent or legal guardian is unavailable or unable to advocate for the child's best interests." *Id.* at ¶14.[25] Given the Young Center's significant relationship to Plaintiff Children and putative class members, Plaintiffs have satisfied the requirements of Rule 17 to proceed with the Young Center as next friend for the putative class.

### Defendants' Unlawful Actions Apply to all Children in ORR Custody from Non-Contiguous Countries.

As described more fully in Plaintiffs' Reply Brief in Support of Plaintiffs' Emergency Motion for Class Certification (Class Certification Reply), since the complaint was filed in this case, developments have come to Plaintiffs' attention that indicate Defendants are taking steps toward removing children from countries other than Guatemala under the guise of reunification, without complying with the protections of the TVPRA and the due process required by the Constitution. For example, on Thursday, September 4, a local legal services provider in Illinois was notified by its ORR Project Officer (i.e., the staff responsible for overseeing care providers)

---

[25] *See id.* at ¶19 ("[T]he Young Center's experience in serving as Child Advocate and next friend will allow us to help the child plaintiffs in the proposed class to understand the proceedings and also to identify relevant issues for class counsel as it represents the full class.")

that "ICE may soon be taking into custody minors from the country of Honduras with the intent to repatriate them to their home country." *See* Reply Ex. T, Smith Decl. (Email Attachment). The following morning, a legal services provider in Texas received an anonymous phone call from a staff member at a shelter housing unaccompanied children, indicated that the government was planning "to repatriate all children under the ORR custody without making any announcement." Reply Ex. S, Rosario Decl. ¶ 6.

Plaintiffs' counsel has also recently learned that at least one child from Honduras, who does not want to be returned to Honduras, attended an immigration hearing at the end of August at which the judge asked the child if they wanted voluntary departure to Honduras, explaining that the child's name was on a list that the judge had been provided. Reply Ex. O, D.Y.D.C.R. Decl. ¶ 6. The experience of D.Y.D.C.R. in immigration court is the same as what some unaccompanied Guatemalan children in ORR custody experienced when they attended immigration court hearings in late August. Like D.Y.D.C.R., they were told by their immigration judge that they were on a list of children who wanted to return to Guatemala, which had been provided to the judge, but they did not in fact want to return to Guatemala. Ex. L, C.M.L. Decl. ¶ 4; Ex. M, M.A.L.R. Decl. ¶ 4. These children were nevertheless woken in the middle of the night on August 30, told to pack a bag, and put on a bus. Ex. M, M.A.L.R. Decl. ¶¶ 5-6; Ex. L, C.M.L. Decl. ¶ 8.

Additionally, a legal service provider for unaccompanied children noticed, when checking the Executive Office for Immigration Review (EOIR) dockets for some of its Honduran and El Salvadoran clients and potential clients in ORR custody, that more than 20 have had their previously scheduled hearings removed from the dockets, something that the legal services provider observed happening to a number of its Guatemalan clients shortly before the attempt to

remove unaccompanied Guatemalan children from the country. Reply Ex. F, Korolev Decl. ¶¶ 6-8; Ex. R, A.V.R.R. Decl. ¶¶ 4-5. Similarly, agents from HSI have begun interviewing children from other countries, consistent with a pattern of HSI interviewing Guatemalan children shortly before their late-night attempted removals. *See* Class Certification Reply at Section IV (citing multiple children's declarations).

Given concerns about these developments, Plaintiffs' counsel reached out to counsel for Defendants on September 5, who declined to disavow any imminent attempt to remove other similarly situated children. *See* ECF No. 27, 27-1. Plaintiffs therefore urge this court to issue a preliminary injunction applicable to a class of all unaccompanied minors, except those who are from a country contiguous to the United States, who are or will be in ORR custody and who are not subject to an executable final order of removal or a voluntary departure approved by an immigration judge. At a minimum, Plaintiffs request a preliminary injunction to protect all Guatemalan unaccompanied minors who are or will be in ORR custody and who are not subject to an executable final order of removal or a voluntary departure approved by an immigration judge.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.


Dated: September 8, 2025

                                        Respectfully submitted,


Joseph W. Mead (1740771)                */s/ Efrén C. Olivares*
Rupa Bhattacharyya (D.C. Bar No. 1631262)    Efrén C. Olivares*
Kate Talmor (DC Bar No. 90036191)       Lynn Damiano Pearson*

24

Mary B. McCord (D.C. Bar. No. 427563)
Seth Wayne (D.C. Bar No. 888273445)
**INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION**
Georgetown Law
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 662-9765
Fax: (202) 661-6730
jm3468@georgetown.edu
rb1796@georgetown.edu
kt894@georgetown.edu
sw1098@georgetown.edu
mbm7@georgetown.edu

Kevin Siegel*
Hilda Bonilla (D.C. Bar No. 90023968)
**NATIONAL IMMIGRATION LAW
CENTER**
1121 14th Street, Suite 200
Washington, D.C. 20005
Tel: (213) 639-3900
Fax: (213) 639-3911
bonilla@nilc.org
olivares@nilc.org
damianopearson@nilc.org
siegel@nilc.org


*Counsel for Plaintiffs*
*\*Admitted pro hac vice*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the District of Columbia by

using the CM/ECF system. I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.

 /s/ Efrén Olivares
Efrén C. Olivares
Attorney for Plaintiffs