# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

L.G.M.L., et al.,
    *Plaintiffs,*

v.

KRISTI NOEM, et al.,
    *Defendants.*

Case No. 25-cv-2942-TJK

## DECLARATION OF JENIFER SMYERS

I, Jenifer Smyers, pursuant to 28 USC § 1746 and based upon personal knowledge, declare as follows:

1. I live in Virginia, United States. I received a Masters of Public Policy from American University in 2008, and I have dedicated my career to advancing the rights of refugee families in the United States.

2. I served as the Chief of Staff and then Deputy Director of the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services (HHS) from February 1, 2021, until January 20, 2025 collectively. Prior to government service, I worked at Church World Service (CWS) for more than 13 years, ultimately serving as the Director of Policy and Advocacy for the CWS Immigration and Refugee Program. I am well versed in refugee rights, programs serving refugee needs, and child welfare best practices. I have advised organizations and the U.S. government on best practices regarding vulnerable populations and child welfare for many years.

3. While working at ORR I had a number of responsibilities including supporting the executive leadership team and 30 inter-related divisions to shift the Refugee Program and Unaccompanied Children Bureaus to be more client-centered; advising and regularly briefing HHS and White House leadership; and translating complex immigration and child welfare issues into informed decision points. I also served as chief spokesperson with litigators, congressional offices, oversight bodies, media, and stakeholders. I directed policy and resource changes and shepherded regulations and sub-regulatory guidance to completion, including the Unaccompanied Children Program Foundational Rule.

4.      Working at ORR deepened my understanding of well-documented child welfare best practices, including those related to the process for safe repatriations. I have read some of the public media reporting during and since Labor Day weekend regarding the government's attempt to send dozens of unaccompanied Guatemalan children to Guatemala early on Sunday morning. I have also reviewed some of the pleadings and Acting Director Angie Salazar's declaration submitted in this case.

5.      In my experience, ORR has rarely used 6 U.S.C. 279(b)(1)(h), never on a mass scale, and always in compliance with processes and practices laid out in the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Such reunification processes were always conducted in close coordination with the child advocates, the attorney(s) of record for the children, and relevant U.S. and foreign government agencies, and with ample time in order to ensure the best interest of the child is prioritized and respected. In my experience, this process typically takes at least several weeks, if not months, to complete, and all provisions of the TVPRA were complied with, as required by the statute.

6.      It is my experience that ORR requests a recommendation from an appointed child advocate, most often a representative from the Young Center for Immigrant Children's Rights, the child's attorney, and any family members to determine whether returning to the child's country of origin is in the best interest of the child. ORR also discusses the situation with the child to take into account the child's perspective and interests. All of these steps are important so that children's best interests are fully taken into account. Otherwise, a child, and also a child's parents, may not have a full and clear understanding of their options and the consequences of certain decisions. This is important because many children in ORR custody have filed, or are in the process of filing, applications for asylum, Special Immigrant Juvenile Status, U- or T-visas, or other forms of relief for which they may be eligible, including due to fear of return to their country of origin. Both the TVPRA and ORR's Policy Guide include child advocates and legal services as important services for unaccompanied children.[1]

7.      For a reunification under 6 USC 279(b)(1)(H), the child advocate typically prepares a best interest determination (BID) or similar recommendation after a thorough individualized assessment of each child's situation. If a child expresses fear of returning to their home country, that is given significant weight. To reunify with a parent, there would need to be a determination that both the child and parent desire the reunification, and the reunification would only be initiated if it was the decision of the child and parent. During my time at ORR, I am not aware of ORR having returned any child to their country of origin against the child's wishes, including the 2023 case of a child from the United Kingdom to be reunited with his grandmother mentioned in Acting Director Salazar's declaration.

---

[1] The child advocate portion of the TVPRA can be viewed at: https://www.law.cornell.edu/uscode/text/8/1232. ORR's Policy Guide on child advocates is available at: https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2#2.3.4.

8.   In my experience, any request for voluntary departure must be made before an immigration judge and approved in order for the child to be removed.

9.   In paragraph 10 of Acting Director Salazar's declaration, there is a list of criteria ORR reportedly employed to review the cases of unaccompanied children from Guatemala "to determine which cases were appropriate for reunification with their parents and legal guardians." I had never seen this list of criteria before, and it is not something that is provided for in any statute or regulation that I am aware of. However, the absence of any review by a child advocate; meaningful engagement with the child's attorney of record; consideration of the child's input; and/or counseling and preparation with the child, are concerning, as those are important criteria that are critical to considering the best interest of the child.[2]

10.   Before any effort to return a child to their country of origin, ORR has historically always given ample notice directly to the attorney of record. This is so that the attorney of record, as well as the child advocate, have time to properly raise any concerns and provide a BID. This process is meant to allow plenty of time and several conferences with the child, their advocate, their family, and their attorney, before any child is removed from the United States.

11.   Before this weekend, I am not aware of any instance in which ORR directed shelters to wake up a child in the middle of the night unless it was to take an early morning flight to be unified with a sponsor, of which they were notified days in advance. It is against child welfare best practices to wake up children in the middle of the night unexpectedly, outside of emergency circumstances. Many children in ORR custody have had traumatic experiences, so ORR has typically made every reasonable effort to stabilize the child's situation and environment, including providing advance notice about changes rather than surprising them. This is especially true for children who are scared about going back to their country of origin, which is true for a large number of children in ORR custody. Events like the ones I understand

---

[2] Per ORR's Policy Guide, "Best interests is a standard ORR applies in determining the types of decisions and actions it makes in relation to the care of an unaccompanied alien child. When evaluating what is in a child's best interests, ORR considers, as appropriate, the following non-exhaustive list of factors:

The unaccompanied alien child's expressed interests, in accordance with the unaccompanied alien child's age and maturity;
The unaccompanied alien child's mental and physical health;
The wishes of the unaccompanied alien child's parents or legal guardians;
The intimacy of relationship(s) between the unaccompanied alien child and the child's family, including the interactions and interrelationships of the unaccompanied alien child with the child's parents, siblings, and any other person who may significantly affect the unaccompanied alien child's well-being;
The unaccompanied alien child's adjustment to the community;
The unaccompanied alien child's cultural background and primary language;
Length or lack of time the unaccompanied alien child has lived in a stable environment;
Individualized needs, including any needs related to the unaccompanied alien child's disability; and
The unaccompanied alien child's development and identity."
Available at: https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-guide-terms.

happened over Labor Day weekend at many ORR shelters would be contrary to that and would likely further cause extreme stress and trauma to already vulnerable children.

Executed this 8th day of September, 2025.

Jenifer Smyers