# EXHIBIT E

# DECLARATION OF ROXANA AVILA-CIMPEANU, DEPUTY DIRECTOR, THE FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT

*I, Roxana Avila-Cimpeanu, make the following statements on behalf of myself and The Florence Immigrant and Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, where I oversee our Legal and Social Service Programs, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona. During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and pro bono mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

## Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained in ICE custody in rural detention centers in Eloy and Florence, Arizona. With no public defender structure in immigration removal proceedings, the vast majority of people who are detained in ICE custody and facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel. The Florence Project strives to address this inequality through direct services through our legal and social service programs as well as through both local and national advocacy and outreach efforts, which are led by our advocacy program, informed by our direct services work, and done in partnerships with the broader immigrant rights community. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to unaccompanied children in Arizona and adults in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representative, legal assistants, and network of pro bono attorneys, the Florence Project provides free legal education and high quality free immigration representation to thousands of people who are detained in immigration custody and face removal in Arizona.

4. The Florence Project provides high quality immigration legal services and education to the thousands of unaccompanied children ("UC") who come into Office of Refugee Resettlement ("ORR") custody in Arizona in any given year. This includes providing age-appropriate "Know Your Rights" presentations to children in ORR shelters to help them understand what is happening to them and their legal process, as required by law under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). We also work to ensure that no unaccompanied child in ORR custody in Arizona goes to court alone, providing friend of court support and representation in hundreds of cases to children seeking humanitarian protection and other relief in Immigration Court or before the United States Citizenship and Immigration Service ("USCIS").

5. The Florence Project also provides free legal services in all three ICE detention centers currently in operation in Arizona: the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. In those facilities, we provide detailed legal orientation and technical support to thousands of detained *pro se* respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. Florence Project attorneys also represent hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals ("BIA") each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Florence Project attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings and, working with support from our legal assistants and social workers, maintain a caseload of approximately one hundred such clients throughout Arizona under the National Qualified Representative Program ("NQRP") and pursuant to court order in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013).

6. In addition to our free in-house representation, Florence Project also has a robust *pro bono* program that receives case referrals from teams providing education and legal screenings and then connect unrepresented noncitizens, both adults and unaccompanied children, with *pro bono* counsel from law firms or *pro bono* private immigration practitioners. Each year, our *pro bono* program places dozens of new cases with volunteer attorneys before the immigration court, state juvenile and probate courts,

1

USCIS, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases.

### Florence Project's Services to Unaccompanied Children

7. The Florence Project's core work is providing free legal services, including both legal education and information about asylum and other forms of humanitarian protection from removal, among other forms of relief, to thousands of people each year. Florence Project staff routinely provide individualized legal education and direct representation to noncitizens who are seeking asylum and/or other fear-based humanitarian protection, such as asylum. Our Children's Program represents unaccompanied children in regular removal proceedings under 8 U.S.C. § 1229a as well as in affirmative asylum applications before USCIS and the asylum officer under the TVPRA. We also represent and advise individuals in bond hearings before the Immigration Courts, and in release requests to ICE.

8. In total, the Florence Project currently has a staff of 138 people. The Florence Project operates two large direct legal service programs, one serving unaccompanied children, and one serving primarily detained adults, and a smaller advocacy program, which directly serves both adults and children in other federal court advocacy. All of the staff members who work on our children's team and advocacy team are impacted by the planned unlawful removals of unaccompanied children to Guatemala and Honduras.

### Issuance and Immediate Impact of the Planned Removals to Guatemala

9. On or about August 6, 2025, Florence Project staff learned that Homeland Security Investigations ("HSI") were conducting unannounced interviews with unaccompanied children in ORR shelters across the country. On August 8, 2025, HSI began to interview children in shelters in Arizona. Florence Project staff sought to be present during these interviews, during which HSI asked a number of questions regarding potential sponsors and trafficking. Little to no part of these interviews focused on fear screening. The purpose of these interviews was, at the time, and to a degree still, remains unclear.

