## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

L.G.M.L. et al.,

        *Plaintiffs*,

      v.

KRISTI NOEM et al.,

        *Defendants*.

Civil Action No. 25-2942 (TJK)

### MEMORANDUM OPINION

Just before midnight on the Saturday of Labor Day weekend, several Executive Branch agencies began to implement a plan to expel from the United States certain unaccompanied alien children in the custody of the Department of Health and Human Services and send them back to their home country of Guatemala.  Those agencies told the children's caretakers, who were hearing about the plan for the first time, to have them ready for pickup in as little as two hours.  The children were roused from their beds in the middle of the night and driven to an airport, where some were loaded onto planes.

Lawyers got wind of this hasty operation while it was unfolding and filed this lawsuit seeking emergency relief that Sunday at 1:00 a.m.  The judge on emergency duty entered a temporary restraining order barring the agencies and their officials from removing or otherwise transporting the children from the United States.  At a hearing later that day, counsel for Defendants explained why it was "fairly outrageous" for Plaintiffs to have sued: all Defendants wanted to do was reunify children with parents who had requested their return.  But that explanation crumbled like a house of cards about a week later.  There is no evidence before the Court that the parents of these children sought their return.  To the contrary, the Guatemalan Attorney General reports that officials could

not even track down parents for most of the children whom Defendants found eligible for their "reunification" plan.  And none of those that were located had asked for their children to come back to Guatemala.

On behalf of a putative class, Plaintiffs now seek a preliminary injunction prohibiting Defendants from transporting them out of the United States while they litigate their statutory and constitutional claims.  For the reasons below, the Court will provisionally certify a more limited class than the one they propose, which will consist of unaccompanied Guatemalan children who have received neither a final removal order nor permission from the Attorney General to voluntarily depart from the United States.  And the Court will also grant their request for preliminary relief. Congress enacted into law a specific process for removing unaccompanied alien children like Plaintiffs, and Defendants' "reunification" plan likely contravenes those statutory requirements. Plaintiffs also face irreparable harm absent an injunction.  And the balance of equities supports relief now.  Thus, the Court will provisionally certify the class described above and grant Plaintiffs' motion for a preliminary injunction.

## I.    Background

### A.    Statutory and Regulatory Background

Federal law treats "unaccompanied alien child[ren]"—individuals under 18 years old who lack both lawful immigration status and a parent or legal guardian able to care for them in the United States—as a distinct group.  *See* 6 U.S.C. § 279(g)(2).  Before Congress passed the Homeland Security Act of 2002, the Immigration and Naturalization Service had enforced federal immigration law, including as to minors.  *See, e.g.*, *Perez-Funez v. District Dir., INS*, 619 F. Supp. 656, 658 (C.D. Cal. 1985).  But that legislation dismantled that agency and "transferred" some of its myriad functions—including those few "with respect to the care of unaccompanied alien children"—to the Department of Health and Human Services.  Homeland Security Act of 2002, Pub.

L. No. 107-296, § 462(a), 116 Stat. 2135, 2202; *see also City of Chicago v. Barr*, 961 F.3d 882, 888 n.1 (7th Cir. 2020).  Now, HHS's Office of Refugee Resettlement ("ORR") is "responsible for," among other things, ensuring that decisions about unaccompanied children's "care and custody" account for their "interests."  6 U.S.C. § 279(b)(1)(B).  That office is also responsible for "reuniting unaccompanied alien children with a parent abroad in appropriate cases."  *Id.* § 279(b)(1)(H).

Six years later, Congress addressed serious concerns about unaccompanied alien children by passing the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  *See* Pub. L. No. 110-457, 122 Stat. 5044.  Aiming to "enhanc[e] efforts to combat the trafficking of children," *id.* § 235, Congress instructed the heads of several agencies to "develop policies and procedures" ensuring "that unaccompanied alien children" are "safely repatriated to their country of nationality or of last habitual residence," 8 U.S.C. § 1232(a)(1).  The statute imposes several obligations on federal departments and agencies.  For example, they must notify HHS within 48 hours of apprehending or discovering an unaccompanied alien child.  *Id.* § 1232(b)(2)(A).  And transferring custody to HHS must happen within 72 hours absent "exceptional circumstances."  *Id.* § 1232(b)(3).  Once in HHS's custody, the child "shall be promptly placed in the least restrictive setting that is in" his "best interest."  *Id.* § 1232(c)(2)(A).  HHS may also "appoint independent child advocates" to "advocate for" those "best interest[s]."  *Id.* § 1232(c)(6)(A).

In addition to these obligations, the TVPRA includes measures to promote the "safe repatriation" of unaccompanied alien children.  8 U.S.C. § 1232(a)(5).  When the Department of Homeland Security seeks to "remove[]" from the United States "[a]ny unaccompanied alien child" originally from a non-contiguous country—that is, a nation other than Canada and Mexico—three

safeguards kick in.  *Id.* § 1232(a)(5)(D).[1]

First, the child must be "placed in removal proceedings under" 8 U.S.C. § 1229a.  *See* 8 U.S.C. § 1232(a)(5)(D)(i).  That path is the "standard removal process."  *Guerrier v. Garland*, 18 F.4th 304, 306 (9th Cir. 2021).  An immigration judge oversees these proceedings, and the alien subject to them may obtain counsel, examine and present evidence, and cross-examine government witnesses.  *See* 8 U.S.C. § 1229a(a)(1), (b)(4).  This kind of removal proceeding also permits an alien to "stipulate[] to" an "order of removal."  *Id.* § 1229a(d).  By way of background, the other removal possibility—which the TVPRA excludes for unaccompanied alien children—is "expedited removal."  *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).  Under that statutory option, if an immigration officer finds that an individual is inadmissible for certain reasons, "the officer shall order the alien removed . . . without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).  The only exception is when the alien "indicates either an intention to apply for asylum" or "a fear of persecution."  *Id.*

Second, the TVPRA makes unaccompanied alien children eligible for voluntary departure under 8 U.S.C. § 1229c "at no cost to the child."  8 U.S.C. § 1232(a)(5)(D)(ii).  That provision authorizes the Attorney General to "permit an alien voluntarily to depart the United States . . . prior to the completion of [§ 1229a removal] proceedings."  *Id.* § 1229c(a)(1).  In addition, the Attorney General may do the same after removal proceedings conclude if "the immigration judge enters an order granting voluntary departure."  *Id.* § 1229c(b)(1).

Third, an unaccompanied alien child whom DHS seeks to remove must receive "access to counsel" to "the greatest extent practicable."  *See* 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5).  This

---

[1] Unless otherwise specified, the Court typically means children from non-contiguous countries when referring to unaccompanied alien children or similar terms.

directive calls for counsel "to represent" the children "in legal proceedings" and, more broadly, to "protect them from mistreatment, exploitation, and trafficking." *Id.* § 1232(c)(5).

Several regulations build on these statutory safeguards. Unaccompanied children must "be treated with dignity, respect, and special concern for their particular vulnerability." 45 C.F.R. § 410.1003(a); *see also* 8 C.F.R. § 236.3(a)(1) (imposing similar obligation on DHS). And "juvenile[s]" from non-contiguous countries cannot be "present[ed]" with a form for "voluntary departure" before they "in fact communicate" with "a parent, adult relative, friend, or with" a "free legal services" organization. 8 C.F.R. § 1236.3(g). ORR also has specific "responsibilities" when it comes to providing "legal services for unaccompanied children." 45 C.F.R. § 410.1309(a)(1). For instance, the agency must offer information about the "child's right to a removal hearing before an immigration judge," his "ability to apply for asylum," and the option of "request[ing] voluntary departure in lieu of removal." *Id.* § 410.1309(a)(2)(iv). Children in the agency's custody, moreover, must receive a "confidential legal consultation with a qualified attorney" to "determine possible forms of relief from removal." *Id.* § 410.1309(a)(2)(v).

### B.    Factual Background

This past Labor Day weekend, some members of the media and immigration lawyers learned that the Executive Branch planned to send unaccompanied alien children from Guatemala in government custody back to that country. *See* ECF No. 1 ("Compl.") ¶¶ 4, 59; ECF No. 20-3 ¶ 3. Shelters in Texas, for example, called immigration attorneys at the South Texas Pro Bono Asylum Representation Project ("ProBAR") just before midnight on August 30 to explain "that they had been told to prepare children to be repatriated." ECF No. 20-3 ¶ 5. Transportation would apparently "arrive to pick them up in two hours." *Id.*

According to ORR's acting director, this operation stemmed from collaboration among

several agencies following outreach from the Guatemalan government. *See* ECF No. 35-1 ("Salazar Decl.") ¶¶ 3–14. In May or July this year—Defendants' declarations seem to differ—the Guatemalan government purportedly "requested" that the United States government "reunify unaccompanied alien children" with "their parents or legal guardians in Guatemala." *Id.* ¶ 3; *see also* ECF No. 39-1 ("Helland Decl.") ¶ 6. "ORR leadership," along with DHS and State Department officials, told "Guatemalan officials" on July 24 that "the United States would honor the request." Salazar Decl. ¶ 5. "DHS would be responsible for" transporting the "children for purposes of repatriation." *Id.* About a month later, Guatemala sent "a formal diplomatic note" saying that unaccompanied children who return "by judicial action or voluntarily" would be "received safely . . . by the Guatemalan Migration Institute" for "reunification with suitable family members." *Id.* ¶¶ 6–7.

