IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L.G.M.L., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, *et al.*, <br><br> *Defendants*. | Case No.: 25-cv-2942-TJK |

**PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE**

After a temporary restraining order narrowly thwarted the government's secret, middle-of-the-night attempt to expel unaccompanied Guatemalan children from the United States over Labor Day weekend, this Court certified a provisional class of certain Guatemalan children who are or will be in the custody of the Department of Homeland Security (DHS) and other Defendants and enjoined Defendants from "transferring, repatriating, removing, or otherwise facilitating the transport" of class members from the United States. Defendants declined to appeal that injunction and it remains in place while this matter proceeds to final judgment. But Plaintiffs have learned that Defendants are engaged in a practice that openly flouts the plain text of the Court's injunction and the statutory protections guaranteed by the Trafficking Victims Protection Reauthorization Act (TVPRA). Specifically, U.S. Customs and Border Protection (CBP) agents are returning unaccompanied children from noncontiguous countries, including class members, to their home countries within 72 hours of entering government custody, typically before they can be transferred

to the Office of Refugee Resettlement (ORR), the agency that cares for unaccompanied children, and before the children can meet with an attorney or present any claims to an immigration judge.

As discussed further below, in unrelated litigation, Defendants recently acknowledged expanding this expedited return practice to children from noncontiguous countries, rather than restricting it to unaccompanied children from contiguous countries, as the TVPRA permits. But even worse, Defendants are using misinformation, coercion, threats, and fear to persuade the children to relinquish their rights and sign paperwork purportedly accepting a form of expedited "voluntary" return. These practices—applied to vulnerable children whom Congress recognized a special need to protect—violate the Court's preliminary injunction as applied to newly arrived Guatemalan children[1] and violate the TVPRA as applied to newly arrived children from all noncontiguous countries. Plaintiffs respectfully move the Court for an order to show cause why Defendants should not be held in civil contempt.[2]

## BACKGROUND

On September 18, 2025, the Court provisionally certified a class of unaccompanied "children from Guatemala who are *or will be* in the custody of Defendants," are not subject to a final removal order, and have not been granted voluntary departure, and preliminarily enjoined Defendants "from transferring, repatriating, removing, or otherwise facilitating the transport of any

---

[1] Although CBP, the agency primarily responsible for carrying out this unlawful practice, is not a separately named Defendant in this matter, CBP is bound by this Court's injunction both because it is a subcomponent of DHS—which is a named Defendant—and because the Court's order includes Defendants' "agents, representatives, and all persons or entities [acting] in concert with them." Order, ECF No. 48. There is thus no question that CBP is bound by the terms of the injunction to the same extent as its parent agency. Plus, as explained *infra*, it is Immigration and Customs Enforcement (ICE) that operates the return flights, and ICE, a named defendant, is indisputably bound by the injunction.

[2] Counsel for Plaintiffs reached out to Counsel for Defendants to discuss this motion but were unable to reach agreement.

Plaintiff—including both named Plaintiffs and all members of the provisionally certified class—from the United States." Order, ECF No. 48 (emphasis added). The government declined to appeal that injunction, and it remains in place pending final judgment on Plaintiffs' claims.

Shortly before Thanksgiving, troubling reports emerged in unrelated litigation that CBP was using a new, secretive process "to intimidate and bully young people out of exercising their statutory rights" under the TVPRA by coercing unaccompanied minors into accepting expedited "voluntary" return. Matt Shuham, *Document Threatens Immigrant Children with 'Prolonged' Detention*, HuffPost (Nov. 20, 2025, 6:00 AM), https://perma.cc/J5GU-AT7M. Specifically, an attorney with the National Immigrant Justice Center received from an ORR shelter, as part of the immigration processing documents provided to a newly arrived unaccompanied child, a document that neither the attorney nor anyone on her team had ever seen. Decl. of Marie Silver, Ex. A.[3] As that attorney attested, the document, officially titled "UAC Processing Pathway Advisal," (Ex. B, hereafter referred to as "Processing Advisal"), "completely misstates—or at least dramatically misrepresents—the immigration laws that apply to unaccompanied immigrant children," and it conveys to vulnerable children "threats" that "are in clear contravention of the entire system implemented to protect and promote the safety and best interests of unaccompanied immigrant children pursuant to the … Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)." Ex. A at ¶ 12.

