# EXHIBIT E

## SUPPLEMENTAL DECLARATION OF LAUREN FISHER FLORES

I, Lauren Fisher Flores, pursuant to 28 U.S.C. § 1746, declare:

1. I am the Legal Director of the South Texas Pro Bono Asylum Representation Project (ProBAR), a project of the American Bar Association (ABA). I submit this declaration to supplement my previous declarations in this matter, *see* ECF 2-2 at 31-32; ECF 20-3, and to update the Court on information my organization has gathered in recent months. As outlined in my previous declarations, ProBAR provides legal services at 20 shelters for unaccompanied children in the Rio Grande Valley and Corpus Christi regions (one facility has recently closed). Over the past several months, our legal services at these facilities have included providing updates to detained children on the protections afforded by the Court's preliminary injunction.

2. I have dedicated my career to working with children at the intersection of immigration law and child welfare. I make this declaration based on personal knowledge and information made known to me in the course of my professional experience, and I make this declaration in my personal capacity and not on behalf of ProBAR or the ABA.

3. ProBAR attorneys represent two of the named Plaintiffs in this action and approximately 200 *LGML* class members. ProBAR attorneys also represent detained unaccompanied children from other countries including Honduras, Nicaragua, and El Salvador.

4. Under normal circumstances and pursuant to the TVPRA and the Flores Settlement, when a child from a non-contiguous country enters the United States without a parent or legal guardian, CBP designates the child an "unaccompanied alien child," issues a Notice to Appear (NTA), and transfers the child to an ORR shelter facility within 72 hours. Then ProBAR staff meet with the child within 10 days, provide the child information about their legal rights, review the child's immigration documents, and conduct an intake screening.

5. In early August of 2025, I started to hear from credible sources about a pilot program to use several of the ORR shelters in the Rio Grande Valley as a staging ground for removals of unaccompanied children from non-contiguous countries who had accepted a form of expedited "voluntary return" while temporarily in CBP custody, before being transferred to ORR custody. The designated shelters included four where ProBAR serves as Legal Service Provider: Compass Connections Henderson, Compass Connections Cameron, Grace House, and New Hope LSSSS. If children accepted this new form of expedited "voluntary return" and CBP could not repatriate the children within 72 hours (the maximum time children may remain in CBP custody), CBP would hold the children in one of the four designated ORR facilities until they could be repatriated.

6. The first week of August, ProBAR identified two children at the above-referenced ORR shelters that purportedly had signed "voluntary return" paperwork with CBP. One child

was from Honduras, and he was repatriated within a few days. Another child was from Guatemala. This child was asked his age and then told to sign paperwork for his "voluntary return." The child said the officer told him to sign twice, never explained the form or what he was agreeing to by signing it, never told him what would happen if he did or did not sign, and never told him he could enter legal proceedings seeking to stay in the U.S. The child signed the documents, though he said if he had known he could see a judge, he would not have signed anything. The child expressed fear about returning to Guatemala and, with the assistance of ProBAR counsel, ultimately withdrew his purported agreement to return and filed an asylum application.

7. I have reviewed CBP paperwork for many of the children arriving at the above-referenced ORR shelters in recent months. During that review, I have seen notations in the Form I-213 Record of Deportable/Inadmissible Alien form that refer to the child accepting "voluntary return" and the box on the I-770 form checked "the subject admitted deportability and requested to return to his/her country voluntarily, without a hearing." The children do not have Notice to Appear (NTA) documents. In cases where ProBAR attorneys intervened, staff successfully advocated with ICE deportation officers to NTA the child so that they could be placed in TVPRA removal proceedings with an immigration judge.

8. Over recent months, newly arrived unaccompanied minors have reported that federal immigration agents pressured them to waive their rights under the TVPRA, to abandon any claims for immigration relief they may have, and instead to accept expedited "voluntary return" from the United States.

