**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.G.M.L., *et al.*,<br><br>      *Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, *et al.*,<br><br>      *Defendants*. | Case No.: 25-cv-2942-TJK |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE**

Plaintiffs' Motion for an Order to Show Cause, ECF No. 74, included evidence that Defendants are using a new, inherently coercive process to entice newly encountered unaccompanied children from noncontiguous countries to relinquish their statutory rights and sign paperwork purporting to accept "voluntary return" to their home countries—and that, in at least eight instances, this process has been applied to Guatemalan children. But for the swift intervention of legal services providers on these children's behalf, it is likely that some or all of them would have been deported in violation of this Court's preliminary injunction. Defendants' response mischaracterizes Plaintiffs' evidence and arguments and relies exclusively on two threadbare, nearly carbon-copy declarations that raise additional questions and fail to demonstrate any serious attempt to ensure that violations of this Court's injunction are not occurring. Plaintiffs' motion for an order to show cause should be granted.

1.    *Defendants misconstrue the relief Plaintiffs seek*

At the outset, Plaintiffs clarify what their motion does *not* seek. At this stage, "[P]laintiffs seek only an Order that [D]efendant[s] show cause why [they] should not be held in contempt," rather than an ultimate finding of contempt.  Plaintiffs thus are not required to meet the "clear and convincing evidence" standard; rather, it is sufficient to give "the Court … some indication that sufficient evidence exists that the Court *might* find" Defendants in contempt. *Stewart v. O'Neill*, 225 F. Supp. 2d 6, 10 (D.D.C. 2002). Plaintiffs also have not asked the Court to make specific findings of past violations or to order sanctions or corrective action as to the eight Guatemalan children described in Ms. Fisher Flores's declaration, ECF No. 74-5. Plaintiffs' motion instead seeks only to curb continuing violations as to class members.

Defendants make much of Plaintiffs declining to identify the specific Guatemalan children that the government attempted, but failed, to expel through the withdrawal-of-admission process. *See* ECF No. 75, Defs.' Opp'n to Mot. to Show Cause ("Opp."), at 6-7, 10. But in each of these cases, a legal service provider was able to remedy the violation by assisting the child in revoking their voluntary return paperwork and in initiating removal proceedings pursuant to the TVPRA. Plaintiffs were under no obligation to divulge their identities and risk any further mistreatment or intimidation of vulnerable children who are not named Plaintiffs and who still are proceeding both before and against Defendants in sensitive removal proceedings with profound stakes for their safety and wellbeing. Plaintiffs submitted the declarations of Ms. Fisher Flores and D.A.T.M., *see* ECF Nos. 74-5, 74-6, to demonstrate that—in at least some instances—the government is using its new Processing Advisal in an attempt to expel Guatemalan children. As explained further below, Defendants have failed to rebut that sworn testimony.

Likewise, Plaintiffs' motion neither "pretend[s] the Court's existing orders cover UACs from countries other than Guatemala" nor "suggest[s] that permitting non-Guatemalan UACs to withdraw their applications for admission and depart the country voluntarily could be a basis for a contempt finding." Opp. at 7 (providing no citation to support these characterizations). On the contrary, Plaintiffs' motion is clear in arguing that Defendants' actions "violate the Court's preliminary injunction *as applied to newly arrived Guatemalan children* and violate the TVPRA as applied to newly arrived children from all noncontiguous countries." Mot. at 2 (emphasis added) (footnote omitted). That is not an attempt to expand the injunction to cover additional conduct through the vehicle of a show-cause motion. *Contra* Opp. at 10. Plaintiffs' footnote "respectfully suggest[ing] the Court consider ruling on their fully briefed motion to modify the class definition to protect children from other nationalities … so that going forward Defendants' unlawful actions may be halted as to all unaccompanied children protected by the TVPRA," Mot. at 15 n.10, requested a ruling on an entirely different, fully briefed motion. That request was neither improper nor an effort to enforce the Court's current injunction as to non-Guatemalan children, but rather was a pragmatic recognition of the government's ability to exploit the current class definition to take unlawful action harming non-Guatemalan children. *See* ECF No. 49 at 24, Op. Granting Prelim. Inj., (noting that "the Court does not foreclose expanding the class later if developments warrant that adjustment"). Indeed, the government has openly admitted that it is applying this practice to other noncontiguous children. ECF Nos. 74-3, 74-4.