10. On August 28, 2025, Florence Project staff heard credible reports from partner organizations of planned removal and repatriation of Guatemalan children from ORR facilities. On August 29, 2025, the Florence Project learned about a letter released that morning by Senator Wyden and reporting from CNN and the *New York Times* stating that Guatemalan children in ORR shelters would be summarily repatriated.

2

11. Immediately upon learning this information, the Florence Project diverted experienced attorney and staff resources to determine a plan of action to identify all Guatemalan children in ORR care in Arizona, create a tailored Know Your Rights presentation, assign teams to meet with children, train staff on how to conduct the presentation and consultations, prepare documentation, and coordinate meetings with ORR for all Guatemalan children detained in shelters across Arizona. Our team met with 55 Guatemalan children, providing specialized Know Your Rights presentations, over August 28, 2025 and August 29, 2025. Florence Project managers and attorneys on the Children's Program also proactively contacted various government stakeholders to notify government officials that we are representing the children; attempt to obtain more information, confirmation, or clarification regarding potential plans for repatriation of Guatemalan children, state objections to removal outside of the statutorily mandated process under the TVPRA, and otherwise express concern regarding the potential removal of these children. This included emailing the following:

   a. On Friday, August 29, 2025, at 4:02 PM, FIRRP sent an email to the local Federal Field Specialists ("FFS"). FFSs are field staff who act as the local ORR liaison with care providers and stakeholders, including legal service providers such as FIRRP. An ORR/FFS is assigned to multiple care providers within a determined region and, acting as an agent of HHS/ORR, serves as the regional approval authority for unaccompanied alien children transfer and release decisions. To date, FIRRP has never received a response to these emails.

   b. On Saturday August 30, 2025 at 9:58AM, FIRRP emailed staff at the Administration for Children and Families' Prevention of Abuse and Neglect team. The PCAN Team, which is part of the Unaccompanied Alien Children Bureau's Division of Quality Improvement and Performance Management, provides policy guidance, technical assistance, and training to ORR care providers to support the prevention of child abuse and neglect in ORR care, as well as oversee compliance with related policies and procedures and the Interim Final Rule 45 C.F.R. § 411.6, *Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children*). The PCAN Team works to ensure that unaccompanied alien children are safe, nurtured, and free from abuse and neglect by prioritizing the prevention of child maltreatment. To date, FIRRP has not received a response to this email.

   c. On Saturday, August 30, 2025 at 2:32 PM, FIRRP emailed the UC Office of the Ombudsman regarding client LMLR*092, to inform them of the purported plan to remove children to Guatemala, and request assistance for the removal of LMLR from any list of children set to be unlawfully repatriated due to failing to meet criteria.

3

    d. On Saturday August 30, 2025 at 10:55 PM, we again emailed to all the FFSs known to FIRRP and informed them of this pending litigation, that we are representing the 53 children listed in this complaint, and that children will suffer irreparable harm if transferred out of ORR custody and removed to Guatemala. To date, FIRRP has never received a response to this email.

    e. On Sunday August 31, 2025 at 12:19 AM, FIRRP emailed MVM to inform them that an email had been sent to ICE and ORR regarding this pending litigation. At 1:24 AM, the email was forwarded to additional MVM email addresses.

    f. On Sunday, August 31, 2025 at 2:03 AM, FIRRP emailed the FFSs, the DHS-ICE Field Office Juvenile Coordinator ("FOJC"), and MVM to inform them of the temporary restraining order issued in the L.G.M.L. class action. At 2:15 PM and 2:34 PM, FIRRP emailed the same list to inform them of the temporary restraining order issued by this Honorable Court, and informing them that the Government is enjoined from removing the 53 Guatemalan children FIRRP represents in this matter.

    g. On Sunday, August 31, 29 at 7:11 AM, FIRRP sent the UC Office of the Ombudsman a list of the 53 children from Guatemala we are representing in this matter.