In ORR's telling, the agency fulfilled Guatemala's request by "review[ing] individual cases" of unaccompanied children from Guatemala to decide which "were appropriate for reunification." Salazar Decl. ¶ 10. ORR selected nine criteria that a child had to meet to be part of the group returning to Guatemala: (1) the child is a Guatemalan national; (2) the child lacks a parent or legal guardian in the United States who is sponsoring him; (3) the child has a parent or legal guardian in Guatemala; (4) the child lacks a credible fear claim or pending asylum case; (5) "ORR is assured the child will not be trafficked upon their return"; (6) the child is medically cleared to travel; (7) the child lacks "indications of being a victim of trafficking"; (8) the "child's attorney of record has not affirmatively protested the child's reunification with their parent (or legal guardian) in Guatemala"; and (9) the child lacks "indications of child abuse/neglect perpetrated by a parent/legal guardian." *Id.* Defendants do not claim to have asked the children whether they want to go back to Guatemala, whether they were abused or neglected, or whether they want to return to

their parents or legal guardians.  Instead, ORR assessed "its records"—and a division of Immigration and Customs Enforcement did the same—to select the children to send back, using what the agency describes as a "best interests framework."  *Id.* ¶¶ 10–11; Helland Decl. ¶¶ 8, 10–11.  After identifying 457 children as "potentially appropriate for reunification," the agency winnowed that number to 327.  Salazar Decl. ¶ 12.  Then, over Labor Day weekend, ORR launched "phase one": placing 76 children on "repatriation planes" to take off the morning of Sunday, August 31.  *Id.* ¶ 24.

Just before midnight on Saturday, August 30, ORR notified care providers that "they have children in their program who have been identified for reunification in Guatemala."  Salazar Decl. ¶ 14.  The agency told the providers to "ensure that children are prepared for discharge" in as little as "2 hours."  *Id.*  That communication included a "Notice to Attorney of Record" that the providers were to "immediate[ly] disseminat[e] to attorneys of record and child advocates," presumably within that two-hour window in the middle of the night on a holiday weekend.  *Id.* ¶ 15.  Next, ORR told an "ORR-funded legal service provider" that Guatemala had "requested the return" of the children, that "repatriation travel was to begin on August 31" (the day of the notice), and that the provider should tell "ORR and ICE[]" if it thought that a child did not meet the criteria.  *Id.* ¶¶ 20–21.  ORR provided this information at 1:12 a.m.—about 30 minutes before the care providers were supposed to have the children ready to be picked up.  *Id.* ¶ 20.

When news about this operation began to spread, ProBAR's limited staff quickly traveled to three shelters and connected with two others by Zoom.  ECF No. 20-3 ¶ 6.  They saw "children," "confused and scared," "who had been pulled out of their beds" in the middle of the night.  *Id.* ¶ 7.  At New Hope McAllen shelter, for example, a "young girl was so scared that she vomited."  *Id.*  A 17-year-old at another shelter was awoken "around two in the morning" on August 31 and "felt

like [he] lost [his] breath." ECF No. 20-17 ¶ 8. Without saying "why [they] were going to leave or where [they] were going," a supervisor told him to "get [his] things." *Id.* This unaccompanied child was then "placed" on a bus headed towards an airport. *Id.* ¶¶ 8–9. A seventeen-year-old boy picked up that night said he was "going to get off the bus," but an "employee of the transport company told" him that he "could try and get off" and "see what happens." ECF No. 40-8 ¶ 12. After being on the bus for about six hours, this unaccompanied child "waited on the airplane for" another four before eventually returning to the shelter. *Id.* ¶¶ 14–18.

The midnight operation reached unaccompanied children in foster homes too. An immigration judge told one child living with a foster family in Texas that the judge "had gotten a list of kids who had said they wanted to leave the United States." ECF No. 40-13 ¶¶ 2, 4. The child "never asked for this"; instead, she is "scared to go back to Guatemala" because she does "not have anyone to care" for her there. *Id.* ¶¶ 4–6. Although she told the judge that she did not want to leave, her "foster parents woke [her] up" in "the middle of the night" that same weekend "because immigration was sending [her] to another place." *Id.* ¶ 8. Government "agents put" her on a "bus for many hours" and brought her to a "shelter with other immigrant kids." *Id.* ¶¶ 12–13.

While all this was happening, Plaintiffs—including ten "unaccompanied minors from Guatemala between the ages of 10 and 17"—filed this lawsuit at 1:00 a.m. on Sunday, August 31. Compl. ¶ 2. Defendants claim that "on available information and belief, five of the ten named plaintiffs" fall within the 327 that ORR had selected for the "reunification" plan. Salazar Decl. ¶ 12. But all ten expressed a desire to remain in the United States rather than return to Guatemala. *See* ECF No. 2-2 at 1–30; ECF No. 37-1 at 1–30. The final Plaintiff is the Young Center for Immigrant Children's Rights, whom the children sue through as their "next friend." *See* Fed. R. Civ. P. 17(c); Compl. at 1. Together, Plaintiffs sue the Department of Justice and Attorney General

Pamela Bondi, DHS and its Secretary Kristi Noem, ICE and its Acting Director Todd Lyons, the Department of State and its Secretary Marco Rubio, HHS and its Secretary Robert F. Kennedy, Jr., and ORR and its Acting Director Angie Salazar.  Compl. ¶¶ 18–28.  Bringing a host of claims, Plaintiffs allege that Defendants violated the TVPRA, the Immigration and Nationality Act ("INA"), and the Fifth Amendment.  *See id.* ¶¶ 79–103.  Plaintiffs' complaint sought relief on behalf of a putative class encompassing "all Guatemalan unaccompanied minors in ORR custody who are not subject to an executable final order of removal."  *Id.* ¶ 72.

Less than an hour after filing their complaint, Plaintiffs moved for a temporary restraining order to stop Defendants from removing unaccompanied alien children to Guatemala.  *See* ECF No. 2.  Planes carrying those children, Plaintiffs' counsel had learned, were "reportedly scheduled to depart" within two to four hours.  *Id.* at 2.  Judge Sooknanan was on emergency duty for the holiday weekend and granted the motion around 4:30 a.m.  Her order prohibited Defendants from "remov[ing] any of the individual Plaintiffs from the United States for 14 days."  Min. Order of Aug. 31, 2025.

Judge Sooknanan then ordered the parties to appear for a hearing that afternoon to address the temporary restraining order and class certification.  *See* Min. Order of Aug. 31, 2025.  Because she "received notification that putative class members [were] in the process of being removed," Judge Sooknanan moved the hearing from 3:00 p.m. to 12:30 p.m.  *See* Min. Order of Aug. 31, 2025.  And given that information and Plaintiffs' motion for class certification, Judge Sooknanan entered a modified temporary restraining order at 12:37 p.m. "that applies to all putative class members."  ECF No. 12 at 7.  More precisely, the order prohibited Defendants from "transfer[ring], repatriat[ing], remov[ing], or otherwise facilitat[ing] the transport of any Plaintiff or member of

the putative class from the United States for 14 days." Min. Order of Aug. 31, 2025.[2]  Counsel for

Defendants represented that "[a]ll planes are on the ground"—though one might have "taken off"

before returning—and that no planes "will take off in light of" the modified temporary restraining

order. ECF No. 12 at 5.  When asked why Defendants believed they could send the unaccompanied

children to Guatemala on short notice despite the TVPRA's provisions, counsel responded that

Defendants' actions were "not removals under the statute" but were "repatriations and reunifica-

tions of children with their parents or guardians." *Id.* at 8–9.  "[A]ll of these children," counsel

asserted, "have their parents or guardians in Guatemala who are requesting their return." *Id.* at 9.

Eventually, the parties agreed to an expedited briefing schedule for Plaintiffs' preliminary-injunc-

tion motion. *See id.* at 16.

After the holiday weekend—and the end of the emergency-duty shift—this case was as-

signed to this Court.  Plaintiffs moved for a preliminary injunction "barring Defendants from trans-

ferring Guatemalan unaccompanied children from ORR custody." ECF No. 20-1 at 8.  To support

that motion, Plaintiffs filed declarations from over a dozen such children.  One explained that he

"experienced neglect and abandonment from" his father in Guatemala and that his mother "didn't

think she could protect" him "from the violent drug dealers." ECF No. 20-17 ¶ 7.  Another fears

returning to Guatemala because his sister was recently murdered there and because his family

members either cannot care for him or are unwilling to do so. ECF No. 20-18 ¶¶ 5–6.  And a third

said that the conditions she would return to in Guatemala would cause her to kill herself.  ECF

No. 20-19 ¶ 5.

Shortly before the hearing on the preliminary-injunction and class-certification motions, a

_____

[2] The Court later found good cause to extend that order's effect for a few days. *See* Min.
Orders of Sept. 13 and 16, 2025.

recent report from the Guatemalan Attorney General came to light that undermines Defendants' claims about parental reunification. According to that report—the contents of which Defendants do not contest, *see* Hearing Tr. at 22—the "National Attorney General's Office" received a "legal memorandum" from ORR in July "containing a database of 609 adolescents between the ages of 14 and 17." ECF No. 40-2 at 2. The office then tried to "identify and locate family resources" for these children. *Id.* at 3. But of "the 609 adolescents listed," the Attorney General's office had "phone numbers" for "only 204" of the families, and it "could only confirm the information of 115." *Id.* Before "conducting home visits" with those families, the office called them and "discovered that the families were surprised"—and "some even annoyed"—by the outreach because "many" did "not expect" their children "to be returned to Guatemala." *Id.* Some "calls went unanswered" or to "disconnected" phone lines. *Id.* And when the office tried to visit the homes, parents for 59 of the children "reject[ed] the request" and refused to "subject themselves to an assessment to determine if they were a suitable family resource." *Id.* at 4. In the end, only parents for about 50 to 57 of the 609 children that ORR identified to Guatemala "were willing to welcome back their children." *Id.* at 3–4. Even within that small group, though, "none of them was requesting their [child's] return." *Id.* at 4. The parents of one child explained why: their daughter "had received death threats and therefore could not live in" Guatemala, so they would "do everything possible to get her out of the country again" if the United States sent her back. *Id.*

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

11

*Id.* at 20.  "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

## III.    Analysis

Beginning with a threshold objection to both motions, the Court finds that Plaintiffs are properly before the Court under Federal Rule of Civil Procedure 17.  It then addresses their certification motion and provisionally certifies a class of certain unaccompanied alien children from Guatemala under Rule 23(b)(2).  Finally, the Court finds that this provisionally certified class is entitled to a preliminary injunction prohibiting Defendants from transporting them out of the United States.  That relief is necessary because Plaintiffs are likely to succeed on their statutory claim, face irreparable injury, and have shown that the public interest and balance of the equities tilt their way.