Specifically, the Processing Advisal tells unaccompanied children (in English and Spanish) that they have "the option to voluntarily return to your country of origin … within 72 hours." Ex. B. "If you choose to voluntarily return to your country," the Advisal says, "there will be no

---

[3] This declaration was submitted in *Garcia Ramirez v. ICE*, No. 18-cv-00508 (D.D.C. Nov. 13, 2025).

administrative consequence," and you can "apply for a visa, through legal means, in the future." *Id.* But for those who decline to be immediately returned, the document threatens dire consequences. For children who "choose to seek a hearing with an immigration judge or indicate a fear of returning to" their home country, the Advisal warns: (i) "You will be detained in the custody of the United States Government[] for a prolonged period of time"; (ii) your sponsor[4] may "be subject to arrest and removal from the United States" and "subject to criminal prosecution for aiding your illegal entry"; and (iii) "[i]f you cannot substantiate your claim of fear of returning to your country, you can be barred from legally applying for a visa." *Id.* And for those who "turn 18 years of age while in U.S. Government custody," the Advisal contends, "you will be turned over to Immigration and Customs Enforcement for removal (deportation) from the United States," resulting "in being barred from applying for a visa in the future." *Id.* These threats can only be read as an attempt to scare children into signing paperwork that relinquishes their rights under the TVPRA before they are transferred to ORR custody, provided any opportunity to consult with legal counsel, or given the opportunity to seek immigration relief before a judge.

Upon learning of this report, undersigned counsel were concerned that this process—if implemented and if successful in convincing children to abandon their legal protections—could both violate the plain language of the Court's injunction and be used as a disingenuous way to seek to prevent newly arrived children from receiving the protections of the Court's order. At that time, however, it was unclear whether the Processing Advisal reflected official government policy or how widespread or successful its use might be in persuading children from noncontiguous countries to accept "voluntary return" during the fleeting 72-hour window before they must be

---

[4] Sponsors are typically close relatives already living in the United States, such as a parent, adult sibling, grandparent, etc.

transferred to ORR custody. *See* Prelim. Inj. Op., ECF No. 49, at 3. Counsel have been working to gather these facts and any others that may bear on Defendants' compliance, but that task has been difficult given that the TVPRA only requires the government to provide children access to counsel after they are transferred to ORR custody.

Since then, Defendants' own admissions have confirmed that Defendants are officially and systematically using these tactics to attempt to expel unaccompanied children from noncontiguous countries without providing the protections of the TVPRA. First, in seeking to dissolve a decades-old permanent injunction that requires the government to provide, *inter alia*, notice of certain legal rights to unaccompanied minors entering government custody, CBP admitted in a sworn declaration that it is using the Processing Advisal to persuade unaccompanied children to "voluntarily" return to their home country before entering ORR custody. *See* Decl. of Michael Julien, Ex. C.[5] According to the declaration, once "an agent has determined" for himself that a child purportedly is "capable of making an independent decision," the information contained in the Processing Advisal "is generally provided orally to the" child. *Id.* ¶ 4.

Similarly, in a recent letter to Senator Ron Wyden, CBP Commissioner Rodney Scott argued that his agency had been granted authority in the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, to subject unaccompanied children from *noncontiguous* countries to expedited "voluntary" return, without ever entering ORR custody, as has long been allowed for some children from Canada and Mexico. *See* Letter from Commissioner Scott, Ex. D. Notably, this is the same argument that this Court flatly rejected on the ground that Defendants have not overcome the strong presumption that appropriations acts do not change substantive law. PI Op. at 33 n.9.

---

[5] This declaration was submitted in *Perez-Funez v. DHS*, No. CV 81-1457-MWF(Ex), ECF No. 277 (Jan. 20, 2026).

Commissioner Scott also admitted that CBP is housing children "in a short-term holding facility" while they await return to their home countries on an "Immigration and Customs Enforcement flight … as soon as operationally feasible"—again, without entering ORR custody. Ex. D at 1.

Defendants' recent public admissions confirm information class counsel has learned from Lauren Fisher Flores, the Legal Director of ProBar—a legal services provider that represents approximately 200 class members in their immigration proceedings, and who has provided previous declarations in this litigation, *see* ECF 2-2, 20-3—that some children in CBP custody are relinquishing their rights under the TVPRA and accepting expedited "voluntary return." Supp. Decl. of Fisher Flores, Ex. E. Last year, Ms. Fisher Flores began to hear rumors of a pilot program through which CBP would use several Rio Grande Valley ORR shelters "as a staging ground for removals of unaccompanied children from non-contiguous countries who had accepted a form of expedited 'voluntary return' while in CBP custody, before being transferred to ORR custody." *Id* ¶ 5. Under this program, if a child accepts the purported voluntary return but CBP is unable to expel them within the 72-hour-statutory maximum in which CBP is permitted to retain custody, CBP would hold them in one of the designated ORR facilities while awaiting expedited return. *Id*.