9. For example, in early August, ProBAR provided initial services to a child from a non-contiguous country who completed this "voluntary return" interview with CBP. The child reported that he had been handcuffed and interviewed by seven federal immigration officers without a parent or legal counsel present. According to the child, he noticed one of the written answers to a question was not what he had responded, and when asked why it was changed, the officer responded, "I don't care." When the child said he was scared to return home due to violence, the officer replied, "There is also violence and dangers here in the United States." The child described feeling scared and pressured by the officers. The child said that he was told to sign a document for his "voluntary return" without any explanation of what it was, what it meant, or the consequences of signing. Once the paperwork was complete, the child witnessed the officers celebrating. As with other children described here, my staff only learned of this encounter because CBP was unable to effectuate his return within 72 hours, so the child was transferred to ORR custody to await his removal.

10. ProBAR has since identified a total of 13 children who signed purported "voluntary return" paperwork. Children reported CBP officers behaving aggressively—shouting,

insulting, cursing, grabbing, threatening, and handcuffing children. Children reported being scared and confused. Eight of the children are from Guatemala, though others are from Honduras, Ecuador, and Nicaragua.

11. An indigenous Guatemalan boy at Compass Connections Harlingen told me his father is disabled and his parents cannot protect and support him. CBP agents detained him around October 14, 2025. According to the child, CBP agents shouted, cursed, and threatened the child with a dog and a stun gun. A CBP agent told him he could accept a "voluntary return" or he could remain detained for an extended period of time. The child asked if he could speak with his family before he decided, but the officer refused. The child signed the paperwork. However, an officer then told him he was being sent to a shelter. The child believes his prayers were answered.

12. Another indigenous boy from Guatemala spoke Kiche as his primary language. CBP detained him around September 15, 2025. He was not provided an interpreter. He did not understand the paperwork. According to the child, he was told that if he did not sign, he would be detained for a long time. He signed the "voluntary return" paperwork. With ProBAR's assistance, he was able to revoke it and is now in court proceedings.

13. A Honduran child from Upbring New Hope, also detained by CBP around September 15, 2025, told ProBAR that she had been abandoned by her mother and was unsafe in Honduras. CBP agents detained her after a van crash that left her bleeding from her head and legs. According to the child, the agents denied her appropriate medical care and yelled at her. CBP agents told her she had two choices: go back to her country or go to a detention facility until she was 18 and then be deported to her country anyway. Agents told her to sign a document. She did not understand the paperwork but signed anyway. With ProBAR's assistance, she revoked the purported withdrawal of admission.

14. ProBAR is not allowed access to children while they are in CBP custody. Therefore, ProBAR staff only see the children with "voluntary return" documentation after they are transferred to ORR custody. Of the 13 children whom ProBAR screened as needing immediate representation to halt their repatriation, it appeared that CBP was unable to repatriate them within 72 hours, and thus the children were awaiting a "voluntary return" flight while in ORR custody. If children from non-contiguous countries are repatriated directly from the CBP station after signing purported "voluntary return" paperwork, ProBAR staff have no access to them to provide legal services and screenings.

15. On September 30th, I received a call from a representative at the Honduran consulate. The representative told me that consular staff had met with a pregnant Honduran teen in CBP custody because CBP had requested travel documents for the child's repatriation. The representative said that the child did not want to return to Honduras but that CBP had told her they would arrest her undocumented parents living in the U.S. if she did not sign the "voluntary return" paperwork. The representative asked me for information about the

protections available to unaccompanied children, and I explained the TVPRA and its protections for such children, including the right to a hearing with an immigration judge and the right to be released to a sponsor in the community.

16. In my professional opinion, having worked with children for 20 years, the conditions of detention in CBP custody create a fearful environment for children, and a child cannot make an informed and willing decision about their future while detained in jail-like conditions, feeling the pressure of serious consequences by law enforcement agents. Based upon the information available to me, it is my professional opinion that CBP is using intimidation tactics like prolonged detention in jail-like settings and arrest of family members to coerce children from noncontiguous countries into waiving their rights under the TVPRA and purportedly agreeing to accept "voluntary return" without receiving any process or a hearing with an immigration judge. These practices are, as far as I am aware, new, and appear to be an attempt by CBP to evade the protections children receive under the TVPRA.

| _____ | 2/20/2026 |
| Signature | Date |