Defendants seek to cabin Plaintiffs' claims to "contest[ing] the government's authority under Title 6 to reunify children with their parents abroad," Opp. at 7, and argue that their unlawful attempts to expel noncontiguous-country children through "voluntary return" concerns "distinct arguments about a distinct statutory authority," *id.* But neither Plaintiffs' original nor amended

complaint was directed at Defendants' purported Title 6 "reunification" authority; rather, Plaintiffs consistently have challenged Defendants' attempt to summarily expel unaccompanied children without affording the legal protections provided by the TVPRA. *See, e.g.*, ECF No. 64, Am. Compl. ¶¶ 2-7. Likewise, the language of the Court's injunction did not turn on Defendants' purported Title 6 authority. ECF No. 48, Order. Defendants' newly devised Processing Advisal, which affirmatively seeks to persuade vulnerable children to relinquish their statutory rights, plainly is a continuation of *that* course of conduct and the legality of expulsions pursuant to that process are properly part of this case.

2.   *Defendants ignore Plaintiffs' evidence and fail to provide credible evidence that they are complying with the injunction*

Turning to substance, Defendants' response reflects no serious attempt to demonstrate compliance with the Court's injunction. The government disparages Plaintiffs' motion as "a cynical misuse of the contempt mechanism" that attempts to "gin [] up" a violation of the injunction without "a scintilla of evidence" in support. Opp. at 1, 11. That disingenuous portrayal is belied by the sworn testimony in support of the motion, which evidences that attorneys with a South Texas legal services provider have encountered *eight* Guatemalan children who signed purported "voluntary return" paperwork and "need[ed] immediate representation to halt their repatriation," ECF No. 74-5 ¶ 10, 11, 12, 14, plus a declaration from a class member describing serious mistreatment at the hands of CBP officers who coerced him to sign such paperwork, ECF No. 74-6. That evidence demonstrates that Defendants continue their efforts to expel unaccompanied children without affording them the protections codified in the TVPRA; as to Guatemalan children, those efforts violate the Court's injunction.

Defendants simply shrug off this testimony, claiming no harm, no foul: "Plaintiffs' own account describes a situation in which the UACs remained in the United States and were placed into removal proceedings, which is not a violation … [n]othing in the Court's order suggests that permitting a Guatemalan UAC to request withdrawal of application is itself impermissible, so long as the child is not actually … removed." Opp. at 6. In other words, Defendants claim that, crediting all of Plaintiffs' testimony as true, they committed no violation because the children's attorneys revoked paperwork purporting to "voluntarily" request return to Guatemala in the nick of time before Defendants effectuated their expulsion. Defendants elide the truth of what happened here: These children did not "indicat[e] a desire to voluntarily return to" Guatemala, and the government did not merely "permit[] a Guatemalan UAC to request withdrawal of" admission, *contra id.* Rather, the government coerced frightened children to sign such paperwork while in CBP custody, sought to expel them in violation of this Court's injunction, and—it is fair to infer—would have succeeded but for the swift intervention of legal counsel once the children were transferred to ORR. Completion of an unlawful expulsion is not required to show that the government took actions to violate the injunction. And because attorneys do not have access to children while in CBP custody, Plaintiffs have no way to determine whether the government has expelled Guatemalan children in violation of this Court's order. ECF No. 74-5 ¶ 14. Defendants' dismissal of these facts as mere "disagreement with the manner in which certain immigration processing procedures are explained to children," Opp. at 9, ignores the seriousness of the conduct at issue.[1]

---

[1] Ms. Fisher Flores's declaration explains that the children who arrived at ORR shelters with the Processing Advisal and other paperwork purporting to accept voluntary return did not have Notices to Appear, prompting her staff to "successfully advocate[] with ICE deportation officers" to place the children in immigration proceedings. ECF 74-5 ¶ 7. Defendants' practice plainly violates the TVPRA, which requires that "[a]ny unaccompanied alien child sought to be removed by the Department of Homeland Security, except for" contiguous-country children subject to certain