12. Florence Project staff also worked over the holiday weekend, including some who cancelled vacation in the event that the U.S. Government elected to pursue removals of these Guatemalan children outside of normal business hours. This entailed having at least 20 staff members monitoring email and other communication and ready to quickly move into action to protect our child clients over a holiday weekend.

13. On Saturday, August 30, 2025, at approximately 9:45 p.m. Pacific Time, Florence Project filed the original complaint in the present lawsuit along with a Motion for a TRO. Florence Project promptly notified government stakeholders regarding this filing.

14. On Saturday, August 30, 2025, at approximately 9:30 p.m. Pacific Time on Labor Day Weekend, we began to hear from network partners that ORR had been instructed to discharge Guatemalan children within hours. In all, Florence Project staff were actively responding to government efforts to remove Guatemalan children between approximately 10 p.m. Pacific Time Saturday, August 30, 2025, and 4 a.m. Pacific Time, Sunday, August 31, 2025. Overnight on a holiday weekend, Florence Project staff and were forced to engage in rapid response efforts to ensure unaccompanied children in Arizona were not taken for unlawful repatriation against their will. Florence Project staff repeatedly emailed government stakeholders in ORR and DHS and spoke with shelter staff formally notifying

4

them that our unaccompanied child clients from Guatemala were not amenable for removal outside of the TVPRA process and highlighting that many of the children in question had fear claims, were at risk of trafficking, had been abandoned, abused, or neglected in their country of origin, and, in some cases, were not medically fit for travel. Ultimately, over the course of the night, the U.S. Government actively sought to physically remove at least 33 children, and one shelter even woke up all the children in care in the facility in the middle of the night even though they were not supposed to be removed that night.

15. Despite having entered appearances as the attorney of record in the vast majority of these children's cases, Florence Project staff received no direct communication, notice, or response to inquiries from the federal government about its plans to effectuate these removals. Rather, in every case Florence Project attorneys learned that their clients were at risk of imminent physical removal only after shelter staff notified the Florence Project that their clients were being transported, and as a result of FIRRP's constant, proactive communication with shelter staff over the course of Friday and Saturday. In approximately nineteen cases, the communication from shelter staff came before MVM – a private transportation company that contracts with ICE – arrived to the shelter. This gave Florence Project staff as much as two hours and as little as thirty minutes of notice that our clients were set to be transported. However, for kids in many of shelters, shelter staff only notified Florence Project attorneys once MVM was already physically present at the shelter seeking to take our clients for removal. In at least one shelter, MVM came to the facility multiple times through the night seeking to remove a child, with attempts taking place between 12:45 a.m. and 3:15 a.m. on Sunday morning. In some cases, it was unclear which children MVM had come to take.

16. In the cases where some advance notice was provided, shelter staff also at times provided Florence Project attorneys with a copy of an additional boilerplate written notice of intent to remove. For some children, the shelter indicated after giving initial notice that not all children were selected for removal after all. In each of those written notices, the form letter provided used bracketed and highlighted spaces in the letter stating "[UAC Name]" where the name of the individual unaccompanied child to be removed was supposed to be filled in, but had been left with only the bracketed generic language. At least one shelter provided the generic, fillable form letter accompanied by a list of actual names of individual children targeted for removal. The process was highly varied, inconsistent, and taking place in the middle of the night, which created confusion as to which of our clients were actually going to be taken away.

17. At a little after 4:00 a.m. Eastern Time - 1:00 a.m. Pacific Time – the DC District Court granted a TRO in *L.G.M.L. et. al. v. Noem*, 1-cv-25-02942 (D.D.C. Aug. 31, 2025). Florence Project staff learned about the TRO shortly thereafter and immediately began to

5

notify shelter staff throughout Arizona regarding the existence of the TRO. We also sent similar notices to ORR FFSs, DHS, and MVM contacts. Despite being notified of the TRO, for at least one shelter, the Florence Project attorney received written notice regarding the intent to remove children at 2:58 a.m. Pacific Time, well after the TRO had been issued and at another shelter, shelter staff notified a Florence Project attorney that MVM had returned to collect children at approximately 3:14 a.m., well after the TRO had been issued in the D.C. District Court case.