### A.    The Young Center Is a Proper Representative Plaintiff Under Rule 17

Defendants invoke the same theory under Rule 17(c) to oppose both the preliminary-injunction request and the class-certification motion.  *Compare* ECF No. 35 at 21, *with* ECF No. 36 at 14.  Rule 17(c) permits unrepresented minors to sue by a "next friend," which Defendants contend the Young Center purports to be but is not because it lacks a "significant relationship" with the "minor[s]."  ECF No. 35 at 21 (quoting *Muthana v. Pompeo*, 985 F.3d 893, 901–02 (D.C. Cir. 2021)).  So Plaintiffs are "not properly before the court."  *Id.*; ECF No. 36 at 14 (same).  Because Defendants seem to advance this argument as a threshold problem for both class certification and the likelihood-of-success inquiry, the Court addresses it first.

Defendants come up short on both the law and the facts.  To begin, the "requirement" of a "significant relationship" may "not rigidly apply when a minor has no significant relationships." *Muthana*, 985 F.3d at 902.  Or put another way, "the contours of" what counts as a "significant relationship" are not "static"; they "necessarily adapt to the circumstances."  *Sam M. ex rel. Elliot*

*v. Carcieri*, 608 F.3d 77, 91 (1st Cir. 2010) (quoting *Coal. of Clergy, Laws. & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002)).  Plaintiffs, of course, are *unaccompanied* children from another country, so identifying individuals with significant relationships to them is no small lift. And Defendants made that already challenging task next to impossible by acting in a way that required immediate legal action at 1:00 a.m. on a Sunday.

Even without those extenuating circumstances, though, the Young Center has shown the kind of relationship permitting next-friend status under Rule 17.  Created "in 2004 *as an ORR pilot project*," the Young Center provides "independent Child Advocates" that are "akin to best interests guardians *ad litem*."  ECF No. 40-4 ¶ 4 (emphasis added).  It has served in that role for over "7,000 children in government custody" and is "the only organization" that ORR has authorized "to serve as Child Advocate[s]."  *Id.* ¶ 5.  These advocates "meet regularly" with unaccompanied children "to identify [their] best interests."  *Id.* ¶ 8.  And the Young Center's chief program officer asserts that the organization has "served as 'next friend' to child plaintiffs in" other "class action litigation."  *Id.* ¶¶ 1, 10 (citing *J.O.P. et al. v. DHS et al.*, No. 19-cv-1944 (D. Md.)).  So the Court has little trouble finding that the Young Center is an appropriate next friend here—or, more precisely, that it is likely appropriate (for preliminary-injunction purposes) and not a barrier to class certification.

### B.     The Court Will Provisionally Certify a Class Under Rule 23(b)(2)

The same day they moved for a temporary restraining order, Plaintiffs sought to certify a class under Rule 23(b)(2) or under Rule 23(b)(1)(A).  *See* ECF No. 6 at 2, 12–13, 15–16.  They first proposed a class definition of "all Guatemalan unaccompanied minors in ORR custody who are not subject to an executable final order of removal."  *Id.* at 16.  In reply, though, Plaintiffs dropped the request for Rule 23(b)(1)(A) certification.  *See* ECF No. 42 at 3 n.1.  And they

proposed two changes to the class definition—one small and one big.  First, they seek to narrow the previously proposed class by excluding unaccompanied Guatemalan children who were "granted voluntary departure by an immigration judge." *Id.* at 21.  Second, Plaintiffs ask the Court to "certify a class of *all* unaccompanied minors" from *all* non-contiguous countries who "are or will be in ORR custody," lack an "executable final order of removal," and have not had "voluntary departure approved by an immigration judge." *Id.* at 22 (emphasis added).

Rule 23 contains four requirements that apply to each kind of class action.  First, numerosity: the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Second, the class must present "common" legal or factual questions. *Id.* 23(a)(2). Third, and in a similar vein, the named plaintiffs must have claims that are typical of the class. *See id.* 23(a)(3).  And fourth, those representative parties must "fairly and adequately protect" the class's "interests." *Id.* 23(a)(4).  On top of these universal requirements, Rule 23 specifies three types of class actions.  Relevant here, a court may certify a Rule 23(b)(2) class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class" such that injunctive or declaratory relief is "appropriate respecting the class as a whole."

For the reasons detailed below, the Court will provisionally certify a Rule 23(b)(2) class consisting of all unaccompanied alien children from Guatemala in (and who will be in) ORR custody who have not received a final order of removal or the Attorney General's permission to voluntarily depart under 8 U.S.C. § 1229c and applicable regulations.  Provisional certification does not lessen the rigor of Rule 23. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015). But the Court proceeds with "the understanding that" this "certification[] may be altered or amended before the decision on the merits." *Id.* at 180 (citation omitted); *see also, e.g., Angelica*

*S. v. HHS*, No. 25-cv-1405 (DLF), 2025 WL 1635369, at *9 (D.D.C. June 9, 2025).[3]

Numerosity is straightforward. Because joinder need only be impractical rather than impossible, "a class of at least forty members" presumptively clears this hurdle. *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 206 (D.D.C. 2018); *see also, e.g.*, *N.S. v. Hughes*, 335 F.R.D. 337, 352 (D.D.C. 2020). And Plaintiffs' proposed class far exceeds that threshold. Take Defendants word for it: they identified "457 Guatemalan [unaccompanied alien children] in ORR care and custody as potentially appropriate for reunification" before narrowing that number to 327. Salazar Decl. ¶ 12. Defendants even described 76 children as "putative class members" when discussing "the return" of those children to ORR custody. ECF No. 9 at 2. If more were needed, two aspects of Plaintiffs' proposed class confirm numerosity. First, the class contains "future claimants"—those who *will* be in ORR custody—and such classes "generally meet the numerosity requirement" because "counting" and "joining" those class members is "impractical[]." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (citation omitted). Second, "non-numerical considerations" like "the fluidity of ORR custody, the dispersion of class members across the country, and their limited resources" suggest that "joinder" is "impracticable." *Id.* at 1323.

Defendants challenge numerosity by describing the class as unaccompanied Guatemalan children who "object to reunification with their parents" and saying that Plaintiffs offer only ten of those. ECF No. 36 at 6. Not so. The class that Plaintiffs propose, and that the Court will certify,

---

[3] Given the Supreme Court's holding in *A.A.R.P. v. Trump*, it is unclear whether the Court *must* certify the putative class before providing preliminary relief. *See* 145 S. Ct. 1364, 1369–70 (2025). The treatise that *A.A.R.P.* relied on for this issue explains that *A.A.R.P.* "means that the filing of a class suit"—along "with a showing that the standard for interim relief has been met"— is enough to "enable such relief to the entire putative class." 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:30 (June 2025 Update); *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2569 (2025) (Kavanaugh, J., concurring). Still, to tread the "safest ground" when deciding whether a putative class may receive preliminary relief, the Court will provisionally certify the class. 2 Rubenstein, *supra*, § 4:30.

does not turn on whether class members object to being returned to Guatemala—or even whether their lawyers or advocates do. Instead, the class depends on whether an unaccompanied child from Guatemala has received either a final order of removal or permission from the Attorney General to voluntarily depart the United States. In any event, the record here is barren of evidence that *any* child in the proposed class wants to return to Guatemala, even if their parents can be found. All the evidence suggests the opposite: Plaintiffs have offered over 30 declarations from Guatemalan children who object to being sent back. And Defendants offer no specific example supporting their claim that "[m]any Guatemalan children may benefit" from "reunification." ECF No. 36 at 6. Such a benefit is possible, assuming their parents can be found. But on this record, that is irrelevant to whether Plaintiffs' proposed class is so numerous that joinder is impracticable.

Next, Plaintiffs meet the commonality requirement because they identify common questions "susceptible to generalized, class-wide proof" that are likely to resolve important issues. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). They need just one; "a *single* such common question can" be enough for Rule 23(a)(2). *J.D.*, 925 F.3d at 1321 (emphasis added). But Plaintiffs offer several. For example: Do the TVPRA provisions governing the removal of unaccompanied alien children like Plaintiffs apply to what Defendants describe as reunifications and repatriations? Would Defendants' "reunification" plan violate binding regulations governing how federal agencies must treat these unaccompanied children? What notice and opportunity to be heard must unaccompanied alien children receive in this situation—and does the "reunification" plan provide it? Any one of these questions takes Plaintiffs over the commonality line.