Ms. Fisher Flores has since learned that CBP is using misinformation, extreme coercion, threats, and fear to persuade children to relinquish their rights and purportedly "voluntarily" accept the return. "Over recent months, newly arrived unaccompanied minors have reported that federal immigration agents pressured them to waive their rights under the TVPRA, to abandon any claims for immigration relief they may have, and instead to accept expedited 'voluntary return' from the United States." *Id.* ¶ 8. The children's descriptions run the gamut from being willfully uninformed to being threatened and coerced. One *LGML* class member, an indigenous Guatemalan child, reported that "CBP agents shouted, cursed, and threatened [him] with a dog and a stun gun," "told

6

him he could accept a 'voluntary return' or he could remain detained for an extended period," and refused his request to speak with his family before signing away his rights. *Id.* ¶ 11. This occurred on or around October 14, 2025—nearly a month after entry of the Court's injunction. *Id.* That child signed the paperwork, but CBP apparently was unable to effectuate his expulsion quickly enough to prevent his transfer to an ORR shelter. Once at an ORR shelter, the child told ProBAR counsel that "his father is disabled and his parents cannot protect and support him" and that he "believes his prayers were answered" by being transferred to the shelter rather than returned to Guatemala. *Id.*; *see also* Ex. F, Decl. of D.A.T.M. (declaration from the child, describing mistreatment from CBP agents in detail).

Another Guatemalan boy, who speaks Kiche as his primary language, was told to sign "voluntary return" paperwork or he "would be detained for a long time." *Id.* ¶ 12. He signed, despite not understanding what he was signing, but with ProBAR's help, he revoked his acceptance of "expedited voluntary return" and is now in immigration proceedings.[6] *Id.*

These coercive tactics are not reserved for Guatemalan children. One child from a noncontiguous country was "handcuffed and interviewed by seven federal immigration officers without a parent or legal counsel present." *Id.* ¶ 9. When this child noticed one of the written answers to a question did not match his response, the officer told him, "I don't care." *Id.* When the child expressed fear of returning home, the officer told him that the United States also has violence

---

[6] This child entered the United States on September 16, 2025, roughly 48 hours before the Court certified the class and issued the preliminary injunction, *see* Ex. E ¶ 12, but while the temporary restraining order was in place, *see* Minute Order, Aug. 31, 2025. Plaintiffs respectfully contend that that timing does not undermine the relevance of this evidence because Defendants' own public admissions confirm, as does other evidence submitted with this motion, that they have continued to apply this practice to newly arrived unaccompanied children, including Guatemalan children, after the Court issued its injunction.

7

and danger. *Id.* That child was scared and pressured into signing a document agreeing to "'voluntary return' without any explanation of what it was, what it meant, or the consequences of signing," and afterward, "the child witnessed the officers celebrating." *Id.* A Honduran girl detained after a van crash was denied medical care while bleeding, yelled at by CBP agents, and told she had only two choices: agree to go back to Honduras now—where she had no parent to care for her—or wait in detention until she turned 18 and be deported at that time. *Id.* ¶ 13. She signed paperwork the agents told her to sign, without understanding what she was signing, but later "revoked the purported withdrawal of admission" in order to pursue immigration relief in the United States with ProBAR's help. *Id.*; *see also* Ex. G, Decl. of Y.Y.Z.O (declaration from child describing coercion and intimidation from CBP agents). The Honduran consulate also called a legal services provider to inquire about the protections afforded to unaccompanied children under the TVPRA, *id.* ¶ 15, explaining that CBP had requested travel documents to "repatriate[e]" a pregnant teen, although "the child did not want to return to Honduras but … CBP had told her they would arrest her undocumented parents living in the U.S. if she did not sign the 'voluntary return' paperwork." *Id.*

ProBAR staff have identified at least 13 children who signed purported voluntary return paperwork—eight from Guatemala, and others from Honduras, Ecuador, and Nicaragua—each of whom required immediate intervention to halt their impending return. *Id.* ¶¶ 10, 14. The children described "CBP officers behaving aggressively—shouting, insulting, cursing, grabbing, threatening, and handcuffing children," leaving them "scared and confused." *Id.* ¶ 10. It is critical to note that ProBAR, like other, similarly situated legal services providers, "is not allowed access to children while they are in CBP custody," so any child who CBP successfully coerces to sign "voluntary return" paperwork and places on an ICE deportation flight within 72 hours will never