In fact, neither Defendants' filing nor the declarations supporting it include any assertion that the government sought to ascertain whether any newly encountered Guatemalan unaccompanied children signed paperwork purporting to voluntarily return to their country, or whether CBP, ICE, or ORR have records of legal services providers moving to revoke such paperwork after any child was transferred to ORR. As explained above, it is true that undersigned counsel declined to identify individual children to protect their safety and wellbeing—but that does not prevent the government from investigating facts related to its own compliance. In light of the testimony submitted by Plaintiffs, it was incumbent on the government to determine promptly whether these or similar events have occurred anywhere in the country since the Court's preliminary injunction issued, take corrective actions if substantiated, and document for the Court any steps taken to ensure compliance. Defendants do not claim to have taken any of these steps.

On the contrary, rather than addressing in any meaningful detail the steps (if any) Defendants have taken to implement the Court's injunction and to ensure that violations are not occurring, Defendants' opposition relies entirely on two short, nearly cookie-cutter declarations that raise more questions than they answer. *See* ECF No. 75-1, Bakopoulos Decl.; ECF No. 75-2, Julien Decl. Both declarations contain materially identical assertions that the declarant "instructed the field that [their component] should not process any Guatemalan UAC for withdrawal" to Guatemala, ECF No. 75-2 ¶ 3; *see also* ECF No. 75-1 ¶ 3. But this is woefully insufficient to

---

exceptions, "shall be—(i) placed in removal proceedings under section 240 of the" INA. 8 U.S.C. § 1232(a)(5)(D). And although undersigned counsel cannot verify whether, and if so how many, Guatemalan children have been expelled without transfer to ORR or seeing an attorney, as to the eight for whom legal services providers were able to withdraw their purported acceptance of "voluntary" return and forestall their expulsion, Defendants arguably violated the preliminary injunction without effectuating removal because the advisal itself is an initial step taken to "facilitat[e] the transport" of class members from the United States. *See* ECF No. 48.

counter Plaintiffs' sworn testimony about events occurring on the ground—regardless of any instruction to "the field." Neither declaration explains the parameters of this supposed instruction; how, when, and to whom it was conveyed; or whether the agency has taken any steps to ensure compliance. Neither declarant even asserts that s/he sought to confirm how this "instruct[ion]" has been implemented by officers in the field, or whether sporadic (or systemic) violations have occurred, in response to Plaintiffs' show-cause motion.

Nor does either declaration claim that CBP has taken *any* steps, since Plaintiffs' motion, to determine whether the Processing Advisal has been given to Guatemalan children. Neither declaration specifies whether the supposed field instruction discussed above, telling officers not to "process" Guatemalan children for expulsion (¶ 3 in each declaration), specifically instructed officers not to provide the Processing Advisal to Guatemalan children. Indeed, the declarations do not even acknowledge that the Processing Advisal—and the expedited expulsion it facilitates for noncontiguous-country children—is a CBP program, nor do they explain how it is being implemented. That omission is striking because CBP has repeatedly publicly acknowledged that it *is* expelling children through this process. *See* ECF 74-4 (Scott letter). In fact, the declarations omit any information on procedures that are currently being applied to unaccompanied children of any nationality, instead skipping to a threadbare response to Plaintiffs' evidence, and fail to address why Guatemalan children arrived at ORR shelters without a Notice to Appear placing them in immigration proceedings. These omissions raise obvious questions as to whether Defendants have taken any steps, much less sufficient steps, to ensure that class members are not subject to the coercive Processing Advisal and expulsion through "voluntary" return.

Even the key sentences purporting to address removal of Guatemalan children fall far short of rebutting Plaintiffs' evidence. Although both declarations claim that CBP's systems of record do

not reflect the expulsion of unaccompanied Guatemalan children by the declarant's component, neither declaration is supported by the underlying data on which these assertions are based or explains what information CBP's systems of record includes, making the declarants' assertions largely meaningless.

For example, Ms. Bakopoulos states, in full, that "CBP's systems of record show that from January 20, 2025, to February 20, 2026, there were no Guatemalan UACs processed as Returned Foreign by OFO (i.e., there were no Guatemalan UACs returned to Guatemala by OFO)." ECF No. 75-1 ¶ 4. This bare assertion does not explain the underlying information or methodology used to come to that conclusion; for example, it does not state what information is captured in "CBP's systems of record" or how that data would (or would not) reflect Defendants' new process for swiftly expelling noncontiguous-country unaccompanied children. Nor does Ms. Bakopoulos provide any actual data or data parameters to support the reliability of this assertion—*i.e.*, anything to establish that children who are expelled through "voluntary return" *would* show as "processed as Returned Foreign by OFO."