18. At approximately 7:00 a.m. on Sunday August 31, 2025, Florence Project staff learned about  memo to ORR shelters from Angie Salazar, Acting Director of the Office of Refugee and Resettlement, demanding that shelters comply with ORR directives and threatening legal action, including possible civil and criminal penalties, for failure to comply. As a result, Florene Project staff again received communication from shelters that were again beginning to prepare children to be removed. Florence Project staff remained on-call and prepared to engage in further rapid response as needed until the resolution of the emergency hearing with the D.C. District Court in *L.G.M.L. et. al. v. Noem* on Sunday morning.

19. All of the children FIRRP represents in this matter are in active § 240 removal proceedings, have indicia of trafficking, asylum, or Special Immigrant Juvenile Status, or have reunification options with family members in the United States. None of them want to be forced back to their country of origin.

**Issuance and Immediate Impact of the Planned Removals to Honduras**

20. On August 29, 2025, while coordinating for Know Your Rights presentations for Guatemalan Children, Florence Project staff were informed by shelter staff that a Honduran Consulate official was meeting with a Honduran child. FIRRP met with the child after the child met with the consulate official. The child disclosed this was not an expected visit. The Honduran child stated the consulate official asked the child questions about his time at the shelter, questions concerning the minor's parents. The minor stated that the consulate official asked them if they wanted to return to Honduras, to which the child said they wished to remain in the United States.

21. On September 4, 2025, Florence Project staff learned while visiting a Honduran minor about the Honduran consulate visiting the same minor the day prior. The child disclosed this was not an expected visit. The child reported that the consulate official asked the minor questions about the minor's own child. The minor was surprised at the level of detail the consulate already had about the minor's child, like their name. The consulate official asked the minor child questions about the minor's family in the United States, and the minor's

6

treatment by ORR shelter team. The consulate official asked the minor if they wanted to return to Honduras, to which the minor responded they wished to remain in the United States.

22. Additionally, the Florence Project staff were aware that a number of Honduran children had also been subjected to HSI interviews that occurred early in the year, beginning on August 8, 2025. This follows a similar pattern of interviews that Florence Project staff witnessed in the case of Guatemalan unaccompanied children, who the U.S. Government did in fact attempt to remove over the Labor Day weekend.

23. On September 1, 2025, the Florence Project learned that the Honduran government was working on a cooperative agreement for the possible return of Honduran unaccompanied children to Honduras through public posts made by the Honduran government on their X account and a statement on the official website of the Honduran Secretariate of Foreign Relations and International Cooperation

24. The Florence Project is part of a broad network of legal service providers who support unaccompanied children. On September 4, 2025, Florence Project began to hear various reports from across the country regarding partner legal service provider organizations receiving communications from shelters in their region indicating that ORR was informing shelters that ICE may soon attempt to take into custody Honduran minors, much as they had attempted to take Guatemalan minors over the Labor Day weekend. On September 5, 2025, credible reports continued to stream in from the network regarding the imminent removal of Honduran children.

25. Immediately upon learning information regarding a possible similar attempt to remove Honduran unaccompanied children, the Florence Project again had to divert experienced attorney and staff resources to determine a plan of action to identify all Honduran children in ORR care in Arizona and provide them with a similar tailored Know Your Rights presentation addressing this situation. This involved assigning teams to meet with children, preparing staff for these consultations, preparing documentation, and coordinate meetings with ORR for an additional 11 Honduran children detained in shelters across Arizona, and one child placed in the legal care and custody of Catholic Charities Unaccompanied Refugee Minor Program. Although some of the materials from the effort for the Guatemalan children were able to be re-purposed for the Honduran children, the additional burden this placed on teams who were already stretched extremely thin by the efforts made the week prior for Guatemalan children was a significant diversion of resources.