In response, Defendants misstate the legal standard and point to purported factual differences that do not undermine commonality. Commonality is "lacking," they say, "because

individual issues dominate." ECF No. 36 at 7. If Defendants mean to invoke the predominance inquiry from Rule 23(b)(3), that move falls flat because Rule 23(b)(2) does not require that "common legal and factual questions predominate." *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006). Perhaps they are suggesting that individualized issues render the common issues incapable of generating class-wide answers. Again, though, Defendants focus on *outcomes*—immediate reunification—that are irrelevant to the common questions that Plaintiffs raise about the *processes* that they say the TVPRA and the Constitution require. *See* ECF No. 36 at 9 (asserting without support that some class members "will greatly benefit from prompt reunification").

Although there is no evidence before the Court that any child wants to return to Guatemala, it is true that some class members *might* prefer to go back immediately, without even going through the process of voluntary departure. But potential "factual variations among the class members" do not alone "defeat the commonality requirement." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003)). Instead, that requirement is met here because (at least) "a single aspect or feature of the claim" remains "common to all proposed class members"—to name two, whether Defendants possess the statutory authority to return them to Guatemala without following the procedures described in the TVPRA for removals, and whether their "reunification" plan heeds their due-process obligations. *Id.* (citation omitted).

In sum, the potential factual differences that Defendants identify—including the children's desires and their parents' purportedly differing "views," which in any event Defendants do not appear to have sought before transporting children to the airport, ECF No. 36 at 9—do not affect Plaintiffs' "entitlement to relief" on their claims about statutorily and constitutionally required

*process.* *J.D.*, 925 F.3d at 1321.  So they are not the kind that destroy commonality.

Despite a wrinkle that emerged at the hearing, Plaintiffs have also satisfied the typicality and adequacy-of-representation requirements.  The former "tend[s] to merge" with commonality and ordinarily does not bar class certification when (1) "the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct," or (2) those claims and defenses "are based on the same legal or remedial theory."  *J.D.*, 925 F.3d at 1322 (citations omitted).  Both the named Plaintiffs and the putative class members press claims deriving from the same conduct: Defendants expelling them from the United States under a "reunification" plan that allegedly violates the TVPRA's procedures.  And those claims rest on a common legal theory: the TVPRA prohibits Defendants' conduct, 6 U.S.C. § 279 does not authorize it, and due process demands more.  Given these shared features, "the facts and claims of all class members" need not "be identical."  *Bratya v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34, 48 (D.D.C. 2024) (internal quotation marks and citation omitted).  In the end, the "test for typicality is not demanding."  1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:29 (June 2025 Update).  This class meets it.

Adequacy, for its part, has two components.  Plaintiffs satisfy both.  First, in the National Immigration Law Center and the Institute for Constitutional Advocacy and Protection, Plaintiffs have capable "counsel" that "is competent to represent the class."  *R.I.L.-R*, 80 F. Supp. 3d at 181.  Defendants do not seem to directly dispute this aspect of adequacy.  Instead, they quibble with the named Plaintiffs for not having alleged "that they would serve as class representative [sic]" when Judge Sooknanan entered the temporary restraining order.  ECF No. 36 at 13.  If Defendants fault Plaintiffs for not having declarations lined up for their class-certification motion while trying to obtain emergency relief on the Sunday before Labor Day because of Defendants' unannounced

reunification operation, the Court finds that the subsequently filed declarations on this front alleviate any concerns—especially at this early stage. *E.g.*, ECF Nos. 29-2–29-7.

Second, the named Plaintiffs do "not have antagonistic or conflicting interests with the unnamed members of the class." *J.D.*, 925 F.3d at 1312. Defendants assert that some Guatemalan children have conflicting interests because—as they argue elsewhere—these children might prefer Defendants' "reunification" plan over the TVPRA's procedures. ECF No. 36 at 14–15. But that objection falters. To begin, the record does not support it. Defendants have provided no evidence that such an unaccompanied child exists—in fact, all the evidence cuts the other way, even over two weeks after Judge Sooknanan entered the temporary restraining order—so this potential conflict is in some sense "speculative" and "hypothetical." 1 Rubenstein, *supra*, § 3:58 (such conflicts do "not affect the adequacy inquiry"). That discrepancy is perhaps unsurprising. The class excludes unaccompanied alien children who seek and receive permission from the Attorney General to voluntarily depart, so children with a demonstrated desire to leave the United States more quickly and avoid the removal process are outside the class already.

True, the Court cannot rule out the possibility that *some* hypothetical class member who wants to receive permission to voluntarily depart has not yet, and that member may prefer being sent back to Guatemala under Defendants' "reunification" plan. But that preference creates at most marginal antagonism between the named Plaintiffs and this hypothetical class member. A win for Plaintiffs would not force this class member to remain in the United States forever against his will; it would simply require him to leave through the voluntary departure process for which he is eligible under the TVPRA. The parties seem to agree that this process takes "weeks" or sometimes "months," although they identify no statutory feature requiring the process to take that long. Hearing Tr. at 6, 32. And while that option is not the immediate return to Guatemala that

comes with Defendants' plan, the difference does not suggest that any potential antagonism is serious enough to defeat adequacy. That is especially so because "courts are reluctant to find the class representatives inadequate" just because "some class members" desire to "maintain" a "status quo" that "involves continuation of an illegal practice," which is likely the case here, as explained below. 1 Rubenstein, *supra*, § 3:64. A contrary rule would defeat most class actions since "it will almost always be the case that some member in a large class prefers the status quo for some reasons." *Id.* Finally, if this conflict were to materialize in a way that casts doubt on the named Plaintiffs' adequacy, creating "subclasses" could "resolve[]" the issue. *Id.* § 3:58 (noting that even "[s]ignificant conflicts of interests" can be handled through subclassing).[4]

Now to the development from the hearing. For the first time, Defendants asserted there that the named Plaintiffs all have attorney objections—and are thus ineligible for the "reunification" plan—because they filed this lawsuit. Hearing Tr. at 25–26. And that ineligibility, they contend, renders them atypical and inadequate for class purposes. Not so. Although Defendants

---

[4] In *J.D. v. Azar*, the Circuit addressed whether pregnant unaccompanied alien children challenging a policy "effectively barring" such children in ORR custody "from obtaining a pre-viability abortion" were adequate representatives, even though "many" of these children "carry their pregnancies to term." 925 F.3d at 1299. The majority did not see that feature of the class as a barrier to certification, reasoning that the "presence of uninterested individuals"—and even of those who "oppose abortion on ideological grounds"—did not create an adequacy-of-representation problem. *Id.* at 1314, 1317. And although Judge Silberman dissented on this score, the Court notes that the concerns that he raised do not apply here. For one thing, he highlighted that "the much larger group" within the class was "pregnant minors who wish to deliver a baby." *Id.* at 1343 (Silberman, J., dissenting); *see also id.* at 1345 (Silberman, J., dissenting) (describing the class as "consisting mostly of class members who plan to carry their pregnancies to term"). But as explained, that kind of record is absent here. No evidence suggests that most—or even some—unaccompanied Guatemalan children want to leave the United States faster than the voluntary departure process would allow. For another, Judge Silberman underscored that "many of the class members . . . have moral" or "religious objections to abortion" that created conflicting interests and other class-certification problems. *Id.* at 1342–43 (Silberman, J., dissenting). Again, though, nothing in this record suggests that the hypothetical child who wants to depart for Guatemala immediately would have a similarly strong opposition to other unaccompanied children from there receiving the TVPRA's process.

did not argue mootness—at least not explicitly—they have not mooted all named Plaintiffs' claims or this class action. The Supreme Court has "reject[ed] the proposition that a class-action defendant may defeat class treatment" that is "otherwise proper" by "promising as a matter of grace to treat named plaintiffs differently." *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369–70 (2025). And that is all this is: a statement by Defendants that they will apply their newly established criteria, unbound by statutes, regulations, or even official policy statements, in a way that renders the named Plaintiffs ineligible for their "reunification" plan.

Mootness is no hurdle here for two reasons. For one, Defendants' "voluntary cessation of" their "challenged practice" as to certain named Plaintiffs does not moot their individual claims; such forbearance "does not deprive" the Court of "its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). The reason is simple: a contrary rule would allow a defendant to "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). And Defendants' application of their newly created criteria—again, untethered to any statute or regulation—is not enough to carry the "heavy burden of persuad[ing] the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189 (internal quotation marks and citation omitted). As discussed later, Defendants' questionable application of their own criteria underscores this conclusion.[5]

---

[5] The attorney-objection criterion does not, in the Court's view, implicate Article III standing. "Courts assess standing based on the facts as they existed at the time the action commenced." *Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220, 1228 (D.C. Cir. 2024). By filing suit, the named Plaintiffs did not automatically make themselves ineligible for the "reunification" plan. Instead, Defendants reviewed their list and decided that this lawsuit rendered the named Plaintiffs ineligible. But nothing about that decision means that the named Plaintiffs lacked a

For another, the "inherently transitory" exception to mootness in the class context applies here and prevents mootness issues tethered to any specific named Plaintiff from precluding certification. *J.D.*, 925 F.3d at 1310. When an "individual claim might end before the district court" can "decide class certification," the "relation back" doctrine kicks in and—true to its name—relates the certification motion back to "a date when the individual claims were live." *Id.* at 1307, 1311; *see also R.I.L.-R*, 80 F. Supp. 3d at 183. Even in Defendants' view, Plaintiffs' claims are inherently transitory in the truest sense: suing counts as an attorney objection, so any unaccompanied child who sues will become ineligible for Defendants' "reunification" plan. If Defendants were right that this feature destroyed the viability of class treatment, then no unaccompanied alien child from the putative class could ever serve as a class representative. That "significant problem" is why this exception exists. 1 Rubenstein, *supra*, § 2:13.