8

receive appropriate legal services and screenings. *Id.* ¶ 14. In other words, neither ProBAR staff nor undersigned counsel in this litigation have any way of knowing how many children from noncontiguous countries, including class members in this litigation, CBP is returning within the 72-hour period before it must transfer children to ORR custody. ProBAR and other legal services providers only have a chance of catching those who slip through to ORR shelters because CBP cannot find them a flight fast enough. *Id.*

Ms. Fisher Flores explains that, in her "professional opinion, having worked with children for 20 years, the conditions of detention in CBP custody create a fearful environment for children, and a child cannot make an informed and willing decision about their future while detained in jail-like conditions, feeling the pressure of serious consequences by law enforcement agents." *Id.* ¶ 16. She further opines that, based on the information made available to her and her staff, "CBP is using intimidation tactics like prolonged detention in jail-like settings and arrest of family members to coerce children from noncontiguous countries into waiving their rights under the TVPRA and purportedly agreeing to accept 'voluntary return' without receiving any process or a hearing with an immigration judge." *Id.* She also confirms that these tactics are new and "appear to be an attempt by CBP to evade the protections children receive under the TVPRA." *Id.*

## STANDARD OF REVIEW

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Civil contempt is available only where the underlying order is clear and unambiguous. *Id.* The movant must show "that the alleged contemnor *violated the court's prior order*," but bad faith is not required. *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C.

9

Cir. 1997). "Indeed, the law is clear in this circuit that 'the contemnor's failure to comply with the court decree need not be intentional' … because, unlike a criminal contempt proceeding, a civil contempt action is 'a remedial sanction used to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." *Id.* (quoting *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 (D.C. Cir. 1981) (internal alteration omitted). And—apart from the power to hold parties in contempt—"a court has the authority to issue additional orders to enforce a prior injunction." *Damus v. Wolf*, No. 18-578, 2020 WL 601629, at *2 (D.D.C. Feb. 7, 2020) (citing *Hutto v. Finney*, 437 U.S. 678, 687 (1978)); *see also Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 765 F. Supp. 1, 6, 12-13 (D.D.C. 1991) (no contempt finding but modifying injunction to ensure further compliance).

## ARGUMENT

This Court's order enjoined Defendants "from transferring, repatriating, removing, or otherwise facilitating the transport of any Plaintiff—including both named Plaintiffs and all members of the provisionally certified class—from the United States." Order, ECF No. 48. Substantial evidence indicates that Defendants are systematically violating the plain terms of this Court's preliminary injunction by pursuing policies to expeditiously expel unaccompanied children, including those from noncontiguous countries. Moreover, the evidence gathered to date shows that they are doing so through a coercive, threatening, and misleading "Processing Advisal" that seeks to persuade vulnerable children to relinquish the protections afforded by the TVPRA and accept such returns "voluntarily."

### I. Defendants Are Violating The Court's Injunction

    A. *Defendants' actions are targeting class members*

The class includes all "unaccompanied alien children from Guatemala who are or will be in the custody of Defendants and who (1) are not subject to an executable final order of removal and (2) have not been permitted to voluntarily depart under 8 U.S.C. § 1229c and applicable regulations." Order, ECF No. 48. The newly arrived Guatemalan children who are being subjected to the tactics described above are neither subject to an executable final order of removal nor have been granted permission to voluntarily depart under 8 U.S.C. § 1229c. They thus cannot be expelled from the country—no matter what Defendants call such expulsion—unless and until they have received their day in immigration court or have been granted voluntary departure with statutory protections to ensure that their choice is truly voluntary and will not place the child at undue risk of future harm. PI Op. at 33.

Ms. Fisher Flores's declaration evidences that Defendants are coercing newly arrived unaccompanied Guatemalan children—*i.e.*, class members—into relinquishing their rights and accepting expedited expulsion before entering the custody of ORR. Ex. E ¶¶ 11-12. There can be no doubt that these children were class members when CBP attempted to expel them, before arriving in ORR custody, because the Court defined the class to include children "who are or will be in the custody of Defendants," and children in CBP's custody necessarily are in the custody of CBP's parent agency, Defendant DHS.[7] ECF No. 48. If not for the serendipity of CBP's inability to secure a deportation flight within 72 hours, ProBAR staff would not have been able to revoke their clients' "voluntary return" paperwork and have them placed in immigration proceedings. *Id.* ¶ 14.