And there is strong reason to doubt that CBP's unexplained "systems of record" *would* capture Guatemalan children expelled through "voluntary return." CBP Commissioner Scott's letter to Congress acknowledged that "voluntary returns to noncontiguous countries" are handled by ICE—*not* by CBP—and that, depending "on the timing of the next available flight" to a child's home country, they "may be transferred to … ORR" to await an ICE flight. ECF No. 74-4. Similarly, DHS Secretary Noem recently wrote to Congress that, "[d]epending on the timing of the next available flight for an unaccompanied alien child's repatriation to a non-contiguous country, the child may be *transferred* to [ICE's] Enforcement and Removal Operations or to … [ORR]." Ex. A (emphasis added).

Indeed, Claire Trickler-McNulty, an attorney with more than twelve years' experience serving in multiple high-level positions in DHS and its subcomponents, avers that "CBP's systems of records data about unaccompanied children is limited to CBP's unique interaction with the unaccompanied children in its custody." *See* Ex. B, Trickler-McNulty Decl. ¶ 8. "Historically, CBP did not itself return children to any non-contiguous countries" but instead transferred custody to ICE to carry out removals or transfers to ORR. *Id.* In her experience, "[t]his transfer to ICE was reflected in CBP's book-out information," so "it is unlikely that noncontiguous-country unaccompanied minors would be coded as 'Returned Foreign by OFO' in CBP's systems of record." *Id.* ¶¶ 8-9. Instead, "unaccompanied minors removed through 'voluntary return' would possibly be reflected as a transfer to ICE ERO in CBP's systems of record." *Id.* ¶ 9. Ms. Bakopoulos's declaration, which provides no explanation for why violations of the injunction *would* be captured in the manner described, does not support Defendants' argument that their declarations establish that "the number of Guatemalan UACs who have been permitted to leave the United States via withdrawal of application for admission [is] [z]ero," Opp. at 5.

Mr. Julien's declaration falls short for the same reasons. Its relevant assertion states, in full, that "[a]s of February 20, 2026, CBP's systems of record show that USBP has not booked out any Guatemalan UACs for withdrawal/voluntary return to Guatemala since September 18, 2025." ECF No. 75-2 ¶ 4. Mr. Julien provides no assertion that children transferred to ICE to be placed on removal flights, or transferred to a designated ORR shelter with "voluntary return" paperwork signed to await placement on an ICE flight, would be captured as "booked out … for withdrawal/voluntary return to Guatemala" in CBP's system. Nor does the declaration address whether children expelled through this process to, for example, Honduras, Nicaragua, or any other noncontiguous country are reflected in CBP's systems in this manner as a point of comparison.

These omissions may be for good reason; Ms. Trickler-McNulty explains that "it is unlikely that noncontiguous country unaccompanied minors who accept 'voluntary return' while in USBP custody would show as 'booked out … for withdrawal/voluntary return' to their home countries … because the children would first be transferred to ICE's Enforcement and Removal Operations before going to ORR or being placed on a flight to their home countries." Ex. B. ¶ 10. This evidence plainly does not—as Defendants claim—demonstrate that they "have unquestionably complied with" the injunction, Opp. at 2.

Defendants' reliance on data pulled solely from CBP's systems of record is inexplicable given their access to comprehensive data that would provide the Court with information needed to confirm compliance. Ms. Trickler-McNulty explains that, "[i]n 2019, the federal government launched the Unified Immigration Portal (UIP), a multi-agency system that combines data from DHS, ICE, CBP, USCIS, Health and Human Services (HHS), including ORR, and the Department of Justice," and that system "allows agencies to track individuals throughout the immigration system, including their apprehension, custody, transfer between agencies, and disposition of individual cases." Ex. B ¶ 5. Using that global dataset, "DHS could track unaccompanied minors, including Guatemalan unaccompanied minors specifically, that have been encountered by CBP since entry of the Court's injunction and verify each individual's movement through the system as well as the disposition or current status of individual cases." *Id.* ¶ 7. Ms. Trickler-McNulty explains that, based on her extensive experience, she "do[es] not believe CBP's systems of record alone would provide reliable and complete information regarding whether Defendants have removed unaccompanied minors to Guatemala without final orders of removal or voluntary departure since entry of the Court's injunction, but that data *is* available to Defendants through also looking at ICE and ORR systems and likely through UIP." *Id.* ¶ 11.