**Impact On Florence Project of Attempted Removals of Unaccompanied Children**

26. From Thursday afternoon of August 28, 2025 to the time of this filing, Florence Project staff have had to divert significant hours of work to this emergency. This includes staff of all levels, including Executive Director, Deputy Director, Legal Director, Advocacy Team, and Children's Program. Florence Project staff members from our non-Unaccompanied Minor program are also being tapped in to create a rapid response on-call system and a buddy system in the event that staff are called to go to shelter facilities in the middle of the night again. Due to the clandestine nature of this process and the middle of the night removals, FIRRP has to double staff visits to shelter that happen after normal business hours in order to protect our staff's safety to have someone dedicated to taking good notes about what happens to our clients in this unprecedented process. Many staff hours have been expended already in communication, both internal and external, document creation, staff support, rapid response planning, client meetings, document preparation, staff guidance, Office of People and culture consultations regarding off work hours work expectations, and constant communication and monitoring of external news and partner communications.

27. The unlawful removal plan impedes Florence Project's core work in a number of crucial ways. First and most importantly, by providing for unlawful removal of unaccompanied minors without providing them with an opportunity to speak with legal counsel, any ability to raise or pursue claims for asylum or other protection, this plan has effectively eliminated Florence Project's ability to serve children who are in the United States and seeking their statutory right to asylum or other fear-based humanitarian protection under the TVPRA. This frustrates our mission of providing legal services to children facing removal in Arizona and eliminates our ability to ensure that noncitizens facing removal have access to counsel, understand their rights, and are treated fairly and humanely. And it essentially eliminates our core practice of representing asylum seekers under proceedings protected by the TVPRA.

28. The plan also substantially interferes with another core aspect of the Florence Project's work, connecting children with fear-based claims for relief with pro bono legal representation. Florence Project was not informed of this plan directly, and with less than 48 hours of notice before the Labor Day holiday weekend, and when many of our staff were predictably out of office on the Friday before Labor Day, our ability to meet with all impacted children and provide services, and assess for relief in a child-friendly manner utilized many resources in time and staffing. The lack of official notification of this plan, and the imminent threat of removal eliminates Florence Project's ability to identify clients for pro bono representation through our Pro Bono Program.

8

29. Florence Project staff have also had to divert resources to understand if and how this plan would impact the children we serve. This includes both outreach to partner organizations and legal service providers across the country, the Guatemalan consulate, the Prevention of Child Abuse and Neglect (PCAN) team at the Administration for Children and Families ("ACF"), local and national ORR staff, the Phoenix Field Office Juvenile Coordinator, officers at the ACF, the ORR Ombudsman, and the Young Center, to learn if anyone is aware of or could share details of this plan as it affects our clients. As of August 30, 2025, no official representing agencies of the United States government has informed the Florence Project whether or not our clients are being impacted, and how, nor who the coordinator of this plan is.

30. Florence Project staff themselves also are not immune to the sense of chaos and confusion created by the plan and its incompatibility with the language of relevant immigration statutes on asylum and other protections such as the TVPRA. At least 31 Florence Project staff and managers have had to divert significant time towards developing a bespoke Know Your Rights Presentation, preparing documents, scheduling meetings, meeting with children to provide KYR presentation and consultation in a child friendly, and culturally and age appropriate manner, communicating with various external stakeholders, and trying to figure what is going to happen to our children clients. This is a task made more difficult at this moment given that, at this stage, there is no official communication regarding what the plan is, which children are impacted, or who or what group is in charge of effectuation of removals. Indeed, even after the class action TRO was issued to protect the class, Florence Project staff were still on high alert given reports that children were still on the planes bound for Guatemala for hours after the TRO was issued. Additionally, the government's actions indicating a plan to repatriate Honduran children, a plan for which we have no notice, does not inspire confidence that our client's rights will be protected.

31. On Thursday, August 28, 2025, staff worked past the usual 5:00 p.m. close of business to coordinate with ORR shelters on accelerated access to children, including sudden scheduling changes that would not have occurred but for the imminent risk of removal. Additionally, staff spent time preparing to visit and advise 56 Guatemalan children in ORR care. On Friday, August 29, 2025, staff continued to work beyond normal office hours, conducting KYR presentations and child interviews, scanning/intaking representation documents, compiling data and information for potentially impacted children, and performing rapid outreach to ORR shelters, FFS, and ICE.