The proposed class's typicality and adequacy also survive this kind of Executive forbearance. The "very existence of the inherently-transitory exception disproves" the idea "that the mootness" (or arguable mootness) "of a plaintiff's claims necessarily demonstrates her inadequacy as a representative." *J.D.*, 925 F.3d at 1313. Indeed, even a plaintiff whose "claims" are actually "moot" may "adequately represent a class." *Id.* (quoting *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017)). And Defendants offer no other reason to think that these named Plaintiffs will not "vigorously prosecute the interests of the class through qualified counsel." *Id.* at 1312 (citation omitted). They still seek to vindicate their claims that the TVPRA and the Constitution require more process than what Defendants' "reunification"-plan criteria provide. For its part,

---

sufficient injury when they sued. Rather, Defendants have described a "policy of forbearance" based on their non-statutory criteria that they applied to those who filed suit. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012). That development (at most) goes to whether the claims of the named Plaintiffs or putative class members are "moot," which they are not. *Id.*

*A.A.R.P.* also supports Plaintiffs' typicality and adequacy.  By explaining that "promising" relief to "named plaintiffs"—*i.e.*, what Defendants did here—does not "defeat class treatment," the Supreme Court suggested that such conduct does not always pose problems for the latter half of Rule 23(a)'s requirements.  *A.A.R.P.*, 145 S. Ct. at 1370.

In sum, the Court finds that the typicality and adequacy requirements are met.  The named Plaintiffs' claims "arise[] from the same . . . practice" and "course of conduct" as those underlying the putative class members' claims, and the "same legal theory" applies to them even if there are some factual differences about how Defendants' criteria might apply in a given case.  1 Rubenstein, *supra*, § 3:29.  And any potential "mootness" issues do not undermine the "conclusion that they can adequately press the class's interests."  *J.D.*, 925 F.3d at 1313.

As for whether a Rule 23(b)(2) class is appropriate, Plaintiffs meet both criteria.  First, Defendants have "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  This requirement does not mean that the challenged conduct must have "damag[ed]" "every member of the class."  2 Rubenstein, *supra*, § 4:28.  Instead, the "[a]ction or inaction" need only be "based on grounds which have general application to the class."  *Id.*  Plaintiffs clear that low bar; Defendants' plan to send unaccompanied Guatemalan children back to that country unsurprisingly applies to a class of unaccompanied Guatemalan children.  Second, injunctive and declaratory relief are appropriate as to the entire class.  The "key" is whether "the injunctive or declaratory remedy warranted" is "indivisible"—that is, whether the conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (citation omitted).  Plaintiffs seek relief based on what the TVPRA and Due Process Clause require before Defendants may send them out of the country.  Under these circumstances, how Defendants may proceed is appropriately the subject of

"a single injunction or declaratory judgment." *Id.* Indeed, Defendants identify no reason that such relief would vary from one class member to the next. *See* ECF No. 36 at 17. And the Court sees none at this provisional stage.

But the Court will not provisionally certify a class covering unaccompanied alien children from all non-contiguous countries in ORR's custody. Defendants have represented that they have no "immediate" or "definite" plans to send out of the United States other unaccompanied children within that broader group. Hearing Tr. at 29. And although the Court appreciates that this case has moved rapidly, it simply lacks the record to address whether such a sweeping class merits provisional certification. Of course, the Court does not foreclose expanding the class later if developments warrant that adjustment. Defendants should not construe this decision as an invitation to take similar action with respect to these other unaccompanied alien children. For the same reasons explained below, any such attempt to expel them is likely to be unlawful.

One final point on class-wide relief. Defendants briefly contend that 8 U.S.C. § 1252(f)(1) prevents the Court from entering the requested injunctive relief because that provision prohibits courts from "'enjoin[ing] or restrain[ing] the operation of' certain provisions in Title 8" on a class-wide basis. *See* ECF No. 35 at 15 (quoting 8 U.S.C. § 1252(f)(1)). But the injunctive relief requested—and that the Court will order—will not enjoin the operation of a covered provision. At the hearing, Defendants left no doubt that the statutory authority for their "reunification" plan relies on 6 U.S.C. § 279. Hearing Tr. at 35. Section 1252(f)(1) does not cover that provision, so any injunction prohibiting conduct relying on it would not trigger this remedial bar. Moreover, any potential "collateral effect[s]" on a covered provision would not implicate § 1252(f)(1). *Refugee & Immigr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (RDM), 2025 WL 1825431, at

*53 (D.D.C. July 2, 2025) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022)).[6]

### C.    Plaintiffs Are Entitled to Class-wide Preliminary Relief

#### 1.    Plaintiffs Are Likely to Succeed on the Merits of Their Statutory Claim

Plaintiffs argue that Defendants' plan to return them to Guatemala violates the TVPRA.[7]

To repeat, when DHS seeks to "remove[]" "[a]ny unaccompanied alien child" from a non-contiguous country, the child must be placed in standard removal proceedings, is eligible for voluntary departure, and must be provided access to counsel when practicable. *See* 8 U.S.C. § 1232(a)(5)(D).

---

[6] Finally, even if the injunction affected 8 U.S.C. § 1232 directly, the remedial bar of 8 U.S.C. § 1252(f)(1) still does not help Defendants. That bar applies only to a limited subset of statutory provisions. True, as codified in the United States Code, § 1252(f)(1) seems to reach § 1232 because it applies to "the provisions of part IV of this subchapter"—that is, §§ 1221–1232. *See* 8 U.S.C. § 1252(f)(1). But the version of § 1252(f)(1) contained within the U.S. Statutes at Large does *not* cover the relevant part of the TVPRA. Instead, that version limits the remedial bar to orders that "enjoin or restrain the operation of the provisions of chapter 4 of title II" of the INA. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, sec. 306(a)(2), § 242(f)(1), 110 Stat. 3009-546, 3009-611; *see also id.* sec. 1(b), 110 Stat. at 3009-546 (noting that the provisions of IIRIRA, unless otherwise indicated, amend the INA). And the relevant provisions of the TVPRA *are not part of the INA*. *See Galvez v. Jaddou*, 52 F.4th 821, 830–31 (9th Cir. 2022). When the U.S. Code and Statutes at Large conflict, the law within the latter controls. *Stephan v. United States*, 319 U.S. 423, 426 (1943); *see also* 1 U.S.C. §§ 112, 204(a). Here, that conflict means that the remedial limitation within § 1252(f)(1) would not preclude class-wide injunctive relief affecting § 1232.

[7] Parties "adversely affected by agency action" often rely on the Administrative Procedure Act's cause of action. *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006). That statute authorizes courts to "hold unlawful and set aside agency action" that is, among other things, "in excess of statutory . . . authority" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Although Plaintiffs did not cite the APA in their complaint, they did not "need" to "pin" their "claim for relief to a precise legal theory." *Mohamed v. Select Portfolio Serv., Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)). And their complaint *does* allege that Defendants' reunification plan is "contrary to law." Compl. ¶ 98; *see also id.* ¶¶ 79–84 (alleging violations of Defendants' "legal obligation[s]" under federal law). Any cause-of-action issues, moreover, are not jurisdictional. *See Trudeau*, 456 F.3d at 188–89; *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). Nor do Defendants contest Plaintiffs' preliminary-injunction motion on these grounds. So the Court does not see this pleading quirk as a barrier to likelihood of success.

Plaintiffs contend that Defendants' "reunification" plan upends that statutory structure by removing them without complying with the TVPRA's requirements. Defendants, for their part, dispute the premise. They claim that their plan does not involve removals—and thus does not trigger the TVPRA—because other statutory authority permits them to reunite children with their parents.

Plaintiffs very likely have the better of the argument. The TVPRA contemplates that an unaccompanied alien child can leave the country in one of two ways: following an order of removal issued through removal proceedings under 8 U.S.C. § 1229a, or via voluntary departure under 8 U.S.C. § 1229c.[8] Thus, Defendants' "reunification" plan, which is predicated on first expelling— that is, removing—these unaccompanied alien children from the United States, would circumvent the process that Congress established for doing so.

Defendants point to what they describe as "longstanding statutory authority to reunify unaccompanied alien children" with "their parents." ECF No. 35 at 9. That authority, they insist, derives from Congress's directive that ORR is "responsible for reuniting unaccompanied alien

_____

[8] Defendants do not argue that, assuming the TVPRA's safeguards apply, they can "place" a child into removal proceedings and then send him out of the country as they propose to do by prematurely terminating those proceedings. For good reason: reading the statute that way would undermine the other protections requiring eligibility for voluntary departure—which happens during or after removal proceedings—and access to counsel for "legal proceedings" to "the greatest extent practicable." *See* 8 U.S.C. § 1232(a)(5)(D)(ii)–(iii), (c)(5). And taking a child out of removal proceedings prematurely would flout the requirements of the § 1229a process that Congress specified. That "process for removing aliens from the country," after all, is the province of the "immigration judge," *Mata v. Lynch*, 576 U.S. 143, 145 (2015), who "shall decide whether an alien is removable" at the "*conclusion* of th[at] proceeding," 8 U.S.C. § 1229a(c)(1)(A) (emphasis added). During that process, the alien has rights—to "examine the evidence," "present evidence," and "cross-examine witnesses"—that early termination of the proceeding would nullify. 8 U.S.C. § 1229a(b)(4)(B). So too would such termination violate the alien's post-removal-order rights to "appeal that decision to the Board of Immigration Appeals" and "file one motion" to "reopen his or her removal proceedings." *Mata*, 576 U.S. at 145 (internal quotation marks and citation omitted); *see also* 8 U.S.C. § 1229a(a)(1), (c)(5), (c)(7)(A).

children with a parent abroad in appropriate cases." 6 U.S.C. § 279(b)(1)(H). They add that the TVPRA "recognizes" this "reunification authority," in part by instructing agencies to develop procedures to safely repatriate unaccompanied children. ECF No. 35 at 10. So in Defendants' view, "reunification and repatriation authorities are distinct from removal." *Id.* at 11. And because the TVPRA's protections under § 1232(a)(5)(D) kick in only for attempted removals, Defendants say that they need not comply with those statutory directives when sending unaccompanied children back to their families in Guatemala.