---

[7] Even were that not the case, the Court's inclusion of children who "will be" in Defendants' custody must include those who, by proper operation of law, should be transferred to Defendant ORR's custody. It would defy the spirit and the purpose of the injunction to permit CBP to unlawfully treat these children like those from contiguous countries by "voluntarily" returning them before they can receive the protections of the TVPRA.

11

It is unknowable to class counsel how many other Guatemalan children Defendants have succeeded in rapidly expelling without ever transferring them to ORR custody or providing *any* of the statutorily mandated TVPRA protections.[8]

      B. *Defendants' actions violate the plain text of the Court's injunction*

Furthermore, Defendants cannot dispute having engaged in this course of conduct, which plainly violates the terms of this Court's injunction. After all, an Acting Division Chief at CBP admitted under oath that his agency began using the Processing Advisal in September 2025 for all children "who an agent has determined are capable of making an independent decision," and that the "advisal is generally provided orally to the" child. Ex. C ¶ 4. And Commissioner Scott similarly wrote to Senator Wyden that his agency is using "processing procedures … for [unaccompanied children] from non-contiguous countries [that] are the same as they are for [unaccompanied children] who are nationals or habitual residents of Canada or Mexico," meaning that those who purportedly "withdraw their application for admission and voluntarily return, and who choose to do so, are repatriated … by a U.S. Immigration and Customs Enforcement flight (for voluntary returns to noncontiguous countries) as soon as operationally feasible." Ex. D at 1.

Through these statements, Defendants have openly, publicly, and in sworn testimony admitted that they are engaging in conduct that constitutes the "transferring, repatriating,

---

[8] It is equally unknowable how many children from other noncontiguous countries have been subjected to this unlawful treatment; although those other children are not technically class members at this time, Plaintiffs' motion to expand the class definition to include additional nationalities is fully briefed and ripe for resolution, *see* ECF Nos. 65, 69, 70. And this Court already has admonished Defendants not to "construe" the decision to certify a class of only Guatemalan children "as an invitation to take similar action with respect to … other unaccompanied alien children," as "any such attempt to expel them" without affording the protections guaranteed by the TVPRA "is likely to be unlawful." PI Op. at 24.

removing, or otherwise facilitating the transport of any Plaintiff … from the United States"—conduct that is squarely prohibited by the Court's Order. ECF No. 48. That is enough to warrant an order to show cause for civil contempt. *See Food Lion, Inc.*, 103 F.3d at 1016; *see also Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9 (D.D.C. 1999) ("Two requirements must be met before a party or its attorneys may be held in civil contempt … [f]irst, the court must have fashioned an order that is clear and reasonably specific … [and] the defendant must have violated that order."); *Al-Adahi v. Obama*, 672 F. Supp. 2d 114, 117-18 (D.D.C. 2009) (holding Department of Defense in civil contempt for violating court order to videotape examination of Guantanamo detainee).

## II. Defendants' Expulsion of Newly Arrived Unaccompanied Children from Noncontiguous Countries is Substantively Unlawful

Not only does Defendants' conduct violate this Court's injunction, but the government's new process for coercing unaccompanied children from noncontiguous countries to purportedly accept expedited "voluntary" return is substantively unlawful.

By enacting the TVPRA, Congress created robust procedures to ensure the safety and protection of unaccompanied children as they face a complex, foreign legal regime. 8 U.S.C. § 1232. Those procedures require that, absent "exceptional circumstances," children be transferred to ORR custody within 72 hours of entering CBP custody. *Id.* § 1232(b)(3). There is one exception: Certain unaccompanied children from Mexico and Canada who are determined to be at low risk of trafficking and who lack a credible fear of persecution may be promptly repatriated to their country of origin following certain special procedures, rather than placed in ORR custody. *Id.* § 1232(a)(2)(A)-(C). All other unaccompanied children must be placed in full removal proceedings and given access to counsel. *Id.* § 1232(a)(5)(D). Yet Defendants now claim the authority to "offer" expedited processes to *all* unaccompanied children, regardless of their countries of origin.

Defendants thus seek to persuade vulnerable children being held in windowless cells without their parents to relinquish their rights during the brief window before they reach the care of a non-law-enforcement agency (ORR) and before they can speak with an attorney. This defies the explicit requirements of federal law and undermines the carefully crafted protections for vulnerable unaccompanied children.