\*      \*      \*

At bottom, the government makes no serious attempt to address Plaintiffs' testimony that legal services providers repeatedly have intervened to thwart Defendants' attempt to expel Guatemalan class members in violation of the injunction and instead rests on the charge that Plaintiffs have failed to prove "that *any* Guatemalan UAC has left the United States in violation of the preliminary injunction." Opp. at 4. This response disingenuously ignores evidence that Defendants' attempts to expel eight Guatemalan children raise a substantial inference that other Guatemalan children may have been expelled in violation of the preliminary injunction before a legal services provider could intervene.  Plaintiffs respectfully contend that this evidence provides a sufficient "prima facie showing that [Defendants] did not comply with the Court's orders," meaning that "the burden shifts to [Defendants] to produce evidence justifying [their] noncompliance," *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000), and an order to show cause should issue.

In the alternative, if the Court finds that additional information is needed to determine whether a show-cause order should issue, it should not allow Defendants to hide behind the serious information asymmetry present in this case while Guatemalan children may still be subject to the government's attempts to coerce them into relinquishing their statutory rights. As Ms. Fisher Flores explains, the fact that attorneys lack access to children in CBP custody means that neither her organization, nor class counsel in this matter, have any method to detect whether the government is succeeding in expelling class members within the 72-hour period before they must be transferred to ORR custody. ECF No. 74-5 ¶ 14. Given the serious deficiencies in Defendants' response, the Court may wish to consider allowing Plaintiffs to call Ms. Bakopoulos and Mr. Julien to testify at a hearing on Plaintiffs' motion regarding the assertions in their declarations and related facts about

11

Defendants' efforts to ensure compliance. In the alternative, the Court may consider authorizing

limited discovery into Defendants' compliance, including evidence that would be available through

the UIP, to determine the steps taken to implement the Court's order and facts regarding

Defendants' use of the Processing Advisal with class members.

**CONCLUSION**

Plaintiffs respectfully request that the Court issue an order to show cause why Defendants

should not be held in civil contempt for violating this Court's unambiguous preliminary injunction.

Dated: March 17, 2026                    Respectfully submitted,

/s/  *Kate Talmor*
Kate Talmor (D.C. Bar No. 90036191)
Rupa Bhattacharyya (D.C. Bar No. 1631262)
Mary B. McCord (D.C. Bar. No. 427563)
Joseph W. Mead (D.C. Bar No. 1740771)
Tinesha Zandamela (D.C. Bar No. 90035492)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Tel: (202) 662-9765
Fax: (202) 661-6730
kt894@georgetown.edu
rb1796@georgetown.edu
mbm7@georgetown.edu
jm3468@georgetown.edu
tcz7@georgetown.edu


Efrén Olivares (D.D.C. Bar No. TX0107)
Lynn Damiano Pearson (D.D.C. Bar No. GA0057)
Kevin Siegel*
Hilda Bonilla (D.C. Bar No. 90023968)
Elizabeth Choo (D.C. Bar No. 90043356)
NATIONAL IMMIGRATION LAW CENTER

12

1101 14th Street, Suite 410
Washington, D.C. 20005
Tel: (213) 639-3900
Fax: (213) 639-3911
olivares@nilc.org
damianopearson@nilc.org
siegel@nilc.org
bonilla@nilc.org
choo@nilc.org

Rebecca Wolozin (D.C. Bar No. 144369)
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
Tel: (202) 868-4792
bwolozin@youthlaw.org


Mishan Wroe*
NATIONAL CENTER FOR YOUTH LAW
428 13th Street, Floor 5
Oakland, California 94612
Tel: (510) 835-8098
mwroe@youthlaw.org

  *Counsel for Plaintiffs*
*Admitted Pro Hac Vice*