32. The timing of this event caused FIRRP to incur overtime costs for non-exempt staff. Additionally, staff members were forced to cancel much deserved time off. In a high stress environment, the ability to take meaningful time off is essential to preventing attrition. When staff have to cancel time off for emergency situations, this can lead to

burnout and puts the Florence Project at risk of losing talented and trained staff, and increases costs spent on recruitment and hiring.

33. Staff also had to spend time working to schedule qualified interpreters for a variety of languages, including rare indigenous Mayan languages, adding to the complexity of talking with 55 children in one day. At least 17 of the children FIRRP interviewed on August 29, 2025, speak an indigenous language, which increased the amount of time staff spent in confirming best language, scheduling the appropriate interpreter, and conducting services through interpretation, which takes more time than when working with Spanish speaking clients, as the majority of our staff speak Spanish. It is also important to note that while many Indigenous children from Guatemala may state that they speak Spanish, they may in fact speak another language better, but they will say the speak and understand Spanish due to fear and the discrimination they may have faced against their indigenous group in home country. In an ideal course of representation of children, the attorney will have time to build trust and identify best language before moving forward to explain extremely complicated legal concepts and talking to the child about the traumatic things that have happened to them which could make them eligible for legal relief.

34. Many of the children we met with on August 29 come from indigenous communities and speak a Mayan language known only to a small number of people in the world. In Guatemala, they may have faced discrimination due to their identities, and not so long ago a Civil War made indigenous communities a target of state-sponsored violence, vestiges of which continue to this day. Many Honduran children are in the United States fleeing violence. Being ripped of bed in the middle of the night by the Government no doubt traumatized vulnerable children even more given their background.

35. Due to the tender age of some clients, staff had to spend more time preparing with care in order to provide important, child-friendly legal information to a three-year-old and 6 children under the age of 13. Before meeting with the children, staff met with FIRRP social workers for best practices on approaching a heavy topic with young children. Providing important legal information to children this age requires time for the child to feel comfortable to talk to staff, this includes play time such as playing with stuffed animals, coloring a picture together, and talking to a child about non-legal subject like favorite animals, games, food, etc. Informing a ten-year-old about possible removal to a country that they do not want to return to caused confusion and emotional distress. This inevitable reaction from a young child, left staff adding more time in providing some sort of comfort and clarity for the child. Staff learned that after the meetings, the children were down in spirits and required the services of the ORR clinician.

36. Staff spent time driving to ORR shelter facilities unexpectedly, and some of the shelters are more remote than others which added commuting costs and time for FIRRP due to the need to talk with clients in person about the situation.

37. The impact to FIRRP's staff and resources cannot be fully understood without taking into account the significant cuts to federal funding and related challenges that have affected the organization as a result of the Government's actions. Cuts to the Legal Orientation Program in its entirety, and cuts and continued uncertainty in the Unaccompanied Children Program have led FIRRP to the painful decision to reduce the workforce and lay off 35 valued staff members as of July 15th, 2025. Additionally, uncertainty around general funding has led to additional attrition of staff. In the past year, FIRRP's staffing levels have decreased from 213 staff members at its highest point to 137 as of the time of this filing. This reduced staffing number means that the Children's Program has been forced to be extremely conscientious about the number of cases we are taking. As a result of this sudden and unlawful plan, FIRRP's limited capacity is being spent on protecting 53 unaccompanied children from unlawful removal, which means there are less resources for children from other countries.