The linchpin of this theory is Defendants' view that they can "reunify" these unaccompanied alien children with their parents in Guatemala or "repatriate" them there without first "removing" them from the United States, thus avoiding the TVPRA's trigger. But that understanding conflicts with the ordinary meanings of these words and their context within the statutes at issue.

Begin with the "ordinary meaning" of the word "removal." *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J., concurring). While the precise formulations vary, dictionaries tend to "define 'remove'" as "connot[ing] *physical* displacement from one location to another." *Id.* To remove someone, after all, means "[t]o make (a person) leave a place" or "to compel (a person or a people) by law to move to another place." *Remove*, Oxford English Dictionary, sense 3.b (2025), https://www.oed.com/dictionary/remove_v; *see also Removal*, Black's Law Dictionary (12th ed. 2024) ("The transfer or moving of a person or thing from one location, position, or residence to another."). The INA also supports that intuitive understanding in the immigration context: "removal" signals "the physical expulsion of an alien from the United States." *J.G.G.*, 147 F.4th at 1052–53 (Katsas, J., concurring) (emphasis omitted). Undeniably, Defendants' plan would do just that.

Because removal focuses on the act of expulsion, whether a removal has occurred does not

depend on what "the country on the receiving end" does after the removal.  *J.G.G.*, 147 F.4th at 1052–53 (Katsas, J., concurring).  Or said a bit differently, whether an alien is removed does not turn on whether an alien was "removed in a certain way" or "to a certain place."  *United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010).  So "if the government effected [a] removal" by "tossing" an alien "overboard" after "sailing her out to the boundary of the territorial waters of the United States," a *removal*—even if unlawful—has still happened.  *J.G.G.*, 147 F.4th at 1053 (Katsas, J., concurring) (quoting *Sanchez*, 604 F.3d at 359).

"Reunification" is something else.  To reunify people is to "bring" them "together again after a period of division or separation."  *Reunify*, Oxford English Dictionary (2025), https://www.oed.com/dictionary/reunify_v?tab=meaning_and_use#25497626.  In this context, then, reunification with a parent is something that could happen *after* an unaccompanied alien child is physically expelled—removed—from the United States.  But just because a reunification follows a removal—or happens as part of the same plan—does not mean that a removal did not occur.  Bottom line: nothing about the word "reunification" suggests that ORR's duty to "reunify" an unaccompanied alien child with his parents (if possible) displaces the process that Congress mandated when DHS "removes" such a child from the United States, even when that removal is a predicate for reunification.

The context in which Congress used these terms tracks their plain meanings.  If ORR's reunification responsibility were really an independent *authority* to expel unaccompanied alien children from the United States, the Department of Health and Human Services—with no other power related to the border or immigration that the parties have brought to the Court's attention—would be a strange place to put it.  Moreover, in passing the TVPRA as a part of a broad effort to combat the trafficking of children, Congress mandated a specific set of procedures and safeguards

that apply to unaccompanied alien children when DHS seeks to remove them. 8 U.S.C. § 1232(a)(5)(D). Congress spoke in mandatory and sweeping terms: this process "*shall*" apply to "*[a]ny* unaccompanied alien child" whom DHS seeks to "remove[]." *Id.* (emphases added). At the time, Congress knew about ORR's reunification responsibility. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). If that responsibility authorized ORR to expel unaccompanied alien children from the country, it would be odd for Congress to have enacted the TVPRA's comprehensive process without specifically acknowledging that supposed authority. Defendants' view, after all, would render the TVPRA inapplicable any time ORR invoked this purported authority to expel an unaccompanied alien child for reunification purposes.

Thus, both the ordinary meanings of the words "removal" and "reunification" as well as their statutory context show that the reunification authority that Defendants claim for ORR is a duty that compliments rather than displaces the process that Congress set out in the TVPRA for those children's removal from the United States. This understanding "harmonizes" § 279 and the TVPRA "by giving effect to" ORR's role in parental reunification without nullifying the TVPRA's protections whenever reunification is the end goal of a removal. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 665 (2007). Indeed, no one disputes that ORR has a valuable role to play in ensuring, where possible and appropriate, that children are reunited with their parents after they are lawfully removed or are permitted voluntarily departure.

The TVPRA's mention of "repatriation" is also no refuge for Defendants. Again, start with that term's ordinary meaning. To repatriate a person is to "restore" him "to his . . . native country." *Repatriate*, Oxford English Dictionary, sense 1.a (2025), https://www.oed.com/dictionary/ repatriate_v?tab=meaning_and_use#25809836. Thus, "repatriation" focuses on where a removed alien

goes *after* being expelled from the United States, and it too does not suggest that an unaccompanied alien child can be repatriated without being removed. Nor does this term suggest that Congress viewed it as interchangeable with reunification. Both are things that happen after a removal, but they are not the same thing.

The structure of the INA and its acknowledgement of what "repatriation" means confirm this understanding. The INA sets out the "process for selecting the country to which" an alien "will be removed" in 8 U.S.C. § 1231(b), which is separate from the process for deciding *whether* an alien is removable. *Jama v. ICE*, 543 U.S. 335, 337 (2005). Under that provision, the default destination is the country where "the alien boarded the vessel or aircraft" that took him to the United States. 8 U.S.C. § 1231(b)(1)(A). But when that country will not accept the alien, the Attorney General may repatriate him—that is, return him to his "country" of "national[ity]." *Id.* § 1231(b)(1)(C)(i). As the Supreme Court's description in *Jama* underscores, though, the decision about where the alien will go contemplates that he "will *be removed*" from the United States to begin with. 543 U.S. at 337 (emphasis added).

The TVPRA itself, by using the word "repatriation," does not suggest that this concept is a freestanding source of authority to expel unaccompanied alien children or to circumvent the TVPRA's procedures when children are removed. To repeat, the best reading of the term, as with "reunification," is that it describes something that may happen after removal. And again, this ordinary meaning aligns with the statutory context. Defendants point to the TVPRA provision requiring agencies to "develop policies and procedures to ensure" safe repatriation. 8 U.S.C. § 1232(a)(1). No doubt, this directive adds to the relevant agencies' obligations to facilitate such repatriation for unaccompanied children who are removed. *See id.* But again, these statutory duties for repatriation are consistent with a removal happening first; they do not recast repatriation

as a distinct expulsion power.

Titled "[e]nsuring the safe repatriation of children," the statutory home of the TVPRA's protections at the heart of this case undercuts Defendants' position too.  Pub. L. No. 110-457, § 235(a)(5), 122 Stat. 5044, 5076.  Section headings are "permissible indicators of meaning," *Huisha-Huisha v. Mayorkas*, 27 F.4th 719, 727 (D.C. Cir. 2022) (citation omitted), and this one about safe repatriation further suggests that repatriation involves removal.  So understood, Congress decided that the processes at issue here—placement in removal proceedings, eligibility for voluntary departure, and the assistance of counsel where practicable—would help make *repatriation* safer.  *See* 8 U.S.C. § 1232(a)(5)(D).  Yet Defendants' understanding of repatriation as a process not involving removal would render them inapplicable.  The Court will not strain to read the TVPRA in this atextual and counterintuitive way that "frustrate[s]" rather than "advance[s] statutory . . . goals."  *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024).

More still, the TVPRA's reporting provision confirms that Defendants' plan to repatriate these children involves removing them.  Section 1232(a)(5)(C) requires three agencies to "submit a report to" Congress "on efforts to improve repatriation programs for unaccompanied alien children."  That report must include "the number of unaccompanied children ordered removed and the number of such children actually removed."  8 U.S.C. § 1232(a)(5)(C)(i).  But if repatriation does not involve removal, it would be odd for a report *about repatriation* to include statistics about *removed* children.  Another required aspect of the report all but puts the issue to rest.  The repatriation report must describe the "policies and procedures used to effect *the removal* of such children" and "the steps taken to ensure that such children were safely and humanely *repatriated* to their country of nationality."  *Id.* § 1232(a)(5)(C)(iii) (emphases added).  The TVPRA thus contemplates that when the Executive Branch sends an unaccompanied alien child out of the United States

and back to his home country, that child is both removed and repatriated. Again, this understanding of the TVPRA "give[s] effect" to the different "word[s] of [the] statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted).

ORR's practices, both past and present, also strongly cut against Defendants' view that their "reunification" plan permits them to circumvent the TVPRA. Though far from dispositive, the Executive's "longstanding practice" can serve as an "interpretive aid" when deciding "what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks and citation omitted). So it is revealing that ORR has no longstanding practice of relying on the asserted statutory authority.