The government likely will claim, as it has elsewhere, that Congress recently authorized its conduct. *See* Ex. D at 1, ("The language in Section 100051(8) of the *One Big Beautiful Bill Act (OBB[B]A)* (Pub. L. 119-21) [2025] makes it permissible to allow certain UACs who are screened and determined to be eligible—including those from noncontiguous countries—the opportunity to withdraw their application for admission and voluntarily return to their country of origin, if they choose to do so."). This argument is specious. Although Congress appropriated funds for "removal operations for specified unaccompanied alien children," "permitting a specified unaccompanied alien child to withdraw" their application under 8 U.S.C. § 1225(a)(4), Pub. L. No. 119-21, § 100051(8), 139 Stat. 72, 386 (2025), nothing in this allocation of funding suggests any congressional intent to override the robust and longstanding protections codified in the TVPRA. On the contrary, the better, consistent reading is that this legislation funds activities that substantive law already authorizes, such as the TVPRA's contiguous-country returns, rather than activities that were expressly prohibited by preexisting substantive law.

This Court already has rejected the contention "that this provision [of the OBBBA] overrides the TVPRA's protections keyed to removal" because Defendants "have not overcome the 'very strong presumption' that 'appropriation acts' do not 'substantively change existing law.'" PI Op. at 33 n.9 (citing *Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000)). As the Supreme Court has made clear, a repeal by implication of substantive law is so strongly disfavored

14

that it will only be found where two statutes cannot be reconciled. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190-91 (1978). And that "policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act" which "have the limited and specific purpose of providing funds for authorized programs"; when voting on such measures, "legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden."[9] *Id.* at 191. The upshot is that the grant of funding in the OBBBA provides no authority for CBP to ignore the TVPRA's protections and return unaccompanied children from noncontiguous countries without first transferring them to ORR custody and placing them in removal proceedings. And it certainly provides no justification for Defendants to flout the plain text of this Court's injunction.[10]

## CONCLUSION

Plaintiffs respectfully request that the Court issue an order to show cause why Defendants should not be held in civil contempt for a pattern of repeatedly and openly violating this Court's unambiguous preliminary injunction.

---

[9] Not only is OBBBA an appropriations law, but it passed through budget reconciliation, which "may be used only for provisions that are predominantly budgetary in nature, not for provisions that would result in substantial policy changes." *See* Br. of Members of Congress as *Amici Curiae* in Supp. of Pls.'-Appellees and Affirmance at 1, *Flores v. Bondi*, No. 25-6308 (9th Cir. Jan. 28, 2026), https://perma.cc/7C69-TTWK.

[10] Plaintiffs respectfully suggest the Court consider ruling on their fully briefed motion to modify the class definition to protect children from other nationalities, *see* ECF Nos. 65, 69, 70, in conjunction with this motion to show cause, so that going forward Defendants' unlawful actions may be halted as to all unaccompanied children protected by the TVPRA, not only Guatemalan children.

Dated: February 24, 2026                    Respectfully submitted,

/s/Joseph W. Mead
Joseph W. Mead (D.C. Bar No. 1740771)
Kate Talmor (D.C. Bar No. 90036191)
Rupa Bhattacharyya (D.C. Bar No. 1631262)
Mary B. McCord (D.C. Bar. No. 427563)
Tinesha Zandamela (D.C. Bar No. 90035492)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Tel: (202) 662-9765
Fax: (202) 661-6730
jm3468@georgetown.edu
rb1796@georgetown.edu
mbm7@georgetown.edu
kt894@georgetown.edu
tcz7@georgetown.edu

Efrén Olivares (D.D.C. Bar No. TX0107)
Lynn Damiano Pearson (D.D.C. Bar No. GA0057)
Kevin Siegel*
Hilda Bonilla (D.C. Bar No. 90023968)
Elizabeth Choo**
NATIONAL IMMIGRATION LAW CENTER
1101 14th Street, Suite 410
Washington, D.C. 20005
Tel: (213) 639-3900
Fax: (213) 639-3911
olivares@nilc.org
damianopearson@nilc.org
siegel@nilc.org
bonilla@nilc.org
choo@nilc.org

Rebecca Wolozin (D.C. Bar No. 144369)
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
Tel: (202) 868-4792
bwolozin@youthlaw.org

Mishan Wroe*
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, California 94612
Tel: (510) 835-8098
mwroe@youthlaw.org

*Counsel for Plaintiffs*
*\*Admitted Pro Hac Vice*
*\*\*Pending Admission*