38. Because of the possible imminent and unlawful removals, the Florence Project Deputy Director, Children's Legal Program Manager, several managers, staff attorneys, legal assistants, advocacy liaison, advocacy attorney, and communications manager have also diverted resources to attempt to gain more information regarding this plan, determine a plan of action, and enter into representation for 53 children in care. Moreover, we at the Florence Project know that the stress caused by the uncertainty and chaos regarding immigration policy wears down staff, undermines morale, and contributes to burn-out and turnover, which has significant financial and brain-drain impacts on the Florence Project as an organization. Like many non-profits, our staff are deeply dedicated and personally connected to our organizational mission and vision; they are motivated by their desire to help people in need. The fact that we, as the designated legal service provider for ORR facilities in Arizona, have been left in the dark and have had to speak to children with real and deep fears of returning to Guatemala on such a truncated schedule has been emotionally disturbing and undermines morale for Florence Project staff.

39. Additionally, the plan is significantly hampering Florence Project's core work of explaining and educating immigrants as to their legal rights under U.S. immigration law. The clandestine nature of the plan is at odds with the TVPRA's guarantee of access to legal counsel to all unaccompanied minors. Conversations and plans for removal have been made without notifying Florence Project attorneys, thereby preventing children from having a meaningful conversation about their rights and eligibility for relief, or other legal options. As a result, Florence Project staff are being forced to explain a process to

11

vulnerable children and explain their rights to the best of our abilities, when we are aware of a plan that is inherently in conflict the laws that govern their rights and protections, and only after the government appears to have talked to the children without counsel present. We met with several children who were inconsolable and scared when we explained that they may be removed, yet due to the lack of information and imminent time frame for supposed removals, we were not able to address the child's concerns and fears in the most trauma-informed and children friendly manner, as is our goal with every conversation with have with child clients. The fact that several children we spoke with were scared and confused shows that they were not properly explained this process, and none of our clients in this complaint consent to returning to Guatemala.

40. The lack of transparency and communication, in turn, impedes our ability to effectively help children understand their rights and legal situation. This level of uncertainty and lack of information is also likely to adversely impact trust that we develop with clients and community stakeholders. That is because we are currently forced to explain a situation that is at odds with what the law says and a process for which we have been given no information, and in a timeline which does not allow us to effectively build rapport and learn the child's immigration history fully, or to figure out what is happening to these children. The government has not yet made public any information about how this plan is being implemented, nor have they shared information directly with us, which both undermines our ability as a legal service provider to give clear and accurate information while also making it much more difficult for us to gain the trust of the children we serve, who are often survivors of acute trauma, are of tender age, are fleeing violence and mistreatment, and require extra attention, intention and care in order to represent effectively. Indeed, all of the children listed in the complaint have expressed a fear of return, have been abused, abandoned, or neglected, or have described circumstances which could indicate the presence or risk of trafficking. They have the right to speak with counsel and file for relief, but they should not be forced into making those decisions with the Department of Homeland Security or ORR, but rather with trusted counsel and within a timeframe that acknowledges their special vulnerabilities as unaccompanied children.

41. The uncertainty with respect to how the plan is being implemented is also harming our efforts to serve unaccompanied children in ORR care. We have no details as to how these children were chosen, or who is in charge of the plan. We have no information as to whom we need to reach out to share that children have expressed fear or have possible relief. We have no information on whom to reach out in order to remind the Government that these children are in 240 proceedings or have the right to go before a judge in 240 proceedings under the TVPRA. We have not been informed of interviews with children that have happened without our presence and that would have clear and serious implications on their legal case, nor what was said in those interviews and in what language. We have no

12

information about who in this scheme is making determinations about children's eligibility for relief or determines if a child has expressed fear or is at risk of trafficking. This makes it impossible to properly counsel and console children who are afraid to return to their country of origin, and who are confused about the legal process they face. MVM contractors charged with taking children away from shelters told us that they "have a job to do," but did not seem well informed of pending and active litigation on this case, including the class action lawsuit and resulting TRO and the instant case.

42. We expect that this uncertainty will continue for the foreseeable future and continue to impact our staff and programs and our choice as to how we steward the organization's resources, and our ability to fulfill our mission.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 5th of September, 2025 in Phoenix, Arizona

*Roxana Avila-Cimpeanu*

---

Roxana Avila-Cimpeanu
Deputy Director
The Florence Immigrant and Refugee Rights Project

13