Trying to fill that blank canvass, Defendants identify three examples to support their claim that "ORR has exercised this authority in the past." ECF No. 35 at 6. Two involved reunifications in Mexico and Canada. *See* Salazar Decl. ¶ 8. But because the statutory provisions at issue here do not apply to children from those contiguous countries absent special circumstances, *see* 8 U.S.C. § 1232(a)(5)(D), those examples do not help Defendants. In the remaining case, ORR "discharged a child from the United Kingdom to the British Embassy so that he [could] reunite with his grandmother." Salazar Decl. ¶ 8. Even if ORR completed that reunification without complying with the TVPRA's protections—something its declarant is unclear about—one example in almost 20 years is hardly a longstanding practice. Nor does Defendants' conduct inspire confidence that they themselves are convinced that they have the authority to proceed as they would like. If their statutory authority is so "unambiguous," ECF No. 35 at 4, why exercise it in the middle of the night on a holiday weekend with nothing but a late-night (or early-morning)

notice to the children's caretakers and advocates?[9]

In the end, Defendants tried—and still want—to remove unaccompanied Guatemalan children from the United States.  But because "calling a thing by a name does not make it so," *City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Emp. Rels. Comm'n*, 429 U.S. 167, 174 (1976), Defendants cannot dodge their statutory obligations under the TVPRA by asserting that these children are being reunified or repatriated without being removed.  The statute does not free Defendants from the requirements that Congress imposed under § 1232(a)(5)(D) or permit them to rely on "an alternative extra-statutory system for removing" unaccompanied children just because the children may wind up with their parents.  *Refugee & Immigr. Ctr. for Educ. & Legal Servs.*, 2025 WL 1825431, at *31.  Nor can Defendants' preference for a faster way to return unaccompanied children to their home countries override the TVPRA.  There may be a better policy solution to this difficult, complex issue than what law requires.  But a "policy disagreement with Congress," of course, is no license for the Executive "to ignore statutory mandates."  *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

---

[9] Defendants invoke the One Big Beautiful Bill Act as a last redoubt, but their opaque argument falls flat.  That legislation appropriated funds for "removal operations for specified unaccompanied alien children."  Pub. L. No. 119-21, § 100051(8)(A), 139 Stat. 72 (2025) ("Big Beautiful Bill").  In doing so, it specified that the funds "shall only be used for permitting" such children "to withdraw" their "application[s] for admission" under 8 U.S.C. § 1225(a)(4).  *Id.* § 100051(8)(B).  From this appropriations provision, Defendants reason that "reunification" is permissible for unaccompanied children "upon withdrawal of [their] application for admission," which apparently "confirm[s] that Plaintiffs misread the statutory scheme."  ECF No. 35 at 15.  The Court does not see why.  Defendants do not claim that they are removing unaccompanied Guatemalan children who have "withdraw[n] the[ir] application for admission."  Big Beautiful Bill § 100051(8)(B).  And if Defendants are saying that this provision overrides the TVPRA's protections keyed to removal, they have not overcome the "very strong presumption" that "appropriation acts" do not "substantively change existing law."  *Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000).

Finally, the Court notes that even if Defendants possessed the "reunification" authority that they say nullifies the TVPRA's provisions, the record shows that they likely have not lawfully exercised it as to most class members.  The statute they invoke makes ORR responsible for reuniting unaccompanied children "*with a parent* abroad in appropriate cases."  6 U.S.C. § 279(b)(1)(H) (emphasis added).  Tracking this language, Defendants' counsel represented to Judge Sooknanan his "understanding": "for these children, a request has been made by either their parent or legal guardian."  ECF No. 12 at 10.  So Defendants, counsel explained, thought it was "fairly outrageous that plaintiffs are trying to interfere with these *reunifications*."  *Id.* (emphasis added).

On this record, that representation about requests made by these children's parents and guardians has no support.  And Defendants' new counsel withdrew it at the hearing.  Hearing Tr. at 23.  As described, the Guatemalan Attorney General issued a report explaining that for the "609 adolescents listed," the Attorney General's office had "phone numbers" for "only 204" and confirmed "information" for 115.  ECF No. 40-2 at 3.  Putting aside that only a smaller subset of those 115 would take their children back—and that none of the parents had asked for their return—the report suggests that less than 20 percent of the 609 children even had identifiable parents with whom reunification was possible.  Even on Defendants' reading, 6 U.S.C. § 279(b)(1)(H) permits ORR to reunite an unaccompanied child *with a parent* when appropriate.  But for most unaccompanied alien children in this class, Defendants seem to lack a reasonable basis for finding that the child will be so reunified.  And although there may be an explanation for this discrepancy between the Guatemalan Attorney General's report and Defendants' earlier justification for their "reunification" plan, Defendants have not offered one.

For all these reasons, Plaintiffs have shown that they are likely to succeed on the merits of their statutory claim.  So the Court need not address their other claims now.

### 2.    Preliminary Relief Is Necessary to Prevent Irreparable Harm

This Circuit has set a "high standard for irreparable injury." *Clevinger v. Advoc. Holdings*, 134 F.4th 1230, 1234 (D.C. Cir. 2025). Qualifying harms must be "certain and great," as well as so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable" injury. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotation marks and citation omitted). And because "irreparable" is the key word, the harm must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Plaintiffs meet this standard. To begin, the harm from Defendants' "reunification" plan is obviously imminent for Plaintiffs whom Defendants agree are eligible for it. Defendants plan to return them to Guatemala if unrestrained by court order. And they even refuse to disclaim a reunification operation mirroring their first attempt: unannounced, in the middle of the night, and with just a few hours of notice to the caretakers and even less to their lawyers. Hearing Tr. at 29.

Given the purpose of the TVPRA's procedures and on this record, losing those safeguards would significantly harm Plaintiffs. The statute brims with evidence of congressional concern about the "trafficking and exploitation" of unaccompanied alien children in this context. 8 U.S.C. § 1232(a)(5)(A). Thus, Congress enacted specific protections to "[e]nsur[e]" their "safe repatriation." *Id.* § 1232(a)(5)(D). Even for children who otherwise would not receive these safeguards—those from Canada and Mexico—Congress extended this process to them if the child is vulnerable to trafficking or credibly fears returning to his home country. *See id.* § 1232(a)(2)(A), (5)(D). Moreover, the record backs up Congress's judgment about the importance of these provisions. The parents of one child seemingly on ORR's original list noted that she "could not live" in Guatemala given the "death threats" that she "had received." ECF No. 40-2 at 4. Another child who

"experienced neglect and abandonment" from his father was taken to the airport over Labor Day weekend even though his family in Guatemala likely could not "protect" him from "violent drug dealers." ECF No. 20-17 ¶¶ 7, 9. And another fears returning to Guatemala because his sister was recently murdered there. ECF No. 20-18 ¶ 5. His "father is not a part of [his] life"; his mother "does not want [him] to return" and "had no idea that the government" planned to send him back; and he has "no other family who could receive" him in Guatemala. *Id.* ¶¶ 5–6, 9. Finally, the report by the Guatemalan Attorney General further underscores how meaningful these procedures are. While Defendants plunged ahead in the middle of the night with their "reunification" plan and then represented to a judge that a parent or guardian had requested each child's return, that turned out not to be true. Such a rushed, seemingly error-laden operation to send unaccompanied alien children back to their home countries is one of the things that the TVPRA's process prevents.

Finally, this harm is not remediable. Nothing in the record suggests that the Court could effectively order Defendants to somehow return these unaccompanied alien children back to ORR custody from Guatemala if the Court later found that they were entitled to the TVPRA's safe-guards. *See* 8 U.S.C. § 1232(a)(5)(D). Certainly, Defendants offered no assurance that they could or would do so, *see* Hearing Tr. at 56–57, nor do they suggest that they would have "any continuing oversight" over the children in Guatemala, *cf. Doe v. Mattis*, 928 F.3d 1, 22 (D.C. Cir. 2019) ("irreparable injury" where plaintiff would be "involuntarily (and irreversibly) handed over to Country B in violation of his constitutional rights"). And even if it were possible to return these children later, just the temporary loss of these statutory procedures is enough to show irreparable harm on this record: the whole point is that the procedures kick in *before* the child is expelled from the United States.

No doubt, Defendants are correct that "removal" is "not categorically irreparable." *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009).  But *Nken* addressed the "new" judicial-review scheme that Congress established when passing the Illegal Immigration Reform and Immigration Responsibility Act.  *Id.* at 424.  Under that scheme, an alien who has been "removed may continue to pursue" his "petition[] for review" from abroad.  *Id.* at 435.  And if he "prevail[s]," he may "be afforded effective relief by facilitation of [his] return" and "restoration of" his pre-removal "immigration status."  *Id.*  *Nken*, though, underscored that these were the features that eliminated categorical irreparability for certain removals.  Indeed, the Court acknowledged "the irreparable nature of harm from removal" prior to a "decision on a petition for review" under the old scheme that did not permit a removed alien to continue challenging his removal order.  *Id.* (emphasis added).  So *Nken* stands only for the proposition that "deportation *pursuant to a valid removal order* is" not necessarily irreparable harm.  *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 66 (D.D.C. 2020) (emphasis added).

So understood, *Nken* is no bar to the conclusion that Defendants' "reunification" plan would inflict irremediable harm on Plaintiffs.  Recall that Plaintiffs do not have final removal orders that they could challenge; they have consistently excluded children with such orders from the putative class and the relief sought.  *See, e.g.*, ECF No. 6 at 16; ECF No. 20-1 at 8; ECF No. 42 at 25.  And the point of Defendants' plan is to send children back to Guatemala *without* the TVPRA process that could lead to a final order of removal (or voluntary departure, for those who wish to pursue that path).  If Defendants do so, no party suggests that Plaintiffs will be able to "prevail" in a challenge to a non-existent removal order from abroad and receive "effective relief by facilitation of their return."  *Sarr v. Garland*, 50 F.4th 326, 335 (2d Cir. 2022) (quoting *Nken*, 556 U.S. at 435).

In sum, Defendants plan to send Plaintiffs back to Guatemala "prior to receiving" the

"protections [that] the immigration laws provide" specifically for them under the TVPRA. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in relevant part and rev'd on other grounds*, 27 F.4th 718 (D.C. Cir. 2022). Those safeguards, as explained, reflect Congress's judgment that certain procedures are necessary to facilitate the safe repatriation of children. *See* 8 U.S.C. § 1232(a)(5)(D). And on this record, nothing suggests that the significant injury that would result from "expulsion from the United States" under a plan lacking those statutory safeguards can "be remediated after the fact." *G.F.F. v. Trump*, 781 F. Supp. 3d 195, 212 (S.D.N.Y. 2025) (citation omitted).

Plaintiffs whom Defendants deem to be currently *ineligible* for their reunification plan present slightly trickier issues for irreparable harm. As of the hearing on September 10, this group includes all named Plaintiffs. Hearing Tr. at 25. The irreparability and magnitude of the harm tracks that of those who *are* eligible for Defendants' "reunification" plan. But on first blush, because Defendants say this group does not meet their criteria, imminence is a closer call. Still, two reasons lead the Court to find that "there is a clear and present need for equitable relief to prevent irreparable harm" such that enjoining Defendants from returning these unaccompanied alien children to Guatemala is appropriate as well. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal quotation marks and citation omitted).

First, nothing binds Defendants to these criteria. *See* Salazar Decl. ¶ 10 (listing nine criteria that ORR "employed"). They cite no statute, regulation, or even policy statement requiring them. That means there is no legal roadblock preventing Defendants from changing the criteria (or how they interpret them) tomorrow, placing a currently non-eligible child onto the eligibility list, and hustling that child out of the country as they tried to do over Labor Day weekend. Given the possibility that Defendants may alter their criteria and then act in a way that would prevent judicial

review, the risk of irremediable harm to Plaintiffs who happen to be ineligible under the criteria now is more imminent than it would otherwise seem.

Second, the record and Defendants' conduct suggest that they are not applying their criteria accurately, consistently, or in ways that reflect good faith.  Consider the criterion that excludes from eligibility any child whose "attorney of record" has "affirmatively protested the child's reunification with their parent."  Salazar Decl. ¶ 10.  How would any such attorney have had a reasonable opportunity to protest Defendants' "reunification" plan when it was set in motion in the middle of the night on a holiday weekend?  Of course, now that litigation has provided the objection opportunity that Defendants did not, many more attorneys have objected.  Hearing Tr. at 26–27.  Still, questions remain.  For example, Defendants asserted at the September 10 hearing for the first time that the named Plaintiffs were ineligible because their attorneys protested by filing this lawsuit.  But if Defendants have always viewed filing a lawsuit as an attorney objection, why did they not bring this issue to the Court's attention earlier—even as soon as the August 31 hearing?  After all, Defendants need not have known the identities of the named Plaintiffs to have raised this point.  True, maybe Defendants recently changed how they apply this criterion.  But either way, its scope and application seem uncertain.

Other examples abound.  According to ORR, an unaccompanied alien child may be eligible for Defendants' "reunification" plan only if he "has a parent or legal guardian in Guatemala."  Salazar Decl. ¶ 10.  The agency found that "327 children" were "ultimately eligible" for reunification," *id.* ¶ 12, meaning that there should have been a similar number of family units—one parent, two, or a legal guardian—that ORR identified.  But the Guatemalan Attorney General's office says that it has been able to "confirm the information" of just "115 families"—and only 57 would take their children back.  ECF No. 40-2 at 3–5.  Again, perhaps there is an explanation for this

discrepancy that Defendants have not offered.  But on this record, it appears that Defendants intend to send back to Guatemala many unaccompanied children without an identified parent or legal guardian there, contrary to this criterion.

It is also unclear how Defendants are applying the criteria meant to exclude children with indicators of trafficking, abuse, and neglect.  In a letter to Congress provided to the Court by Plaintiffs, whistleblowers report that "many children identified for repatriation" have "indicators of being a victim of child abuse, including death threats, gang violence, [and] human trafficking."  ECF No. 47-1 at 2–3.  And Plaintiffs have provided evidence casting doubt on whether Defendants are reliably applying these criteria.  One child woken up at 2:00 a.m. on Labor Day Sunday "experienced neglect and abandonment from" his father growing up in Guatemala.  ECF No. 20-17 ¶¶ 7–8.  Despite that history, a "supervisor" put him "on a bus headed for the airport" that morning.  *Id.* ¶ 8.  As he was about to board the plane, someone told him that he "was not on the list."  *Id.* ¶ 9.  A close call.  Or consider another child seemingly slated for reunification who appears to share a similar history of neglect: his "father is not a part of [his] life," and his mother lacks "resources to care for" him and "does not want [him] to return."  ECF No. 20-18 ¶¶ 6, 10 (describing "a man who "showed up to take us away in a van" at "4:00 a.m.").

For these reasons, the Court finds that class-wide preliminary relief—to include even those unaccompanied alien children whom Defendants currently view as ineligible for their "reunification" plan—is "necessary to provide complete relief to the plaintiffs," including all class members. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  Defendants' eligibility criteria do not provide a workable line for dividing relief.  And the Court need not require currently ineligible plaintiffs—however many there may be—to individually request relief "on a rolling, emergency basis" with "one-by-one temporary restraining orders" given the showing

of irreparable harm here. *J.D.*, 925 F.3d at 1338.

The Court emphasizes that this class-wide relief is not the frowned-upon "universal relief." *CASA*, 145 S. Ct. at 2557. Instead, it fits comfortably within the "equitable tradition" of "administer[ing] complete relief between the parties," *id.* (citation and emphasis omitted), and of providing such relief when it is "need[ed]" to "prevent irreparable harm," *Wis. Gas Co.*, 758 F.2d at 674 (citation omitted). The Supreme Court's recent decision in *A.A.R.P.* confirms as much. There, the defendants had "agreed to forgo removing the named petitioners" while "their habeas proceedings" were "pending," which (as here) might seem to have lessened the imminence of the threatened injury. 145 S. Ct. at 1369. But the Court still granted them preliminary relief despite that Executive "grace." *Id.* at 1369–70. And by temporarily "enjoin[ing]" the defendants "from removing the *named plaintiffs* or putative class members," the Court necessarily found that the named plaintiffs—whom the defendants said they would not remove—had a likelihood of irreparable injury. *Id.* at 1370 (emphasis added).[10]

Thus, the Court finds that Plaintiffs—both the representatives and class members—have established irreparable injury requiring preliminary relief.

### 3. The Remaining Factors Favor Preliminary Relief

Because Plaintiffs seek to enjoin "the government," the last two preliminary-injunction factors—"public interest" and "balance of equities"—merge. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021). And these considerations support preliminary relief too. The "perpetuation of unlawful agency action" does not serve the "public interest." *League of Women Voters*

---

[10] The two dissenting justices highlighted this very issue: "the main interim relief sought on behalf of the putative class . . . is not needed by either" named plaintiff. *A.A.R.P.*, 145 S. Ct. at 1376 (Alito, J., dissenting). So seven justices seemed to reject the idea that Executive forbearance, even for named plaintiffs, eliminates the irreparable injury necessary for class-wide preliminary relief.

*of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, the public has a "substantial" interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation omitted). So too does the "public interest" benefit from "aliens" not "being wrongfully removed." *Nken*, 556 U.S. at 436. On the flip side, Defendants endure minimal harm. They "cannot suffer harm from an injunction that merely ends," at least temporarily, a likely "unlawful practice." *R.I.L-R*, 80 F. Supp. 3d at 191 (citation omitted). And Defendants have not identified any exigency suggesting that other types of harm will follow if they cannot send unaccompanied alien children back to Guatemala as soon as possible. As an aside, it bears repeating that the preliminary relief sought and granted here does not prevent Defendants from beginning or continuing removal proceedings against Plaintiffs, or from allowing them to voluntarily depart as the TVPRA permits. Finally, Defendants invoke the benefits of "family reunification" to contend that the balance of the equities tips their way. ECF No. 35 at 25. But as clarified at the September 10 hearing and by the Guatemalan Attorney General's report, this rationale for their plan has little factual basis in the record.

## IV.    The Court Will Require Plaintiffs to Post a Nominal Bond

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Circuit has observed the "widely recognized discretion" of a district court "not only to set the amount of security but to dispense with any security requirement whatsoever." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Still, it has more recently expressed concern about how some courts have exercised this discretion. *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025). Plaintiffs ask the Court to waive the bond requirement, *see* ECF

No. 20-1 at 48, and Defendants take no position in their briefing or elsewhere.  Thus, they have arguably forfeited (or waived) the issue of the appropriate amount.  *See United States v. Olano*, 507 U.S. 725, 733 (1993).  Still, in light of the rule's language, the Court considers whether and in what amount to require a bond.  Given the lack of representation that Defendants will sustain any monetary injury from an injunction, the self-evidently limited financial resources of Plaintiffs, and the important rights they seek to vindicate, the Court will impose a nominal bond of $1.00.  *See N. Am.'s Building Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (defendants had "not sufficiently demonstrated any likelihood of suffering costs or damages if they are later found to have been wrongfully enjoined").

## V.    Conclusion

For all these reasons, the Court finds that Plaintiffs are entitled to certification of their proposed class of certain unaccompanied alien children from Guatemala and to a preliminary injunction.  Thus, the Court will grant their motion for class certification and provisionally certify the class described above.  In addition, the Court will grant Plaintiffs' motion for a preliminary injunction.  And it will order that Defendants, their agents, representatives, and all persons or entities in concert with them are enjoined from transferring, repatriating, removing, or otherwise facilitating the transport of any Plaintiff—including both named Plaintiffs and all members of the provisionally certified class—from the United States.  Finally, the Court will require Plaintiffs to post a $1.00 nominal bond by September 22, 2025.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 18, 2025

43